# In the United States Court of Appeals for the Eleventh Circuit

PROPERTIES OF THE VILLAGES, INC.,

*Plaintiff-Appellee,*

v.

FEDERAL TRADE COMMISSION,

*Defendant-Appellant.*

*On Appeal from the United States District Court
for the Middle District of Florida*

## BRIEF OF CONSTITUTIONAL ACCOUNTABILITY CENTER AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT

Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Margaret Hassel*
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

* Not admitted in D.C.; supervised
by principals of the firm

*Counsel for Amicus Curiae*

Case No. 24-13102, *Properties of the Villages, Inc. v. FTC*

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

I also hereby certify that I am aware of no persons or entities, in addition to those listed in the party and *amicus* briefs filed in this case, that have a financial interest in the outcome of this litigation. Further, I am aware of no persons with any interest in the outcome of this litigation other than the signatory to this brief and its counsel, and those identified in the party and *amicus* briefs filed in this case.

Dated: November 8, 2024

*/s/ Brianne J. Gorod*
Brianne J. Gorod

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................. ii

INTEREST OF *AMICUS CURIAE* ................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ................................................................................ 6

I.  The Major Questions Doctrine Is Reserved For "Extraordinary" Cases Involving Breathtaking New Claims of Power that Congress Did Not Likely Intend .......................................................... 6

II.  The FTC's Noncompete Clause Rule Does Not Trigger the Major Questions Doctrine ................................................................ 10

    A.  Transformative Expansion Beyond Congressional Intent ........ 11

    B.  Economic and Political Significance ................................. 20

III.  Stretching the Major Questions Doctrine Beyond the Most Extraordinary Cases Would Undermine Statutory Interpretation and Constitutional Principles .................................................. 23

    A.  Textualism ................................................................ 23

    B.  Original Meaning ........................................................ 25

    C.  Separation of Powers ................................................... 28

CONCLUSION ............................................................................ 30

**Page(s)**

<u>CASES</u>

*Ala. Ass'n of Realtors v. HHS*,
 594 U.S. 758 (2021) ...................................................................... 3, 8, 15, 20-22

*ATS Tree Servs., LLC v. FTC*,
 No. 24-1743, 2024 WL 3511630 (E.D. Pa. July 23, 2024) ................ 15

*Biden v. Missouri*,
 595 U.S. 87 (2022) ...................................................................... 7, 15, 18, 21, 24

*Biden v. Nebraska*,
 600 U.S. 477 (2023) ...................................... 2-4, 6, 8-10, 12, 20, 22, 24, 25, 28

*Bostock v. Clayton County*,
 590 U.S. 644 (2020) ................................................................................. 23, 24

*Bradford v. Dep't of Lab.*,
 101 F.4th 707 (10th Cir. 2024) ................................................................... 11

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
 601 U.S. 416 (2024) ................................................................................. 27

*E.I. du Pont de Nemours & Co. v. FTC*,
 729 F.2d 128 (2d Cir. 1984) ...................................................................... 14

*FDA v. Brown & Williamson Tobacco Corp.*,
 529 U.S. 120 (2000) ...................................... 2, 8, 15, 16, 19, 21, 22

*Gamble v. United States*,
 587 U.S. 678 (2019) ................................................................................. 24

*Gonzales v. Oregon*,
 546 U.S. 243 (2006) ................................................................................. 18

*Gregory v. Ashcroft*,
 501 U.S. 452 (1991) ................................................................................. 22

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
448 U.S. 607 (1980)................................................................ 9

*King v. Burwell*,
576 U.S. 473 (2015)............................................................ 18, 22

*Little Sisters of the Poor v. Pennsylvania*,
591 U.S. 657 (2020)................................................................ 24

*The Margaretta*,
16 F. Cas. 719 (C.C.D. Mass. 1815)...................................... 27

*Massachusetts v. EPA*,
549 U.S. 497 (2007)................................................................ 8

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
512 U.S. 218 (1994)............................................................... 17

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
595 U.S. 109 (2022).............................................. 8, 14, 19, 20, 22

*Nat'l Petrol. Refiners Ass'n v. FTC*,
482 F.2d 672 (D.C. Cir. 1973)........................................ 12, 13, 16

*Nebraska v. Su*,
--- F.4th ----, 2024 WL 4675411 (9th Cir. Nov. 5, 2024)................... 10

*New Prime Inc. v. Oliveira*,
586 U.S. 105 (2019)................................................................ 28

*NLRB v. SW Gen., Inc.*,
580 U.S. 288 (2017)................................................................ 15

*Pension Benefit Guar. Corp. v. LTV Corp.*,
496 U.S. 633 (1990)................................................................ 19

*Properties of the Villages, Inc. v. FTC*,
No. 24-316, 2024 WL 3870380 (M.D. Fla. Aug. 15, 2024) ............... 15, 17

*United States v. Craft*,
535 U.S. 274 (2002) ............................................................ 19

*United States v. JS & A Grp., Inc.*,
716 F.2d 451 (1983) ............................................................ 12

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ............................................... 2, 3, 8, 20-22

*West Virginia v. EPA*,
597 U.S. 697 (2022) .............................. 2-13, 15, 17, 18, 20, 22, 24, 25, 27-29

*Wis. Cent. Ltd. v. United States*,
585 U.S. 274 (2018) ............................................................ 23

*Yellen v. Confederated Tribes of Chehalis Rsrv.*,
594 U.S. 338 (2021) ............................................................ 19

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. I, § 1 ....................................................... 27

## STATUTES AND LEGISLATIVE MATERIALS

Act of Apr. 10, 1790, ch. 7, 1 Stat. 109 ................................. 27

Act of May 26, 1790, ch. 12, 1 Stat. 122 ................................ 27

Act of July 22, 1790, ch. 33, 1 Stat. 137 ............................... 26

Act of Aug. 4, 1790, ch. 34, 1 Stat. 138 ............................... 26

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

An Act to Create a Federal Trade Commission, Pub. L. No. 63-203, 38 Stat. 717 (1914) ............................................................... 21

51 Cong. Rec. 11,083 (1914) ................................................. 18

51 Cong. Rec. 11,084 (1914) ................................................. 14

H.R. 527, 118th Cong. (2002) ................................................ 19

H.R. 7917, 93d Cong., 2d Sess. (1974) ................................. 20

Pub. L. No. 89-92, 79 Stat. 282 (1965) ................................. 13

Pub. L. No. 93-637, 88 Stat. 2183 (1975) ............................. 20

5 U.S.C. § 801 ........................................................................ 29

5 U.S.C. § 804 ........................................................................ 29

15 U.S.C. § 45 .................................................................. 16, 17

15 U.S.C. § 46 .............................................................. 4, 15, 17

15 U.S.C. § 57a ...................................................................... 13

15 U.S.C. § 57b-3 .................................................................. 16

## EXECUTIVE BRANCH MATERIALS

Care Labeling of Textile Wearing Apparel, 36 Fed. Reg. 23,883 (Dec. 16, 1971) ............................................................................. 14

16 C.F.R. § 910.4 ................................................................... 22

31 Fed. Reg. 3,342 (Mar. 3, 1966) ........................................ 12

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

35 Fed. Reg. 4,614 (Mar. 17, 1970) .......................................... 12

Non-Compete Clause Rule, 89 Fed. Reg. 38,342 (May 7, 2024) ........... 18, 21

Posting of Minimum Octane Numbers on Gasoline Dispensing
    Pumps, 36 Fed. Reg. 23,871 (Dec. 16, 1971) ..................................... 14

## BOOKS, ARTICLES, AND OTHER AUTHORITIES

Kevin Arlyck, *Delegation, Administration, and Improvisation*, 96
    Notre Dame L. Rev. 243 (2021) .......................................... 26

Christine Kexel Chabot, *The Lost History of Delegation at the
    Founding*, 56 Ga. L. Rev. 81 (2021) .................................... 26

Lisa Heinzerling, *Nondelegation on Steroids*, 29 N.Y.U. Env't L.J.
    379 (2021) ..................................................................... 29

Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L.
    Rev. 2118 (2016) ............................................................. 28

Julian Davis Mortenson & Nicholas Bagley, *Delegation at the
    Founding*, 121 Colum. L. Rev. 277 (2021) ........................... 26

Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case
    Against Administrative Regulatory Power: New Evidence from the
    Federal Tax on Private Real Estate in the 1790s*, 130 Yale L.J.
    1288 (2021) ..................................................................... 27

Nathan Richardson, *Antideference: COVID, Climate, and the Rise of
    the Major Questions Canon*, 108 Va. L. Rev. Online 174 (2022) ...... 28

Antonin Scalia, *A Matter of Interpretation: Federal Courts and the
    Law* (1997) ..................................................................... 23

# TABLE OF AUTHORITIES – cont'd

**Page(s)**

Mila Sohoni, *The Major Questions Quartet*, 136 Harv. L. Rev. 262 (2022) ................................................................. 28

Chad Squitieri, *Major Problems with Major Questions*, Law & Liberty (Sept. 6, 2022) ...................................................... 29

## INTEREST OF *AMICUS CURIAE*[1]

Constitutional Accountability Center (CAC) is a think tank and public interest law firm dedicated to the progressive promise of the Constitution's text and history. CAC has studied the development and scope of the major questions doctrine, along with its implications for the separation of powers, and accordingly has an interest in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The major questions doctrine applies only in "extraordinary" cases, when agencies radically transform their authority by citing vague provisions to claim "breathtaking" new powers beyond their traditional roles and expertise. This is not a major questions case. The FTC was created to prevent unfair methods of competition nationwide. Its statute explicitly authorizes rulemaking to carry out that mandate, and the agency began issuing binding rules six decades ago. Congress responded by preserving, not withdrawing, that authority. And regulating noncompete agreements falls squarely within the FTC's expertise. For these reasons and others, applying the major questions doctrine to the Noncompete Clause Rule would defy precedent. It would also run roughshod over textualism, the original understanding of the Constitution, and the separation of powers.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than *amicus* or its counsel made a monetary contribution to the brief's preparation or submission. All parties have consented to the filing of this brief.

In a series of cases over recent years, the Supreme Court concluded that agencies were claiming enormous and surprising new authority despite indications that Congress did not mean to grant that authority. Taking stock of this case law, *West Virginia v. EPA* explicitly recognized a "major questions doctrine," explaining that "there are 'extraordinary cases' that call for a different approach" from "routine statutory interpretation." 597 U.S. 697, 721-24 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000)).

In these "extraordinary" cases, courts take an extraordinary approach. Rather than simply determining the original public meaning of a statute's text, courts instead weigh various factors outside of the text—including legislative history, contemporary political controversy, projected economic implications, and prior agency practice—to help decide whether a "major question" is implicated. If so, courts require "clear congressional authorization" for the agency's action. *Id.* at 723 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

The major questions doctrine thus differs sharply from "the ordinary tools of statutory interpretation." *Biden v. Nebraska*, 600 U.S. 477, 506 (2023). Accordingly, the Supreme Court has limited its application to "extraordinary" claims of authority, *id.* at 503, that amount to a "fundamental revision of the statute, changing it from [one sort of] scheme of ... regulation into an entirely different kind," *id.* at 502 (quoting *West Virginia*, 597 U.S. at 728).

The doctrine thus has two requirements.  First, an agency must claim "breathtaking" new powers, *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam), with "staggering" economic and political significance, *Nebraska*, 600 U.S. at 502.  Second, the agency's claim must represent a "transformative expansion in [its] regulatory authority," *West Virginia*, 597 U.S. at 724 (quoting *Util. Air*, 573 U.S. at 324), reaching "beyond what Congress could reasonably be understood to have granted," *id*.

The latter requirement is satisfied when agencies assert "unheralded" new power by twisting the "vague language" of "ancillary" provisions to "make a radical or fundamental change to a statutory scheme," particularly where the agency "has no comparative expertise" in the area it seeks to regulate and where Congress has "conspicuously and repeatedly" denied that same power to the agency.  *Id.* at 723-24, 748 (quotation marks omitted).  All told, the agency's action must transform the statute "from one sort of scheme of ... regulation into an entirely different kind."  *Id.* (brackets and quotation marks omitted).

Here, however, the FTC has not exploited an "obscure, never-used section of the law" to assert a new type of power outside its "comparative expertise."  *Id.* at 711, 729 (quotation marks omitted).  The Noncompete Clause Rule implements a core responsibility Congress assigned the agency—preventing methods of competition it determines to be unfair.  Relying on its authority "to make rules and

regulations for the purpose of carrying out" that mandate, 15 U.S.C. § 46(g), the FTC began issuing binding rules 60 years ago—including high-profile rules with significant national effects. Courts confirmed this authority, and Congress preserved it in subsequent amendments. The Rule thus reflects no "change to [the] statutory scheme," much less a "radical or fundamental change." *West Virginia*, 597 U.S. at 723 (quotation marks omitted).

Extending the major questions doctrine to cases like this would not only conflict with Supreme Court precedent but would also undermine textualism. Unlike "the ordinary tools of statutory interpretation," *Nebraska*, 600 U.S. at 506, the major questions doctrine emphasizes factors outside of a statute's text and structure, including the subjective expectations of the legislators who passed it and the practical ramifications of agency action. *See id.* at 500-07. Some of these factors require judges to venture beyond their expertise into non-legal evaluations of politics or economics, and many of these factors have no possible bearing on a statute's original public meaning. Precisely because the major questions doctrine is "distinct" from "routine statutory interpretation," *West Virginia*, 597 U.S. at 724, it is reserved for the most extraordinary cases, in which staggering new assertions of power—despite their "textual plausibility," *id.* at 722—are at odds with other evidence of congressional intent.

The major questions doctrine should also be applied sparingly because it is in tension with the original understanding of the Constitution. The doctrine presumes that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* at 723 (quotation marks omitted). But Congress has tasked the executive branch with resolving major policy decisions since the Founding, when it routinely granted the executive vast discretion over the nation's most pressing challenges. Nothing in the Constitution forecloses that choice, and history does not suggest that Congress must speak in any particularly clear manner to exercise it. On the contrary, the major questions doctrine is the modern innovation, originating more than two centuries after the Founding.

Finally, an overly permissive use of the major questions doctrine would erode critical limits on the judiciary's role. The doctrine aims to promote "separation of powers principles" by preventing agencies from exceeding Congress's "legislative intent." *Id.* at 723. But in the process, the doctrine constrains Congress too—blocking it from authorizing agency action whenever courts decide that a major question is implicated, unless Congress used language that courts deem sufficiently clear. The doctrine thus tells Congress how it must draft certain types of laws, based on new categories and concepts devised by the one branch of government not directly accountable to the people. This risk of

judicial aggrandizement is exacerbated by the subjective and political nature of some of the factors that implicate the doctrine.

These tensions make clear why the Supreme Court has confined the major questions doctrine to the most extraordinary cases, involving stark attempts to disregard an agency's limited mandate. When an agency claims stunning new powers that appear incongruous with the relevant statutory scheme, the history of its implementation, the agency's own expertise, and Congress's conspicuous withholding of such power from the agency, then "a practical understanding of legislative intent" may call for hesitation. *Id.* But when radical innovation of that sort is absent, artificially narrowing the meaning of a statute's text would undermine, not vindicate, Congress's authority.

## ARGUMENT

### I. The Major Questions Doctrine Is Reserved For "Extraordinary" Cases Involving Breathtaking New Claims of Power that Congress Did Not Likely Intend.

"[W]hile the major questions 'label' may be relatively recent, it refers to 'an identifiable body of law that has developed over a series of significant cases.'" *Nebraska*, 600 U.S. at 504-05 (quoting *West Virginia*, 597 U.S. at 724). Under those cases, a major question arises only when agencies make "a radical or fundamental change to a statutory scheme" by claiming "an unheralded power representing a transformative expansion in [their] regulatory authority." *West*

*Virginia*, 597 U.S. at 723-24 (quotation marks omitted). The issue is not whether agencies are asserting "highly consequential power," but rather whether they are asserting "highly consequential power *beyond what Congress could reasonably be understood to have granted*." *Id.* (emphasis added).

Two requirements must therefore be met. First, an agency's newly claimed power must reflect "a fundamental revision of the statute, changing it from [one sort of] scheme of ... regulation into an entirely different kind." *Id.* at 728 (quotation marks omitted). Second, the agency must be claiming an "[e]xtraordinary grant[] of regulatory authority" by asserting "extravagant statutory power over the national economy." *Id.* at 723-24.

Importantly, therefore, the economic and political significance of an agency action cannot alone trigger the major questions doctrine, so long as the action "fits neatly within the language of the statute" and aligns with the agency's role. *Biden v. Missouri*, 595 U.S. 87, 93-94 (2022) (per curiam). For example, the Court refused to apply the doctrine to a vaccination mandate that allegedly "put more than 10 million healthcare workers to the choice of their jobs or an irreversible medical treatment." *Id.* at 108 (Alito, J., dissenting). Despite its significant impact, the mandate was not "surprising" because "addressing infection problems in Medicare and Medicaid facilities is what [the HHS Secretary] does." *Id.* at 95 (majority opinion). Likewise, the Court found no major question when the EPA

decided to regulate greenhouse gas emissions, despite the immense stakes, because that decision involved no "counterintuitive" departure from the agency's "pre-existing mandate." *Massachusetts v. EPA*, 549 U.S. 497, 530-31 (2007).

Only when extraordinary economic and political significance is paired with a dubious transformation of an agency's role does the doctrine come into play. No major questions case has involved economic and political significance alone. *See West Virginia*, 597 U.S. at 724-29 ("unheralded" and "transformative" use of "ancillary provision[s]" reaching beyond the agency's "comparative expertise"); *Nebraska*, 600 U.S. at 501-03 (use of "never previously claimed powers" to work a "fundamental revision of the statute" and claim "virtually unlimited power to rewrite [it]"); *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 112, 118 (2022) (per curiam) ("*NFIB*") (a type of mandate "never before imposed" that regulated beyond the agency's "sphere of expertise" despite Congress's choice to deny the agency this power); *Realtors*, 594 U.S. at 761, 764-65 ("unprecedented" claim of power with "no limit" that required reading selected text "in isolation"); *Util. Air*, 573 U.S. at 324 ("unheralded" and "transformative" power that "the statute [was] not designed to grant"); *Brown & Williamson*, 529 U.S. at 126, 160 (new reliance on "cryptic" provisions to assert power "inconsistent with the ... overall regulatory scheme").

In *West Virginia*, for instance, the Court described the EPA's attempt to "substantially restructure the American energy market" as giving the agency "'unprecedented power over American industry.'" 597 U.S. at 724, 728 (quoting *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645 (1980) (plurality opinion)). But the agency's plan was not merely significant in scope—the Court concluded that it changed the entire "paradigm" of the EPA's role, effecting a "transformative expansion" based on an "unheralded" power that converted the statutory scheme "into an entirely different kind." *Id.* at 724, 728 (quotation marks omitted). This "newfound power" was based on "the vague language of an ancillary provision[]," required technical and policy expertise not traditionally held by the EPA, and was an approach that Congress "repeatedly declined to enact itself." *Id.* at 724 (quotation marks omitted).

*Biden v. Nebraska* confirmed these demanding standards in applying the major questions doctrine to a student debt relief plan. The plan satisfied the doctrine's "economic and political significance" requirement because it affected "[p]ractically every student borrower" and amounted to "nearly one-third of the Government's $1.7 trillion in annual discretionary spending." 600 U.S. at 502-03. This "extraordinary program," moreover, was judged to be completely unlike prior exercises of the same statutory authority. *Id.* Indeed, the executive branch was claiming "virtually unlimited power to rewrite the Education Act" and "unilaterally

define every aspect of federal student financial aid." *Id.* at 502. This was "a fundamental revision of the statute, changing it from [one sort of] scheme of ... regulation into an entirely different kind." *Id.* (quoting *West Virginia*, 597 U.S. at 728).

Notably, *Nebraska* first concluded that the agency was asserting a new type of authority that Congress likely did not intend, *id.* at 500-02, and only then determined that this assertion had "staggering" economic and political significance, *id.* at 502. Unless both criteria are met, the major questions doctrine does not apply. *Accord West Virginia*, 597 U.S. at 724-32.

## II. The FTC's Noncompete Clause Rule Does Not Trigger the Major Questions Doctrine.

As explained above, "[t]he Supreme Court has adopted a two-prong framework to analyze the major questions doctrine." *Nebraska v. Su*, --- F.4th ----, 2024 WL 4675411, at *10 (9th Cir. Nov. 5, 2024). "First, we ask whether the agency action is 'unheralded' and represents a 'transformative expansion' in the agency's authority in the vague language of a long-extant, but rarely used, statute. Second, we ask if the regulation is of 'vast economic and political significance' and 'extraordinary' enough to trigger the doctrine." *Id.* (quoting *West Virginia*, 597 U.S. at 716, 721, 724-25) (citations omitted).

Here, the FTC's authority to restrict noncompete clauses through rulemaking does not transform the agency's power beyond congressional expectations—as

confirmed by both Congress's response and the courts' response to the FTC's first use of binding rules long ago. And while the Noncompete Clause Rule may have widespread effects, reflecting the FTC's national mandate, that is not enough to make a case "extraordinary" enough for the major questions doctrine.

## A.  Transformative Expansion Beyond Congressional Intent

No matter how great its economic and political significance, agency action triggers the major questions doctrine only if it represents a "radical or fundamental change to a statutory scheme" that Congress is "very unlikely" to have intended. *West Virginia*, 597 U.S. at 723 (quotation marks omitted); *see Bradford v. Dep't of Lab.*, 101 F.4th 707, 728 (10th Cir. 2024). To identify such radical changes, the Supreme Court looks for eyebrow-raising novelty, conflict with the overall statutory scheme, reliance on cryptic or ancillary provisions, mismatch with agency expertise, and congressional activity suggesting the agency lacks the authority it asserts. Those telltale signs are absent here.

### 1.  Belated Assertion of Novel Authority

The major questions doctrine is skeptical of "unprecedented" claims of "unheralded power" newly discovered in "a long-extant statute," suggesting that an agency is reaching "beyond what Congress could reasonably be understood to have granted." *West Virginia,* 597 U.S. at 728, 724 (quotation marks omitted); *e.g.*,

*Nebraska*, 600 U.S. at 504 ("Congress did not unanimously pass the HEROES Act with such power in mind").

There is no "unprecedented" or "unheralded" claim of authority here. The FTC began issuing binding rules six decades ago, including high-profile rules that prompted congressional response and put lawmakers firmly on notice of the agency's claimed authority. Indeed, after the FTC asserted—and courts upheld— its power to issue rules construing "unfair methods of competition," Congress repeatedly amended the agency's statute. Instead of stripping this power from the FTC, those amendments *bolstered* its statutory basis.

Interpreting the FTC Act as authorizing substantive rulemaking is not a "novel reading of the statute." *West Virginia*, 597 U.S. at 716. The FTC first embraced this reading in the early 1960s—when Americans were being introduced to Beatlemania. Although the FTC long relied on adjudications alone to flesh out the meaning of "unfair methods of competition," *see Nat'l Petrol. Refiners Ass'n v. FTC*, 482 F.2d 672, 684, 693-94 (D.C. Cir. 1973), it began supplementing that approach through rulemaking in 1963, covering practices ranging from representations about television sizes, 31 Fed. Reg. 3,342 (Mar. 3, 1966), to credit card solicitations, 35 Fed. Reg. 4,614 (Mar. 17, 1970). When industry challenged the FTC's authority to issue such rules, courts upheld it. *See Nat'l Petrol. Refiners*, 482 F.2d at 678; *United States v. JS & A Grp., Inc.*, 716 F.2d 451, 454

(1983); *cf. West Virginia*, 597 U.S. at 725 (the EPA's only attempt at a similar rule "was never addressed by a court").

From the start, Congress was aware of the FTC's claimed authority and declined to disturb it. Congress acted to modify specific rules, but conspicuously never touched the agency's authority to issue them. *E.g.*, Pub. L. No. 89-92, § 5, 79 Stat. 282, 283 (1965) (superseding FTC rule about cigarette-package labeling but leaving in place the agency's rulemaking authority). Instead, subsequent legislation only strengthened the agency's interpretation. After the D.C. Circuit affirmed the FTC's rulemaking authority, Congress added procedural requirements for certain types of rules but clarified that they did "not affect any authority of the Commission to prescribe rules ... with respect to unfair methods of competition." 15 U.S.C. § 57a(a)(2). And in 1980, Congress further confirmed its understanding that the FTC may issue binding rules with far-reaching economic impacts. *See infra* at 16. This is not a case in which a surprising new claim of authority has caught Congress by surprise.

Nor is it significant that the FTC only recently turned its attention to noncompete agreements. Congress designed the Commission to respond to changing market conditions and address emerging threats to competition: the flexibility of the FTC's unfair-methods standard "could be adapted to the variety of business practices with anticompetitive effects." *Nat'l Petrol. Refiners*, 482 F.2d

13

at 702. Congress took that approach because it was "utterly impossible" to identify all the "numerous practices which constitute unfair competition." 51 Cong. Rec. 11,084 (1914). The FTC could instead "cope with new threats to competition as they arise." *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 136-37 (2d Cir. 1984).

Utilizing this authority, the FTC long ago began issuing binding rules with far-reaching effects. For instance, in 1971 it required clothing manufacturers to include care instructions on each garment's tag, over industry objections that implementation costs would be "tremendous[]" and "incalculable." Care Labeling of Textile Wearing Apparel, 36 Fed. Reg. 23,883, 23,888 (Dec. 16, 1971). That rule affected virtually every American consumer. And it reflected a change in market conditions: retail clerks had once been a knowledgeable source of garment-care information, but with the growth of mass production and mail-order purchases, omitting care instructions became sufficiently harmful to qualify as an unfair or deceptive trade practice. *Id.* at 23,886; *see also, e.g.*, Posting of Minimum Octane Numbers on Gasoline Dispensing Pumps, 36 Fed. Reg. 23,871 (Dec. 16, 1971) (similarly affecting every American purchaser of gasoline).

In sum, the Noncompete Clause Rule is not "strikingly unlike" the agency's past efforts. *NFIB*, 595 U.S. at 118.

### 2. Incongruence with statutory scheme

A newly claimed authority that fits poorly within the overall regulatory structure may signal a "fundamental revision of the statute." *West Virginia*, 597 U.S. at 728 (quotation marks omitted); *see also Brown & Williamson*, 529 U.S. at 137; *Realtors*, 594 U.S. at 763-64. But the FTC's authority to regulate noncompete agreements through rulemaking "fits neatly within the language of the statute." *Missouri*, 595 U.S. at 93.

Section 5 of the FTC Act directs the agency to "prevent" unfair methods of competition, "an inherently forward-looking directive" that goes beyond "remediating or stopping past harm." *ATS Tree Servs., LLC v. FTC*, No. 24-1743, 2024 WL 3511630, at *14 (E.D. Pa. July 23, 2024). Section 6, in turn, provides a bevy of powers to supplement this authority, including the power "to make rules and regulations for the purpose of carrying out *the provisions of this subchapter*." 15 U.S.C. § 46(g) (emphasis added). Plainly, therefore, the FTC may issue rules under Section 6(g) to effectuate its mandate under Section 5. *Cf. NLRB v. SW Gen., Inc.*, 580 U.S. 288, 300 (2017) (courts must respect Congress's use of internal cross-references).

Notably, "[n]othing in Section 6 says it is limiting the FTC's rulemaking to 'procedural' rules." *Properties of the Villages, Inc. v. FTC*, No. 24-316, 2024 WL

3870380, at *5 (M.D. Fla. Aug. 15, 2024).  And using binding rules to construe the term "unfair methods of competition" promotes both efficiency and prior notice in adjudications.  *See Nat'l Petrol. Refiners*, 482 F.2d at 684.  Nor does the lack of a penalty in Section 6(g) suggest otherwise, because the FTC enforces its unfair-methods-of-competition rules through adjudications under Section 5, which prescribes the available remedies.  *See* 15 U.S.C. § 45(*l*).

Indeed, the surrounding statutory context confirms, rather than calls into doubt, the FTC's rulemaking power.  The agency's "authority ... to prescribe rules ... with respect to unfair methods of competition" is expressly excluded from the restrictions on other types of rulemaking—confirming the existence of this authority.  *Id.* § 57a(a)(2).  Moreover, strictly procedural rules are exempt from various requirements that govern Section 6 rulemaking—a carveout that would be meaningless if Section 6 authorized *only* procedural rules.  *Id.* § 57b-3(a)(1).  Finally, the Act recognizes that Section 6 rulemaking can "have an annual effect on the national economy of $100,000,000 or more," *id.* § 57b-3(a)(1)(A), further indicating the existence of substantive, not merely procedural, rulemaking authority.

### 3.  *Reliance on obscure and ancillary provisions*

The Supreme Court is wary of newly claimed authority that rests on "'subtle device[s]'" or "cryptic" delegations.  *Brown & Williamson*, 529 U.S. at 160

16

(quoting *MCI*, 512 U.S. at 231). *West Virginia*, for instance, emphasized that the EPA was using an "obscure," "ancillary," "little-used backwater" of the statute for its far-reaching policy. 597 U.S. at 711, 724, 730 (quotation marks omitted).

Here, Sections 5 and 6(g) are not cryptic or obscure but textually clear: the FTC may "make rules and regulations" to "carry out[]" its mandate to "prevent ... unfair methods of competition." 15 U.S.C. §§ 45(a)(2), 46(g). Nor are these provisions a "little-used backwater" of the statute. As discussed, the FTC employed them to issue a host of prominent rules in the twentieth century, garnering the approval of both Congress and the courts.

To be sure, Section 6 "deals primarily with reports and investigative powers," and "the 'rules and regulations' portion of Section 6(g) has to share space with 'classifying corporations.'" *Properties of the Villages*, 2024 WL 3870380, at *8. But even if this gave an ancillary appearance to Section 6(g) when originally enacted, the FTC's later reliance on that provision as a central feature of its authority—together with Congress's fortification of that reading in subsequent legislation—has diminished whatever force this consideration might once have had in discerning congressional intent.

### 4. *Mismatch between asserted power and agency expertise*

The scope of an agency's expertise sheds significant light on whether it is claiming a power that Congress did not likely intend. "[W]hen [an] agency has no

17

comparative expertise in making certain policy judgments ... Congress presumably would not task it with doing so." *West Virginia*, 597 U.S. at 729 (quotation marks omitted); *see Gonzales v. Oregon*, 546 U.S. 243, 266 (2006) (doubting that Congress entrusted "medical judgments" to an official "who lacks medical expertise"); *King v. Burwell*, 576 U.S. 473, 486 (2015) (similar).

This factor weighs strongly in the FTC's favor, for there is no credible argument "that an agreement not to compete falls outside the meaning of a 'method of competition.'" Non-Compete Clause Rule, 89 Fed. Reg. 38,342, 38,353 n.216 (May 7, 2024). Congress established the FTC to develop expertise in market conditions and prevent practices that unfairly hamper competition. *See* 51 Cong. Rec. 11083 (1914). For over a century, the agency has done just that. Here, drawing on its expertise and extensive investigation, the FTC concluded that noncompete agreements unfairly interfere with competition. 89 Fed. Reg. at 38,461. Simply put, this "is what [the FTC] does." *Missouri*, 595 U.S. at 95.

Thus, it does not "raise[] an eyebrow," *West Virginia*, 597 U.S. at 730, that the FTC would investigate and prohibit a trade practice that expressly limits the ability to compete.

### 5. *Subsequent legislative activity*

The Supreme Court has sometimes considered congressional activity after a statute's enactment, such as failed bills, in its major questions analysis. *E.g.*, *West*

*Virginia*, 597 U.S. at 731-32 (failure of cap-and-trade legislation suggested EPA's similar approach was unauthorized).  But other cases have downplayed such evidence.  *E.g.*, *Brown & Williamson*, 529 U.S. at 155-56 (disclaiming reliance "on Congress' failure to act").

The Court's usual guidance is that "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress," *Pension Benefit Gaur. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (quotation marks omitted), and that failed bills are "a particularly dangerous ground" for doing so, *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 362 n.9 (2021), because "several equally tenable inferences may be drawn from such inaction," *United States v. Craft*, 535 U.S. 274, 287 (2002) (quotation marks omitted).

That is the case here.  While Congress has considered bills limiting noncompete agreements, *e.g.*, H.R. 527, 118th Cong. (2023), many factors could explain their failure to pass—including quibbles with their specific terms or a desire to continue leaving the details of "unfair methods of competition" to the FTC.  There is certainly no evidence of "Congress' consistent judgment to deny [the FTC] this power."  *Brown & Williamson*, 529 U.S. at 160.  Plaintiffs have identified no action Congress has actually taken to limit the FTC's ability to regulate noncompete agreements.  *Cf. NFIB*, 595 U.S. at 119 (citing "a majority vote of the Senate disapproving the regulation").

Nor has Congress denied the FTC binding rulemaking authority over unfair methods of competition. On the contrary, Congress rejected proposals to strip the FTC of that authority after it was validated by the courts. *E.g.*, H.R. 7917, § 202, 93d Cong., 2d Sess. (1974). Instead, Congress took steps to make sure it was leaving this power in place. *See* Pub. L. No. 93-637, § 202, 88 Stat. 2183, 2193 (1975).

### B. Economic and Political Significance

Because Congress uses agencies to help solve nationwide problems, much of what they do has economic and political significance. To implicate the major questions doctrine, a newly claimed authority must be "staggering," *Nebraska*, 600 U.S. at 502, "breathtaking," *Realtors*, 594 U.S. at 764, and "extravagant," *West Virginia*, 597 U.S. at 724 (quoting *Util. Air*, 573 U.S. at 324).

The impact of agency action is sometimes self-evident, as when agencies purport to "decid[e] how Americans will get their energy," *id.* at 729, spend "nearly one-third of the Government's $1.7 trillion in annual discretionary spending," *Nebraska*, 600 U.S. at 503, "impos[e] a vaccine mandate on 84 million Americans," *NFIB*, 595 U.S. at 118, or claim authority "to take whatever measures [an agency] deems necessary to control the spread of COVID–19," *Realtors*, 594 U.S. at 763.

More often, gauging economic significance involves complex, debatable financial predictions. Here, some costs and benefits of the Noncompete Clause Rule cannot be quantified, but the FTC estimates that it may affect millions of workers and yield increased earnings, greater innovation, and other benefits. *See* 89 Fed. Reg. at 38,343, 38,467. It is not obvious that the economic ramifications here match the measurable effects considered in prior cases. *Cf. Nebraska*, 600 U.S. at 502 ($500 billion charged to taxpayers); *Realtors*, 594 U.S. at 764 ($50 billion in immediate costs to landlords).

Notably, too, the Supreme Court focuses more on the range of entities newly swept into regulatory schemes—*see id.* at 765; *Brown & Williamson*, 529 U.S. at 159; *MCI*, 512 U.S. at 231—than on new limitations for already-regulated entities, *see Util. Air*, 573 U.S. at 332 ("We are not talking about extending EPA jurisdiction," but about increasing demands for "entities already subject to its regulation."). There is no newly regulated entity here: the FTC has always had authority over "methods of competition" used by "any ... person, partnership, or corporation ... except banks, and [certain] common carriers." An Act to Create a Federal Trade Commission, Pub. L. No. 63-203, § 5, 38 Stat. 717, 719 (1914).

Moreover, a major question requires vast "economic *and* political significance." *Nebraska*, 600 U.S. at 502 (emphasis added). The Supreme Court consistently uses "and" in that formulation—never "or." *See id.*; *West Virginia*,

597 U.S. at 700; *NFIB*, 595 U.S. at 117; *Realtors*, 594 U.S. at 764; *Burwell*, 576 U.S. at 486; *Util. Air*, 573 U.S. at 324; *Brown & Williamson*, 529 U.S. at 160. Beyond carrying a high price tag, therefore, an agency's initiative must also be the subject of "earnest and profound debate across the country." *Nebraska*, 600 U.S. at 504 (quoting *West Virginia*, 597 U.S. at 732). But noncompete clauses hardly seem to carry the political salience of, say, climate change, the student debt program, or the government's emergency COVID responses.

Opponents of the FTC's rule have argued that it "intrudes into an area that is the particular domain of state law." *Realtors*, 594 U.S. at 764. But this overreads a single line from the per curiam *Realtors* opinion. While the CDC was never thought to have authority over "the landlord-tenant relationship," *id.*, until the eviction moratorium intruded into that area, business arrangements that unfairly limit competition have always been in the heartland of the FTC's authority. The mere fact that federal measures co-regulate an area alongside state law does not implicate the major questions doctrine (or the separate federalism canon). Just as Congress may "legislate in areas traditionally regulated by the states," *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), federal agencies may implement that legislation by promulgating rules that overlap with state regulation. *Cf.* 16 C.F.R. § 910.4 (limiting the Noncompete Clause Rule's preemptive effect on state

enforcement).  Virtually every FTC initiative concerns practices that could also be regulated by the states.  It takes much more to make agency action "extraordinary."

## III.   Stretching the Major Questions Doctrine Beyond the Most Extraordinary Cases Would Undermine Statutory Interpretation and Constitutional Principles.

As shown above, the Supreme Court has limited the major questions doctrine to "extraordinary" cases in which a rigorous two-part standard is met.  Following that precedent helps ameliorate serious tensions between the doctrine and textualism, the Constitution's original meaning, and the separation of powers.

### A.  Textualism

"The people are entitled to rely on the law as written, without fearing that courts might disregard its plain terms based on some extratextual consideration." *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020).  Courts should therefore "interpret the words consistent with their ordinary meaning ... at the time Congress enacted the statute."  *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quotation marks omitted); *cf.* Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 22-23, 29-30 (1997) (discounting legislative history, pragmatic concerns, and Congress's perceived goals).

Departing from these principles, however, the major questions doctrine emphasizes factors outside of a statute's text and structure, including economic fallout, political controversy, legislators' subjective expectations, and how an

agency has previously implemented the statute. Many of these factors post-date the statute's enactment and therefore cannot have informed its original public meaning. And because the doctrine requires sifting through various extratextual considerations with undetermined relative weights, it resembles the type of multi-factor balancing test that textualists typically disparage. *E.g.*, *Gamble v. United States*, 587 U.S. 678, 724 (2019) (Thomas, J., concurring).

Accordingly, Justices across the ideological spectrum have recognized that the major questions doctrine poses problems for textualists. *See Nebraska*, 600 U.S. at 507-08 (Barrett, J., concurring) ("[S]ome articulations of the major questions doctrine on offer ... should give a textualist pause."); *West Virginia,* 597 U.S. at 751 (Kagan, J., dissenting) (calling the doctrine a "get-out-of-text free card[]"). The Court itself has acknowledged that the doctrine is "distinct" from "routine statutory interpretation." *Id.* at 724 (majority opinion).

After all, when the text of a statute gives an agency broadly worded authority, "imposing limits on an agency's discretion" based on extratextual considerations is to "alter, rather than to interpret," the statute. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 677 (2020). Statutory language should not be artificially constrained due to "undesirable policy consequences," *Bostock*, 590 U.S. at 680, or because a policy "goes further than what the [agency] has done in the past," *Missouri*, 595 U.S. at 95.

Precisely because the major questions doctrine departs from "the ordinary tools of statutory interpretation," *Nebraska*, 600 U.S. at 506, the doctrine is reserved for "extraordinary" cases in which an agency tries to transform a statute "into an entirely different kind," *id.* at 502 (quoting *West Virginia*, 597 U.S. at 728).  That is not the case here.

## B.  Original Meaning

Imposing a heightened clarity requirement on Congress when it authorizes economically and politically significant agency actions is also in tension with the Constitution's original meaning.

No detailed justification for the major questions doctrine has been endorsed by a majority of the Supreme Court, which has only gestured at "separation of powers principles and a practical understanding of legislative intent." *West Virginia*, 597 U.S. at 723.[2]  But the Court has stated that "Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.*

Contrary to this presumption, the Constitution embodies no skepticism toward agency resolution of major policy decisions.  Indeed, the earliest Congresses repeatedly granted the executive branch vast discretion over the era's most pressing economic and political choices.  The Founders had no qualms about

---

[2] The Justices who have offered more thorough explanations for the doctrine disagree about its basis.  *Compare West Virginia*, 597 U.S. at 735-39 (Gorsuch, J., concurring), *with Nebraska*, 600 U.S. at 510-12 (Barrett, J., concurring).

authorizing the executive branch to resolve critically important policy questions, and they did not require Congress to speak in any particular manner to do so.

For example, because trade with Indian tribes was financially vital but politically fraught, the First Congress required a license for such trading.  But far from making the major policy decisions itself, Congress gave the President total discretion over the licensing scheme's "rules, regulations, and restrictions."  Act of July 22, 1790, ch. 33, § 1, 1 Stat. 137, 137; *see* Julian Davis Mortenson & Nicholas Bagley, *Delegation at the Founding*, 121 Colum. L. Rev. 277, 341 (2021).

The First Congress granted similarly broad authority to address "arguably the greatest problem facing our fledgling Republic: a potentially insurmountable national debt."  Christine Kexel Chabot, *The Lost History of Delegation at the Founding*, 56 Ga. L. Rev. 81, 81 (2021).  Legislation authorized the President to borrow about $1.3 trillion in new loans (in today's dollars) and to make other contracts to refinance the debt "as shall be found for the interest of the [United] States," Act of Aug. 4, 1790, ch. 34, § 2, 1 Stat. 138, 139; *see* Chabot, *supra*, at 123-24, leaving implementation of this broad mandate largely to the President's discretion.  *See id.*

These statutes were not unusual.  To cite just three more examples, Congress granted the Treasury Secretary "authority to effectively rewrite the statutory penalties for customs violations," Kevin Arlyck, *Delegation, Administration, and*

*Improvisation*, 96 Notre Dame L. Rev. 243, 306 (2021); *see* Act of May 26, 1790, ch. 12, § 1, 1 Stat. 122, 122-23, handing him "one of the most important and extensive powers" of the government, *The Margaretta*, 16 F. Cas. 719, 721 (C.C.D. Mass. 1815) (Story, J.). Congress authorized an executive board to formulate its own standards for granting exclusive patents that would deny other Americans the "right and liberty" of offering the same products. Act of Apr. 10, 1790, ch. 7, § 1, 1 Stat. 109, 110. And Congress gave federal commissioners nearly unguided power over the politically charged question of how to appraise property values for the first direct tax. *See* Nicholas R. Parrillo, *A Critical Assessment of the Originalist Case Against Administrative Regulatory Power*, 130 Yale L.J. 1288, 1391-1401 (2021).

Nothing in the Constitution's text or history prohibits Congress from using its "legislative Powers," U.S. Const. art. I, § 1, to assign major policy questions to agencies, which helps explain why Congress has done so from the start. *Cf. CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 432 (2024) (early legislation "provides contemporaneous and weighty evidence of the Constitution's meaning" (quotation marks omitted)). Simply put, the premise underlying the major questions doctrine was not shared by the Founders—yet another reason to reserve the doctrine for the most "extraordinary" cases. *West Virginia*, 597 U.S. at 724.

### C. Separation of Powers

The major questions doctrine is meant to promote "separation of powers principles." *West Virginia*, 597 U.S. at 723. But an aggressively applied doctrine raises its own separation-of-powers concerns, shifting authority from the elected branches to the courts. Because the doctrine is a judicial creation that "directs how Congress must draft statutes," Mila Sohoni, *The Major Questions Quartet*, 136 Harv. L. Rev. 262, 276 (2022), it risks becoming "a license for judicial aggrandizement," Nathan Richardson, *Antideference: COVID, Climate, and the Rise of the Major Questions Canon*, 108 Va. L. Rev. Online 174, 175, 200 (2022).

At bottom, the major questions doctrine disallows plausible readings of a statute's text based on concerns about the real-world implications of an agency's reading and how the legislators who enacted the statute might have regarded that reading. *E.g.*, *Nebraska*, 600 U.S. at 503-05. But distorting a statute's original public meaning because of cost, political controversy, or other post-enactment developments risks "amending legislation outside the single, finely wrought and exhaustively considered, procedure the Constitution commands." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (quotation marks omitted). "When courts apply doctrines that allow them to rewrite the laws (in effect), they are encroaching on the legislature's Article I power." Brett M. Kavanaugh, *Fixing Statutory Interpretation*, 129 Harv. L. Rev. 2118, 2120 (2016).

This potential for encroachment underscores the need to employ the doctrine only in truly extraordinary cases. If the judiciary "starts to reject Congress's legislation on important matters precisely because it is important," it risks eroding the courts' status as non-political arbiters of the law. Lisa Heinzerling, *Nondelegation on Steroids*, 29 N.Y.U. Env't L.J. 379, 391 (2021).

Far from reflecting "a practical understanding of legislative intent," *West Virginia*, 597 U.S. at 723, applying the doctrine too broadly would also be at odds with Congress's explicit choice to allow agencies to make decisions with significant economic consequences. Under the Congressional Review Act, agencies must identify "major" rules (defined by economic impact, *see* 5 U.S.C. § 804) when reporting new regulations to Congress—and these major rules "shall take effect" unless Congress acts to disapprove them, *id.* § 801. Applying the doctrine to all economically and politically significant actions would invert this statute, making such actions presumptively invalid instead of valid. *See* Chad Squitieri, *Major Problems with Major Questions*, Law & Liberty (Sept. 6, 2022), https://lawliberty.org/major-problems-with-major-questions/.

In sum, stretching the major questions doctrine beyond "extraordinary" cases in which an agency seeks a "transformative expansion" of its power, *West Virginia*, 597 U.S. at 724, would not serve the separation of powers but instead would severely undermine it.

## CONCLUSION

For the foregoing reasons, this Court should hold that the major questions doctrine does not apply here.

Respectfully submitted,

Dated: November 8, 2024

*/s/ Brianne J. Gorod*
Elizabeth B. Wydra
Brianne J. Gorod
Brian R. Frazelle
Margaret Hassel*
CONSTITUTIONAL
    ACCOUNTABILITY CENTER
1200 18th Street NW, Suite 501
Washington, D.C. 20036
(202) 296-6889
brianne@theusconstitution.org

* Not admitted in D.C.; supervised
by principals of the firm

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,493 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.

Dated: November 8, 2024

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

Dated: November 8, 2024

*/s/ Brianne J. Gorod*
Brianne J. Gorod

*Counsel for Amicus Curiae*