# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

PROPERTIES OF THE VILLAGES, INC.,

*Plaintiff-Appellee*,

v.

FEDERAL TRADE COMMISSION,

*Defendant-Appellant.*

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

## APPELLEE'S ANSWER BRIEF

Patrick M. Muldowney
Meagan L. Martin
BAKER & HOSTETLER LLP
200 South Orange Avenue,
Suite 2300
Orlando, FL 32802
(407) 649-4000
pmuldowney@bakerlaw.com
mmartin@bakerlaw.com

Stacey K. Grigsby
Lauren Willard Zehmer
Matthew J. Glover
Daniel G. Randolph
Eli Nachmany
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
sgrigsby@cov.com
lzehmer@cov.com
mglover@cov.com
drandolph@cov.com
enachmany@cov.com

*Counsel for Plaintiff-Appellee Properties of the Villages, Inc.*

**CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Plaintiff-Appellee Properties of the Villages, Inc., certifies that the following is a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case on appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held corporation that owns 10% or more of a party's stock, and other identifiable legal entities related to a party.

This Certificate of Interested Persons has been amended to include new attorneys and parties that have become involved in this appeal. These new additions are indicated in bold.

- **American Federation of Teachers**

- American Hotel & Lodging Association

- American Investment Council

- Araiza, William

- Associated Builders and Contractors, Inc.

- Baker & Hostetler LLP

- Barack, Ryan D.

- Bedoya, Alvaro

- **Bonta, Rob**

- Boucek, Carolyn O.

- Bowen, Molly Judith

- Boynton, Brian M.

- **Brown, Anthony G.**

- **Campbell, Andrea Joy**

- **Clark, Charity R.**

- **Cohen Milstein Sellers & Toll PLLC**

- **Commonwealth of Massachusetts**

- **Commonwealth of Pennsylvania**

- Constitutional Accountability Center

- Consumer Technology Association

- Corrigan, Hon. Timothy J.

- Covington & Burling LLP

- Creed & Gowdy, P.A.

- Crooks, Jamie

- Democracy Forward Foundation

- **Dempsey, Rachel**

- **District of Columbia**

- **Ellison, Keith**

- **Emmer, Daniella**

- Epstein, Becker, & Green, P.C.

- Fairmark Partners LLP

- Farby, Lesley

- Federal Trade Commission

- **Feigenbaum, Jeremy**

- Ferguson, Andrew N.

- **Ferguson, Robert W.**

- **Ford, Aaron D.**

- Frazelle, Brian R.

- **Frey, Aaron M.**

- Friedman, Todd R.

- Futures Industry Association

- Galvin, Jodyann

- Glover, Matthew J.

- Goodnature, Taisa M.

- Gorod, Brianne J.

- Gowdy, Bryan

- Grigsby, Stacey K.

- **Grossman, Robert I., M.D.**

- Handberg, Roger B.

- Hassel, Margaret

- Hearn, Robert

- **Henry, Michelle A.**

- **Hodgson Russ LLP**

- Holyoak, Melissa

- Home Care Association of America

- Hudson, Brian

- **Hurst, Bryce K.**

- Independent Electrical Contractors

- Interfaith Coalition on Corporate Responsibility

- International Franchise Association

- **James, Letitia**

- Janda, Sean R.

- Klein, Jonathan M.

- Khan, Lina M.

- Kwall Barack Nadeau PLLC

- Lammens, Hon. Philip R.

- **Lander, Brad**

- **Levy, Nathaniel I.**

- **Lieberman, Michael**

- Liu, Wendy

- Lubbers, Jeffrey

- Ludwig, Cynthia Giganti

- Managed Funds Association

- **Martin, Diana**

- Martin, Meagan L.

- Mayer Brown LLP

- **Mitchell, Marcus D.**

- Mittal, Urja

- Mody, Arjun

- Muldowney, Patrick M.

- Nachmany, Eli

- Nadeau, Michelle Erin

- National Association of Wholesaler-Distributors

- National Employment Lawyers Association (Florida Chapter), Inc.

- National Employment Law Project

- National Federation of Independent Business Small Business Legal Center, Inc.

- National Retail Federation

- **Neronha, Peter F.**

- **Nessel, Dana**

- **New York University**

- **NYU Grossman Long Island School of Medicine**

- **NYU Grossman School of Medicine**

- NYU Langone Health

- **NYU Langone Hospitals**

- Open Markets Institute

- Parr, Jennifer

- **Phatak, Ashwin P.**

- Pincock, Tara

- **Platkin, Matthew J.**

- Posner, Eric A.

- Properties of the Villages, Inc.

- Public Citizen

- Public Citizen Litigation Group

- Raab, Michael S.

- Randolph, Daniel G.

- **Raoul, Kwame**

- Restaurant Law Center

- Rigby, Katherine G.

- **Roffino, John**

- Rose, Alexander

- **Rosenblum, Ellen F.**

- **Rucci, Mark A.**

- Saharsky, Nicole A.

- Samburg, Mark B.

- **Schwalb, Brian L.**

- Securities Industry and Financial Markets Association

- **Seligman, David H.**

- **Shiver Hamilton Campbell**

- Slaughter, Rebecca Kelly

- Shane, Peter 4M.

- Small Business Majority

- Starr, Evan

- **State of California**

- **State of Colorado**

- **State of Illinois**

- **State of Maine**

- **State of Maryland**

- **State of Michigan**

- **State of Minnesota**

- **State of Nevada**

- **State of New Jersey**

- **State of New Mexico**

- **State of New York**

- **State of Oregon**

- **State of Rhode Island**

- **State of Vermont**

- **State of Washington**

- Todd R. Friedman, P.A.

- The Holding Company of The Villages, Inc.

- The Villages of Lake-Sumter, Inc.

- Thurston, Robin F.

- **Torrez, Raúl**

- **Towards Justice**

- United States Council for International Business

- Vaheesan, Sandeep

- **Van Zile, Caroline S.**

- **Varnell, Janet**

- **Varnell & Warwick PA**

- Vernon, Emily A.[*]

- Wallace, Kyle G.A.

- Warner, A. Millie

- **Warwick, Brian**

- Weibust, Erik W.

- **Weiser, Philip J.**

- Westmoreland, Rachael L.

- Wydra, Elizabeth B.

- Zehmer, Lauren Willard

- Zevin Asset Management

- Zieve, Allison M.

January 15, 2025

*/s/ Lauren Willard Zehmer*
Lauren Willard Zehmer

*Counsel for Plaintiff-Appellee*
*Properties of the Villages, Inc.*

---

[*] Emily A. Vernon is no longer employed at Covington & Burling LLP, and she no longer represents Plaintiff-Appellee.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, counsel for Plaintiff-Appellee Properties of the Villages, Inc., files this Corporate Disclosure Statement to notify this Court that the following parent corporations own 10% or more of Plaintiff-Appellee's stock:

The Holding Company of The Villages, Inc.

The Villages of Lake-Sumter, Inc.

Neither of these corporations is a publicly traded company or corporation, nor is Properties of the Villages, Inc.  No publicly traded company or corporation has a 10% or greater ownership interest in The Holding Company of The Villages, Inc., or The Villages of Lake-Sumter, Inc.

**STATEMENT REGARDING ORAL ARGUMENT**

Plaintiff-Appellee respectfully submits that oral argument would be beneficial for the Court given the significance of the matter. This appeal concerns whether the Federal Trade Commission may effectively invalidate non-compete agreements nationwide—including those of Plaintiff-Appellee—based on a novel interpretation of a long-extant and ancillary statutory provision, even though non-compete agreements have long been regulated and permitted by the States.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ................................................... C-1

CORPORATE DISCLOSURE STATEMENT ................................................ C-10

STATEMENT REGARDING ORAL ARGUMENT .............................................. i

TABLE OF CITATIONS ...................................................................... iv

INTRODUCTION ................................................................................ 1

STATEMENT OF JURISDICTION ........................................................... 5

STATEMENT OF THE ISSUE ................................................................. 5

STATEMENT OF THE CASE .................................................................. 6

I.     POV's Business and the Benefits of Non-Compete Agreements .................. 6

II.    The FTC Act ............................................................................. 9

III.   The Non-Compete Rule ............................................................... 13

IV.    The District Court's Ruling in POV's Favor ...................................... 15

V.     Standard of Review .................................................................... 18

SUMMARY OF ARGUMENT ............................................................... 19

ARGUMENT ..................................................................................... 23

I.     The District Court Correctly Held That POV Is Likely to Succeed on
       the Merits of Its Claim That the FTC Lacks the Statutory Authority to
       Issue the Non-Compete Rule. ........................................................ 23

       A.     The Major Questions Doctrine Applies. ................................... 24

              1.     Economic Significance ............................................... 24

              2.     Political Significance ................................................. 28

              3.     Disrupts the Federal-State Balance ................................ 29

        4.     *The Commission's Counterarguments Are Unavailing.* ........... 31

  B.   The Commission Lacks a Clear Grant of Statutory Authority for the Non-Compete Rule. ........................................................ 34

        1.     *Vague and General Language* ................................................. 34

        2.     *Ancillary Provision* .................................................. 38

        3.     *Previously Unheralded Power* ...................................... 39

  C.   Ordinary Tools of Statutory Construction Confirm that the Commission Lacks Authority to Issue Substantive Unfair Competition Rules. ............................................................. 42

  D.   Constitutional Avoidance Requires the Same Conclusion. ............... 49

II.   The District Court Correctly Weighed the Remaining Preliminary Injunction Factors in POV's Favor. .............................................. 52

  A.   The District Court Correctly Concluded that POV Would Suffer Irreparable Harm Absent the Injunction. ........................................... 52

  B.   The District Court Reasonably Weighed the Equities and the Public Interest. ...................................................................... 56

CONCLUSION ................................................................... 58

CERTIFICATE OF COMPLIANCE ..................................................... 59

ADDENDUM

# TABLE OF CITATIONS

<b>Page(s)</b>

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935)...................................................................... 21, 50-51

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021).................................................................25-26, 29-30

*Alabama v. U.S. Sec'y of Educ.*,
  2024 WL 3981994 (11th Cir. 2024) .................................................55

*AMG Cap. Mgmt., LLC v. FTC*,
  593 U.S. 67 (2021)......................................................................10, 43

*Bailey v. Metro Ambulance Servs.*,
  992 F.3d 1265 (11th Cir. 2021) .........................................................55

*BellSouth Telecommc'ns, Inc. v. MCI Metro Access Trans. Servs.,
  LLC*,
  425 F.3d 964 (11th Cir. 2005) ...........................................................56

*Biden v. Missouri*,
  595 U.S. 87 (2022).............................................................................33

*Biden v. Nebraska*,
  600 U.S. 477 (2023).................................. 23, 25-26, 28, 31, 33, 37, 40

*BP P.L.C. v. Mayor & City Council of Baltimore*,
  593 U.S. 230 (2021)...........................................................................47

*Cate v. Oldham*,
  707 F.2d 1176 (11th Cir. 1983) ........................................................57

*CFTC v. Schor*,
  478 U.S. 833 (1986)...........................................................................48

---

*The authorities on which POV primarily relies are identified with an asterisk.

*Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*,
    720 F.2d 1553 (11th Cir. 1983) ..............................................9

*DHS v. MacLean*,
    574 U.S. 383 (2015)........................................................47

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades
    Council*,
    485 U.S. 568 (1988)........................................................50

*FCC v. Nat'l Citizens Comm. for Broad.*,
    436 U.S. 775 (1978)........................................................46

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)....................................................28, 38

*Fischer v. United States*,
    603 U.S. 480 (2024)........................................................38

*Florida v. HHS*,
    19 F.4th 1271 (11th Cir. 2021) ..............................................32

*\*Georgia v. President of the U.S.*,
    46 F.4th 1283 (11th Cir. 2022) .................................. 52-53, 56

*Gundy v. United States*,
    588 U.S. 128 (2019)........................................................51

*Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*,
    303 F.3d 1242 (11th Cir. 2002) ..............................................18

*LaCroix v. Town of Ft. Myers Beach*,
    38 F.4th 941 (11th Cir. 2022) ..............................................57

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)........................................................45

*Maine Cmty. Health Options v. United States*,
    590 U.S. 296 (2020)........................................................44

*Mills v. Hamm*,
    102 F.4th 1245 (11th Cir. 2024) ............................................18

*Morrisey v. U.S. Dep't of the Treasury*,
  59 F.4th 1124 (11th Cir. 2023) ..........................................................35

*Nat'l Petroleum Refiners Ass'n v. FTC*,
  482 F.2d 672 (D.C. Cir. 1973) ................................................... 11-12

*NFIB v. OSHA*,
  595 U.S. 109 (2022) ..........................................................................26

*Nken v. Holder*,
  556 U.S. 418 (2009) ..........................................................................56

*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*,
  715 F.3d 1268 (11th Cir. 2013) ........................................................56

*Pan Am. World Airways, Inc. v. United States*,
  371 U.S. 296 (1963) ..........................................................................51

*\*Props. of the Villages, Inc. v. Kranz*,
  No. 5:19-CV-647-JSM-PRL, 2021 WL 2144178 (M.D. Fla. May
  24, 2021) ............................................................................................8

*\*Ryan, LLC v. FTC*,
  2024 WL 3879954 (N.D. Tex. Aug. 20, 2024) ............................. 21, 42, 44-45

*Sackett v. EPA*,
  598 U.S. 651 (2022) .....................................................................30, 44

*\*Snap-On Tools Corp. v. FTC*,
  321 F.2d 825 (7th Cir. 1963) .......................................................9, 33, 40

*Solid Waste Agency v. U.S. Army Corps of Engineers*,
  531 U.S. 159 (2001) ..........................................................................52

*Texas v. Biden*,
  10 F.4th 538 (5th Cir. 2021) .............................................................57

*United States v. Darby*,
  312 U.S. 100 (1941) ..........................................................................51

*United States v. JS & A Grp., Inc.*,
  716 F.2d 451 (7th Cir. 1983) ............................................................12

*United States v. Lopez*,
514 U.S. 549 (1995)................................................................51

*United States v. Williams*,
553 U.S. 285 (2008)...........................................................38, 43

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014)........................................................ 24-25, 34

*\*West Virginia v. EPA*,
597 U.S. 697 (2022)............... 2-3, 23-25, 28-29, 31-32, 34-35, 37-40, 42, 45, 47

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001).........................................................34, 39

**Statutes**

15 U.S.C. § 45 ...............................9-10, 27, 36-37, 39, 43, 48

15 U.S.C. § 45a .........................................................36

15 U.S.C. § 45f ..........................................................36

15 U.S.C. § 46 ............................... 11, 20, 35, 38-39, 43-44

15 U.S.C. § 57 ...........................................................21

15 U.S.C. § 57a ................................... 13, 37, 41, 43, 48-49

15 U.S.C. § 57a ...........................................................48

15 U.S.C. § 57b ....................................................13, 45

15 U.S.C. § 57b-3 .......................................................27

15 U.S.C. § 1604 .......................................................46

29 U.S.C. § 156 ..........................................................46

42 U.S.C. § 802 ..........................................................35

42 U.S.C. § 1408 .......................................................46

47 U.S.C. § 303 ..........................................................46

An Act to Amend the FTC Act,
Pub. L. No. 75-447, 52 Stat. 111 (1938)............................................................10

Federal Trade Commission Act,
ch. 311, 38 Stat. 717 (1914)...........................................................................9

Fla. Stat. § 542.335 ...........................................................................8, 56

Ga. Code Ann. §§ 13-8-50-54............................................................30

Magnuson-Moss Warranty Act in 1975,
Pub. L. No. 93-637, 88 Stat. 2183 ...................................................13

Minn. Stat. § 181.988 (2023) ...........................................................30

**Regulatory Materials**

16 C.F.R. § 910.1 ..............................................................................14

16 C.F.R. § 910.2 ..............................................................14, 53, 55

16 C.F.R. § 910.3 ..............................................................................14

16 C.F.R. § 910.4 ..............................................................................14

32 Fed. Reg. 15584 (Nov. 9, 1967)...............................................12, 42

59 Fed. Reg. 8527 (Feb. 23, 1994) ...............................................12, 42

88 Fed. Reg. 3482 (Jan. 19, 2023) .....................................................33

89 Fed. Reg. 33474 (Apr. 29, 2024) ...................................................55

89 Fed. Reg. 38342 (May 7, 2024) .............................. 12-15, 24, 41

Dissenting Statement of Comm'r Ferguson, *In re Non-Compete Clause Rule* (June 28, 2024)...........................................15, 29

Dissenting Statement of Comm'r Holyoak, *In re Non-Compete Clause Rule* (June 28, 2024) ...........................................15, 27

**Legislative Materials**

51 Cong. Rec. 9048 (1914) ................................................................39

51 Cong. Rec. 14932 (1914) ...............................................................10

120 Cong. Rec. 41406 (1974) .............................................................27

120 Cong. Rec. 41407 (1974) .............................................................49

5 *The Legislative History of the Federal Antitrust Laws and Related Statutes* (Part I, Earl W. Kintner ed., 1982).......................................39

Digital Consumer Protection Commission Act of 2023,
S. 2597, 118th Cong. (2023).................................................................29

Domestic Workers Bill of Rights Act,
H.R. 4826, 117th Cong. (2021) ...........................................................29

Domestic Workers Bill of Rights Act,
S. 2569, 117th Cong. (2021).................................................................29

Domestic Workers Bill of Rights Act,
H.R. 8732, 118th Cong. (2024) ..................................................... 28-29

Domestic Workers Bill of Rights Act,
S. 4552, 118th Cong. (2024).................................................................28

Employment Freedom for All Act,
H.R. 5851, 117th Cong. (2021) ...........................................................29

End Employer Collusion Act,
S. 2535, 118th Cong. (2023).................................................................28

Freedom for Workers to Seek Opportunity Act,
H.R. 4254, 114th Cong. (2015) ...........................................................29

Freedom To Compete Act of 2023,
S. 379, 118th Cong. (2023)...................................................................28

H.R. Rep. No. 63-1142 (Sept. 4, 1914) ...............................................39

Hearings on H.R. 2321 Before the House Comm. on Interstate & Foreign Commerce, 82d Cong. 160 (1951)........................................11

Mobility and Opportunity for Vulnerable Employees Act,
S. 1504, 114th Cong. (2015).................................................................29

Restoring Worker Power Act of 2020,
    H.R. 7638, 116th Cong. (2020) ..........................................................29

Restoring Workers' Rights Act of 2022,
    H.R. 8755, 117th Cong. (2022) ..........................................................28

Workforce Mobility Act of 2021,
    H.R. 1367, 117th Cong. (2021) ..........................................................29

Workforce Mobility Act of 2021,
    S. 483, 117th Cong. (2021) ................................................................28

Workforce Mobility Act of 2023,
    H.R. 731, 18th Cong. (2023) ..............................................................28

Workforce Mobility Act of 2023,
    S. 220, 118th Cong. (2023) ........................................................... 28-29

**Other Authorities**

Alan J. Meese, *Don't Abolish Employee Noncompete Agreements*,
    57 Wake Forest L. Rev. 631 (2022) .....................................................8

Evan P. Starr et al., *Noncompete Agreements in the US Labor Force*,
    64 J.L. & Econ. 53 (2021) ...................................................................8

Fed. Trade Comm'n, Annual Report (1922).............................................11

*State Noncompete Law Tracker*, Econ. Innovation Grp. (May 22, 2024),
    https://eig.org/state-noncompete-map ..................................................9

Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the
    Force of Law: The Original Convention*,
    116 Harv. L. Rev. 467 (2002)...............................................................45

Thomas W. Merrill, *Antitrust Rulemaking: The FTC's Delegation Deficit*,
    75 Admin. L. Rev. 277 (2023)...............................................................49

# INTRODUCTION

Non-compete agreements serve a pivotal role in encouraging and enabling companies to invest in their workers without fear that competitors will free-ride off those investments. Recognizing that they can benefit employers and workers alike, the vast majority of States—including Florida—permit reasonable non-compete agreements.

Plaintiff-Appellee Properties of the Villages, Inc. ("POV")—which sells homes in The Villages® ("The Villages"), an active adult community—maintains narrowly tailored non-compete agreements with its real estate sales associates ("Sales Associates"). A federal district court upheld these agreements as valid and enforceable just a few years ago under Florida law. These agreements allow POV to invest heavily in its Sales Associates, who often serve as the public face of The Villages. Sales Associates receive intensive training, proprietary information, and streams of prospective clients generated through POV's brand recognition and goodwill. In exchange, Sales Associates agree that if they depart POV, they will not sell real estate in The Villages community for 24 months afterward. But they remain free to sell real estate anywhere else.

Last year, however, the Federal Trade Commission ("Commission" or "FTC") issued a sweeping regulation (the "Non-Compete Rule" or "Rule") that would ban virtually *all* non-compete agreements nationwide—prospectively and

retroactively—including those POV appropriately relied on.  By the Commission's own estimates, the Non-Compete Rule would nullify 30 million contracts, with an economic impact of hundreds of billions—if not trillions—of dollars.  The Rule also preempted the judgment of 46 States that have long allowed non-compete agreements and overruled well-established antitrust precedent analyzing such agreements on a case-by-case basis.  And it displaced the judgment of Congress, which has recently considered—but declined to adopt—more than a dozen proposals to regulate non-compete agreements.

An agency decision of this magnitude is unquestionably one of "vast economic and political significance," involving "basic and consequential tradeoffs" that "Congress would likely have intended for itself."  *West Virginia v. EPA*, 597 U.S. 697, 716, 730 (2022) (citation omitted).  Under the major questions doctrine, "courts expect Congress to speak clearly if it wishes to assign to an agency" such monumental authority.  *Id.* at 716 (cleaned up).  Thus, the Non-Compete Rule is unlawful unless Congress has given "clear authorization" for it.  *Id.* at 732.

But no clear authorization for the Non-Compete Rule exists.  Instead, the Commission relies on vague and ancillary statutory language, plucked out of context from the second half of a provision about "classify[ing] corporations"—a provision itself buried in a section describing the Commission's reporting and ministerial powers.  Nothing in this provision even mentions competition rules, much less the

authority to ban all non-compete agreements.  And it is divorced from the section of the Federal Trade Commission Act ("FTC Act") directing the Commission to "prevent" "unfair methods of competition," which spells out the adjudicatory process that the Commission has used—almost exclusively—for more than one hundred years to do so.  In short, the Commission relies on the slenderest of reeds that cannot bear the immense weight of the Non-Compete Rule.  *See id.* at 722.

The district court thus preliminarily enjoined the Commission from enforcing the Non-Compete Rule against POV.  It held that POV was likely to succeed on the merits because the major questions doctrine likely applied to the Non-Compete Rule and the Commission likely lacked clear statutory authorization to issue it.  The district court also found that the Rule would impose significant nonrecoverable compliance costs and other irreparable harms on POV, and that the public interest favored narrow, preliminary injunctive relief over the likely unlawful, wholesale disruption of a status quo that has held for more than a century.

That decision was correct and, at minimum, does not constitute an abuse of discretion.  Indeed, even setting aside the major questions doctrine, POV is entitled to a preliminary injunction because the Commission lacks *any* authority to issue substantive rules defining unfair methods of competition.  Throughout the FTC Act, Congress has given the Commission explicit, detailed authority to issue various types of legislative rules.  Yet none of those provisions authorizes substantive

competition rules.  Since its creation in 1914, the Commission has instead enforced its mandate to "prevent" "unfair methods of competition" through case-by-case adjudications as set forth in Section 5 of the FTC Act.  The Commission's sudden assertion of competition rulemaking authority is thus wrong as a matter of text, structure, and history—and it raises serious nondelegation and Commerce Clause concerns, providing further reason to reject it.

The question in this case is not whether a nationwide, blanket ban of virtually all non-compete agreements is sound policy, but whether the Commission can usurp the authority to make that decision from the States and Congress.  Under either the major questions doctrine or ordinary tools of statutory interpretation, the Commission lacks the authority to issue the Non-Compete Rule—a Rule that would irreparably harm POV should it take effect.  This Court should therefore affirm the district court's order preliminarily enjoining enforcement of the Rule against POV.

## STATEMENT OF JURISDICTION

Plaintiff-Appellee concurs with the jurisdictional statement included in Defendant-Appellant's brief.

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in granting Plaintiff-Appellee's request for a preliminary injunction based on determinations that: (1) Plaintiff-Appellee is likely to succeed on the merits in arguing that the Commission lacked authority to issue the Non-Compete Rule; (2) Plaintiff-Appellee would be irreparably harmed by the Rule, given unrecoverable compliance costs and irreversible damage to its business; and (3) the balance of the equities and the public interest favor an injunction as to Plaintiff-Appellee, as the public does not benefit from the implementation of an unlawful regulation and the injunction preserves the longstanding status quo.

# STATEMENT OF THE CASE

## I. POV's Business and the Benefits of Non-Compete Agreements

POV sells homes in The Villages, an active adult community encompassing approximately 58,000 acres in parts of Lake, Sumter, and Marion Counties, Florida. Declaration of Jennifer Parr, Dkt. No. 25-1 at 2, 10.[1] Since its founding in the 1980s, The Villages has grown from a mobile home park with access to free golf to a community of over 145,000 "Villagers," due in large part to the hospitality mindset of its founders, Gary and Sharon Morse. *Id.* at 4. POV focuses on creating enduring relationships with customers that last decades and generations. Because of the reputation that POV has built, both new and returning customers frequently turn to POV and its sales team—rather than third-party real estate brokers—when looking to buy or sell property in The Villages. *Id.* at 7-8.

POV contracts with Sales Associates who work exclusively in The Villages and are often hired with little to no prior real estate experience. *Id.* at 5. POV provides Sales Associates with an intensive three-month training course covering The Villages' history and culture, neighborhoods, amenities, and lifestyle opportunities. *Id.* at 4-6. To enable new Sales Associates to participate in this

---

[1] District court docket entries are cited as "Dkt. No. # at #," with page numbers referring to CM/ECF pagination.

training full time, POV pays them a stipend in the form of an advance on future commissions. *Id.* at 5.

POV's Sales Associates also benefit from a steady stream of prospective clients based on POV's brand, goodwill, and efforts to attract potential residents. *Id.* at 7-8. For example, hundreds of thousands of people visit The Villages' website each month, and clients reach out to POV through website inquiries, call centers, and walk-ins. *Id.* POV shares those prospective clients with its Sales Associates. Access to POV's customer base is particularly valuable because Villagers often relocate within The Villages multiple times, and Villagers and their families may turn to the same POV Sales Associate for future sales. *Id.* at 7. As a result, rather than knocking on doors to generate business, Sales Associates are free to focus on serving customers.

In exchange for all these benefits, Sales Associates agree to abide by limited non-compete agreements that require them to refrain from acting as real estate representatives only "within the geographic area known as The Villages community," *id.* at 9-10, for 24 months after their engagement with POV ends, *id.* at 9. Sales Associates remain free to sell real estate anywhere else in the State and may resume selling in The Villages after their short cooling-off period. *Id.* at 10-11.

Just a few years before the Commission promulgated the Rule at issue here, a federal district court upheld POV's limited non-compete agreements as enforceable

under Florida law. *See Props. of the Villages, Inc. v. Kranz*, No. 5:19-CV-647-JSM-PRL, 2021 WL 2144178, at \*5 (M.D. Fla. May 24, 2021). POV sought to enforce its non-compete agreements against several former Sales Associates who left to form a competing real estate brokerage and immediately started soliciting POV's clients. *Id*. The court held that POV's non-compete agreements were "reasonable in time, area, and line of business" and justified to protect POV's legitimate business interests in its customers; goodwill; and confidential, proprietary, and trade secret information. *Id*. (citing Fla. Stat. § 542.335(1)).

Tailored non-compete agreements like POV's encourage businesses to invest in their workforces—including by providing training, allowing access to proprietary information, and sharing relationships with clients—without the risk that those individuals will immediately take those investments across the street to a competitor. *See* Evan P. Starr et al., *Noncompete Agreements in the US Labor Force*, 64 J.L. & Econ. 53, 80 (2021); Alan J. Meese, *Don't Abolish Employee Noncompete Agreements*, 57 Wake Forest L. Rev. 631, 637 (2022). Reasonable non-compete agreements are thus beneficial for employees, with evidence showing that such agreements can lead to "higher wages, more training, more information, and greater job satisfaction." Starr et al., *Noncompete Agreements*, *supra*, at 80.

The overwhelming majority of States recognize that reasonably tailored non-compete agreements can and do benefit workers and businesses alike. As of May

8

2024, 46 States and the District of Columbia allowed at least some types of non-compete agreements. *See State Noncompete Law Tracker*, Econ. Innovation Grp. (May 22, 2024), https://eig.org/state-noncompete-map. Similarly, an "unbroken line of cases" has recognized that reasonable non-compete agreements are permissible under federal antitrust laws. *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1561 (11th Cir. 1983); *Snap-On Tools Corp. v. FTC*, 321 F.2d 825, 836-37 (7th Cir. 1963).

## II. The FTC Act

In 1914, Congress enacted the Federal Trade Commission Act, ch. 311, 38 Stat. 717 (1914), which created the FTC. Congress gave the FTC both enforcement and investigative functions, housed in separate sections of the Act.

The FTC's enforcement powers are found in Section 5, which "empower[s]" and "direct[s]" the Commission to "prevent" the use of "unfair methods of competition in or affecting commerce." 15 U.S.C § 45(a)(2).[2] In 1938, Congress amended Section 5 to add the prevention of "unfair or deceptive acts or practices" to the Commission's mandate. An Act to Amend the FTC Act, Pub. L. No. 75-447, § 3, 52 Stat. 111, 111 (1938).

---

[2] Although the Commission included portions of the statutory provisions in its Addendum, it omitted important and relevant statutory context. For the Court's benefit and for the sake of completeness, POV has reproduced those provisions in full in its Addendum.

From its inception, the FTC has enforced the Act's prohibition on unfair methods of competition through case-by-case adjudication. *See, e.g.*, *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 71-72 (2021). Representative Harry Covington— who chaired the House subcommittee that drafted the first iteration of the FTC Act— remarked about the final bill that "[t]he Federal trade commission will have no power to prescribe the methods of competition to be used *in future* [*sic*]." 51 Cong. Rec. 14932 (Sept. 10, 1914) (emphasis added). Instead, he explained, the agency would "exercise power of a judicial nature" in individual cases. *Id.* Accordingly, Section 5 provides a robust scheme for case-by-case adjudication to prevent unfair methods of competition: It sets out the FTC's authority to (1) file complaints when it believes a person or entity "has been or is using any unfair method of competition," (2) hold hearings, (3) make factual findings, (4) enter, modify, and set aside cease-and-desist orders, and (5) obtain judicially ordered civil penalties and equitable relief. *See* 15 U.S.C. § 45(b), (*l*). Section 5 also specifies the process for service of complaints, finality of cease-and-desist orders, timing, and judicial review. *See id.* § 45(b)-(c), (f)-(j).

Section 6 of the Act describes "[a]dditional powers," including investigative powers, distinct from and ancillary to the FTC's core Section 5 enforcement powers. 15 U.S.C. § 46. For instance, Section 6 grants the authority to "gather and compile information" on certain industries and issues and monitor compliance with consent

decrees and antitrust laws.  *See id.* § 46(a)-(d), (h)-(j).  It also authorizes the FTC to publish reports, *id.* § 46(f), and expend appropriated funds, *id.* § 46(*l*).  Tucked away within a miscellaneous subpart of Section 6, under the header "Classification of corporations; regulations," Section 6(g) provides that the FTC shall have the power to "[f]rom time to time classify corporations and (except as provided in section 57a(a)(2) of this title) to make rules and regulations." 15 U.S.C. § 46(g).  The Act does not contain any provisions authorizing enforcement actions or sanctions based on violations of Section 6(g) rules.

For nearly five decades after the FTC was established in 1914, the agency never invoked Section 6(g) to promulgate substantive rules of any sort—and, indeed, previously indicated "that it *lacked* such power."  *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 693 (D.C. Cir. 1973) (emphasis added); *see also* 1922 FTC Annual Report 36 (stating that the Commission could not "issue orders, rulings, or regulations unconnected with any proceeding before it"); Hearings on H.R. 2321 Before the House Comm. on Interstate & Foreign Commerce, 82d Cong. 160 (1951) (FTC Assistant General Counsel explaining that to address unfair methods of competition, the Commission must adjudicate "individual cases").

In the 1960s and 1970s, the Commission briefly experimented with rulemaking to address unfair and deceptive acts and practices ("UDAPs").  *See* Non-Compete Clause Rule, 89 Fed. Reg. 38342, 38349-50 (May 7, 2024).  While some

of the UDAP rules also invoked the Commission's claimed authority to define unfair methods of competition, just one—addressing discriminatory practices in the men's and boys' tailored clothing industry—was a standalone competition rule. *See* 32 Fed. Reg. 15584 (Nov. 9, 1967). That rule was never enforced and was subsequently repealed. *See* 59 Fed. Reg. 8527 (Feb. 23, 1994).

During that period, the question of the scope of the FTC's Section 6(g) authority arose in a case concerning a rule requiring disclosure of octane rating numbers on gasoline pumps. In that case, the D.C. Circuit held that the FTC had authority to issue that narrow consumer protection rule. *See Nat'l Petroleum*, 482 F.2d at 674, 678. But in doing so, it relied on since-discarded methods of statutory interpretation. *See id.* at 675, 683, 691 (emphasizing the "judicial trend favoring rule-making over adjudication" and "expansive agency readings of statutory rule-making authorizations").[3]

Congress reacted to the FTC's novel use of its Section 6(g) authority by passing the Magnuson-Moss Warranty Act in 1975. Pub. L. No. 93-637, § 202, 88 Stat. 2183, 2193-96 (codified at 15 U.S.C. § 57a). That Act expressly authorized the FTC to issue rules proscribing UDAPs pursuant to a detailed set of procedural

---

[3] The Seventh Circuit later reached the same conclusion for the same reasons, "incorporat[ing] by reference" the D.C. Circuit's discussion. *United States v. JS & A Grp., Inc.*, 716 F.2d 451, 454 (7th Cir. 1983).

requirements, and it specified civil penalties for violations of such rules. *See id.* §§ 57a(b)-(c), 57b(a). Tellingly, Congress included no similar provisions permitting rulemaking to address unfair methods of competition.

For nearly a half-century—from the Magnuson-Moss Warranty Act until 2024—the FTC did not invoke Section 6(g) to promulgate any substantive rules. And before 2024, "[n]either the FTC nor any other federal agency" attempted "to regulate non-competes in a meaningful way." Dkt. No. 59 at 20.

## III. The Non-Compete Rule

On April 23, 2024, the Commission (by a 3-2 vote) announced a nationwide ban of nearly all non-compete agreements, regardless of an individual agreement's effect on competition or legitimate business justifications. 89 Fed. Reg. at 38342, 38502-03. Specifically, the Rule declares that "it is an unfair method of competition" to (i) "enter into or attempt to enter into a non-compete clause," (ii) "enforce or attempt to enforce a non-compete clause," or (iii) "represent that [a] worker is subject to a non-compete clause." *Id.*

If the Rule takes effect, it would prospectively bar virtually all new non-compete agreements. *See* 16 C.F.R. § 910.2(a); 89 Fed. Reg. at 38502-03. The Rule would also *retroactively* void virtually all existing non-compete agreements, including those that, as in POV's case, were entered in exchange for compensation and other benefits and which are reasonable and legal under existing law. *See* 16

C.F.R. § 910.2(a)(1)(ii). Indeed, the Rule purports to "supersede" any state law that would "permit or authorize" such agreements. *Id.* § 910.4(a). And it carves out only an exceedingly narrow set of exceptions, permitting non-compete agreements entered in connection with the sale of an entire business and exempting non-compete agreements with certain "senior executives" from retroactive nullification (though banning them prospectively). *See id.* §§ 910.1, 910.2(a), 910.3(a)-(b). Aside from these limited exceptions, the Rule prohibits non-compete agreements with any worker in any industry, regardless of salary, purpose, or reasonableness, and it demands that businesses "provide clear and conspicuous notice to the worker[s]" to that effect. *Id.* § 910.2(b)(1).

The Commission itself intends for the Rule to have seismic economic consequences. It found that non-compete agreements "are in widespread use throughout the economy and pervasive across industries and demographic groups," 89 Fed. Reg. at 38346, and, by its "conservative estimate," that the Rule would invalidate non-compete agreements of "approximately 30 million workers," *id.* at 38343 & n.34. The Commission also predicted that the economic impact of the Rule would exceed hundreds of *billions* of dollars—affecting investment, innovation, and wages across the country. *See, e.g.*, *id.* at 38467, 38477.

Commissioners Ferguson and Holyoak dissented from this sweeping and unprecedented action. Commissioner Holyoak explained that the text and structure

of the FTC Act does not authorize competition rulemaking, which is further confirmed by the Commission's historical practice. *See* Dissenting Statement of Comm'r Holyoak, *In re Non-Compete Clause Rule* (June 28, 2024). Commissioner Ferguson further stated that the Rule is invalid under the major questions doctrine given its vast economic and political significance and intrusion into an area of traditional state power despite a lack of clear congressional authorization. Dissenting Statement of Comm'r Ferguson, *In re Non-Compete Clause Rule* (June 28, 2024). He also observed that adopting the Commission's interpretation of its authority would create an unconstitutional delegation of legislative power, *id*. at 20-34, and that the Commission had no basis to conclude that "every single noncompete agreement in America is unfair and anticompetitive in violation of Section 5 of the FTC Act," *id*. at 34.

## IV. The District Court's Ruling in POV's Favor

On June 21, 2024, POV filed suit challenging the Non-Compete Rule, Dkt. No. 1 at 1, contending that the Commission lacked authority to issue it under both the major questions doctrine and ordinary tools of statutory interpretation. Shortly thereafter, POV moved for a stay of the Rule's effective date and a preliminary injunction against its enforcement. Dkt. No. 25 at 1. On August 14, 2024, the district court granted POV's motion and entered a narrow preliminary injunction "prohibiting enforcement of the [Rule] as to [POV]" alone. Dkt. No. 59 at 28.

The district court concluded that POV demonstrated "a substantial likelihood" of prevailing on its claim under the major questions doctrine that the Rule "exceeds the FTC's authority." *Id.* at 25. After carefully considering the scope of the Rule, the history of the FTC's rulemaking efforts, and relevant precedent, the court explained that the major questions doctrine was likely applicable given the Rule's immense economic and political significance. The Rule's "huge economic impact," the court observed, would amount to at least hundreds of billions of dollars according to the FTC's own, conservative estimates. *Id.* at 19-20. And as to political significance, the court noted that "non-competes have been the subject of substantial debate and regulation in the states" and have met with "unsuccessful legislative efforts" at the federal level over the years. *Id.* at 20-21. The court also pointed to the "long history" of state common-law and statutory regulation of non-compete agreements, which would each be preempted by the Rule. *Id.*

Because the major questions doctrine applied, the court recognized that the Commission must identify "clear Congressional permission" to promulgate the Rule. *Id.* at 24. Yet the Commission had not done so. Specifically, the court determined that the FTC's "new assertion" of "expansive authority" in the ancillary and "relatively dormant Section 6(g)" likely did not authorize the "hugely consequential expansion of regulatory authority" reflected in the Rule. *Id.* at 22-23. In particular, the court explained, Section "6(g) may not be the behemoth that the

Commission says it is," given that the "rules and regulations" portion of the provision has to "share space" with the "more ministerial" "classifying corporations" power and that the Commission had "never tried substantive rulemaking of this magnitude before." *Id.* The court was especially troubled by the "lack of historical precedent, coupled with the breadth of authority" that the FTC now claims. *Id.* at 23.[4]

The district court then held that the remaining factors favored preliminary relief. It found that POV would face irreparable harm were the Rule to take effect, because it would "incur costs"—which would "obviously" be "more than *de minimis*"—"to review its existing contracts for compliance with the [R]ule, and to strategize on how best to change [its] existing agreements and business models." *Id.* at 26-27. And it further held that the balance of equities and the public interest favored relief because the FTC was likely exceeding its statutory authority, yet would "not be substantially harmed by maintenance of the status quo" pending a final decision on the Rule's validity. *Id.* at 27-28.

---

[4] Although further analysis was unnecessary given the court's ruling under the major questions doctrine, the court also concluded that POV did not demonstrate a likelihood of success on its constitutional avoidance arguments or its argument that the FTC lacks statutory authority to issue substantive competition rules generally. *See id.* at 8, 13.

## V.    Standard of Review

"The grant or denial of a preliminary injunction is within the sound discretion of the district court and will not be disturbed absent a clear abuse of discretion." *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242, 1246 (11th Cir. 2002).    This Court reviews the district court's underlying "legal conclusions de novo and factual findings for clear error." *Mills v. Hamm*, 102 F.4th 1245, 1248 (11th Cir. 2024).

# SUMMARY OF ARGUMENT

The district court was right to grant a preliminary injunction barring enforcement of the Non-Compete Rule against POV. At a minimum, that conclusion was not an abuse of discretion. This Court should affirm.

**I.** POV is likely to succeed on the merits of its claim that the FTC lacked authority to issue the Non-Compete Rule.

**A.** There should be no question that the major questions doctrine applies to the Non-Compete Rule; indeed, each factor that the Supreme Court has found significant in past major questions cases is present here. The Rule is economically significant: it reshapes the economy on a massive scale, wiping out approximately 30 million contractual agreements and increasing labor costs by *$400 billion to $1.2 trillion*, according to the Commission's own estimates. It is politically significant: Congress has considered more than a dozen bills on this issue in the last five years alone, yet thus far has declined to act. And the Rule upends the balance of power between the federal government and the States, which have traditionally regulated (and largely permitted) non-compete agreements.

**B.** Because the major questions doctrine applies, the Rule is unlawful unless the Commission can identify clear congressional authorization for it. The Commission fails to do so. Instead, it relies on vague language from the second half of an ancillary provision—Section 6(g) of the FTC Act—authorizing the FTC to

"[f]rom time to time classify corporations and … to make rules and regulations." 15 U.S.C. § 46(g).  That vague language is not housed in Section 5, which details the Commission's competition authority.  It is instead buried in Section 6, which catalogs miscellaneous reporting and procedural powers, further confirming that it is not the font of authority to transform the national economy that the Commission claims.

The Commission's own practice tells the same story.  Aside from a rushed attempt to enforce against a handful of non-compete agreements on the eve of promulgating the Rule, the Commission's only prior attempt to regulate non-compete agreements came in an adjudication that it lost decades ago.  And since its establishment in 1914, the Commission had never attempted to use Section 6(g) to issue so sweeping a competition rule.  Indeed, aside from some brief experimentation with consumer protection rulemaking in the 1960s and 1970s, the Commission has never invoked the provision as the basis for *any* substantive rule.

**C.**  Even setting aside the major questions doctrine, the Non-Compete Rule is invalid because ordinary tools of statutory interpretation confirm that the FTC lacks the authority to issue substantive unfair competition rules generally.  The text of Section 6(g) begins by conferring the ministerial power to "classify corporations," indicating that the rulemaking authority that follows is similarly pedestrian.  *Id.*

The statutory structure and history underscore that this rulemaking authority is not substantive. Congress knew how to *explicitly* authorize the Commission to make substantive rules concerning various matters, and it did so elsewhere in the FTC Act. *See, e.g., id.* § 57(a)(1)(B) (authorizing "rules which define with specificity acts or practices which are unfair or deceptive"). But nowhere did it do so with respect to unfair methods of competition—and certainly not in Section 6(g), a "housekeeping" provision buried in a list of ministerial and reporting powers. *Ryan, LLC v. FTC*, 2024 WL 3879954, at *9 (N.D. Tex. Aug. 20, 2024). The fact that, for most of its existence, the Commission has not relied on Section 6(g) to issue substantive competition rules to "prevent" "unfair methods of competition" further suggests that it lacks such authority.

**D.** Constitutional avoidance compels the same conclusion. In *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), the Supreme Court noted that the FTC Act did not violate the nondelegation doctrine in part because the Commission would exercise the significant power to define "unfair methods of competition" only through adjudication—*i.e.*, "in particular instances, upon evidence, in the light of particular competitive conditions." *Id.* at 532-33. But the Commission's novel assertion of substantive competition rulemaking authority is not subject to any similar limitations. The Rule also raises concerns under the Commerce Clause, as adopting the Commission's interpretation would allow it to

issue sweeping regulatory changes—like the Non-Compete Rule—without any individualized inquiry as to effects on interstate commerce.

**II.** The district court correctly found that POV would be irreparably harmed absent a preliminary injunction and that the equities and the public interest weighed in POV's favor.

**A.** Should the Rule take effect, POV would suffer irreparable harm in the form of unrecoverable costs of compliance, including the cost of providing notice to current and former Sales Associates and redrafting agreements to comply with the Rule's eradication of long-accepted contract terms. Those costs are clearly more than *de minimis*, as the district court found, and are the direct and predictable consequence of the Rule. The Rule also threatens to disrupt POV's unique business model, which relies on significant investment in its Sales Associates in exchange for reasonably limited non-compete agreements. Thus, should the Rule go into effect, POV will suffer additional irreparable harm through the loss of employees, proprietary information, clients, and goodwill.

**B.** The balance of equities and the public interest also strongly favor preliminary relief. There is no public interest in enforcing an unlawful rule like the Non-Compete Rule. And the Commission has not demonstrated that it will suffer any harm from a narrow preliminary injunction, applicable only to POV, that simply preserves the long-standing status quo.

## ARGUMENT

**I.** **The District Court Correctly Held That POV Is Likely to Succeed on the Merits of Its Claim That the FTC Lacks the Statutory Authority to Issue the Non-Compete Rule.**

In issuing the Non-Compete Rule, the Commission asserted the authority to eradicate 30 million contracts nationwide and to ban the future use of non-compete agreements in all but the narrowest of circumstances. By any measure, that is an "extravagant statutory power over the national economy," *West Virginia*, 597 U.S. at 724 (cleaned up), circumventing what had been a vibrant, ongoing political debate in the halls of Congress and among the States.

Under the Supreme Court's major questions precedents, that sweeping assertion of "transformative" regulatory power must be greeted with the utmost "skepticism." *Id.* The major questions doctrine is based on the commonsense principle that Congress does not delegate sweeping regulatory power on a "question of deep economic and political significance" by using "vague" or "ancillary" statutory terms. *Id.* at 716 (citation omitted). Instead, "courts expect Congress to speak clearly" before conferring such power on an agency. *Id.* (cleaned up); *see also Biden v. Nebraska*, 600 U.S. 477, 506 (2023).

The major questions doctrine is squarely implicated here. And the Commission's reliance on vague and ancillary language fails to meet its burden of

identifying a "clear congressional authorization" for the Rule. *West Virginia*, 597 U.S. at 723.

## A.   The Major Questions Doctrine Applies.

As the district court concluded, this is a quintessential major questions case: the Rule has extraordinary economic consequences, carries great political significance, and intrudes on an area traditionally regulated by the States. In other words, this is "a relatively easy case for the doctrine's application" because "each of the signs the Court has found significant in the past is present here." *West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring).

### 1.   *Economic Significance*

Courts have applied the major questions doctrine when a federal agency asserts regulatory power over "a significant portion of the American economy." *Id.* at 722 (majority opinion) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Here, as the district court correctly found, the Non-Compete Rule would have a "huge economic impact" and "affect a significant portion of the American economy." Dkt. No. 59 at 20.

The numbers are staggering. The Commission "estimate[d] that approximately one in five American workers—or approximately 30 million workers—is subject to a non-compete," 89 Fed. Reg. at 38343, 38346, 38464, and that an even greater number—anywhere from "45.3 million" to "101.1 million"

workers—would be "affected" by the Rule, *id.* at 38480. Under its "primary" estimation approach, the Commission determined that employers would pay out an additional "$400 billion to $488 billion over ten years" in increased wages. *Id.* at 38433, 38474. But the Commission acknowledged that this estimate "may *understate*" the effects, and that the actual impact could amount to more than *$2.1 trillion* over ten years. *Id.* at 38474-75 (emphasis added). And even that figure does not include other economic impacts, such as billions of dollars in legal and administrative compliance costs that are certain to result. *Id.* at 38484.

These figures are similar to—or well exceed—economic impacts that the Supreme Court has found sufficient to trigger the major questions doctrine. The invalidation of 30 million non-compete contracts is an economic disruption at least on par with "erasing the debts of 20 million borrowers," *Nebraska*, 600 U.S. at 483, barring the eviction of "between 6 and 17 million tenants," *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021), or requiring "permits for the construction and modification of tens of thousands, and the operation of millions, of small [emissions] sources," *Util. Air*, 573 U.S. at 324. And imposing a wealth transfer from employers to employees and between competitors in the range of $400 billion to $2.1 trillion— on top of billions more in compliance costs and other economic effects—*dwarfs* the considerable economic impacts of agency actions in other major questions cases. *See, e.g.*, *West Virginia*, 597 U.S. at 714 (EPA Clean Power Plan; "billions of dollars

in compliance costs"); *NFIB v. OSHA*, 595 U.S. 109, 119 (2022) (OSHA vaccine mandate; "billions of dollars" in compliance costs); *Ala. Ass'n of Realtors*, 594 U.S. at 764 (eviction moratorium; "nearly $50 billion" impact).

The Commission does not dispute that the Rule would have sweeping economic effects—nor could it, as the numbers above reflect its own estimates. Rather, it argues that these impacts do not matter because "relatively large economic effects" are "an inherent feature of the statutory scheme." FTC Br. 39. But that has been true in all the statutory schemes at issue in the Supreme Court's major questions cases. Nobody contests that agencies like the EPA and OSHA are economically powerful regulators operating under substantial grants of statutory authority as a general matter. But if that were enough to escape the major questions doctrine, the doctrine would be a nullity.

The "pertinent question" in a major questions case instead concerns the nature and breadth of the *particular* regulation at issue. *Nebraska*, 600 U.S. at 504. In *Biden v. Nebraska*, for instance, the relevant question was not whether the Secretary of Education generally had authority "to give borrowers more relief when an emergency has inflicted greater harm," but instead whether he could "use his powers to abolish $430 billion in student loans" at the end of the COVID pandemic. *Id.* (citation omitted). Similarly, here, the question that matters is not whether the FTC generally has authority to "prevent" individuals from engaging in "unfair methods

of competition," 15 U.S.C. § 45(a), but instead whether Congress clearly authorized the FTC to abolish 30 million contracts, by rulemaking, to the tune of hundreds of billions of dollars.

Even on its own terms, the Commission fails to establish that the statute contemplates competition rules as economically significant as the Non-Compete Rule. It relies on a provision requiring that amendments to existing rules with annual economic effects of at least $100 million must follow certain procedures laid out in Section 22. *See* FTC Br. 40 (citing 15 U.S.C. § 57b-3(a)(1)(A)). But that $100 million threshold pales in comparison to the Commission's own *conservative* estimate of the Rule's economic impact ($400 billion). And regardless, the provision addresses *UDAP* rules, which Section 18 explicitly authorizes the Commission to issue.[5] The fact that the statute contemplates $100 million amendments to UDAP rules reveals little about whether it also contemplates a new $2.1 trillion competition rule. *Cf.* 120 Cong. Rec. 41406 (1974) (statement of Rep. Broyhill) (observing that "[a]ntitrust rules would obviously have a far more pervasive effect than rules defining unfair or deceptive acts or practices").

---

[5] On its face, the provision also applies to rules promulgated under Section 6(g). But that reference merely captures amendments to legacy rules issued under Section 6(g) before the Magnuson-Moss Warranty Act and nowhere references unfair methods of competition. *See* Holyoak, *supra*, at 13.

2.      *Political Significance*

The major questions doctrine has also applied when an agency asserts the authority to resolve a matter of "political significance." *West Virginia*, 597 U.S. at 701 (citation omitted).  To gauge political significance, the Supreme Court has looked to whether Congress has considered legislating to address the matter—and, in particular, whether it has rejected legislation that would do so.  *See, e.g.*, *Nebraska*, 600 U.S. at 503 (Congress had considered and rejected a number of "student loan forgiveness bills and other student loan legislation"); *West Virginia*, 597 U.S. at 731-32 (Congress had "consistently rejected proposals to amend the Clean Air Act" and create a program like EPA's Clean Power Plan); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 122 (2000) ("Congress several times considered and rejected bills that would have given the FDA [the] authority" to regulate tobacco products).

The Non-Compete Rule easily checks this box.  Within the last five years alone, more than a dozen draft bills have been introduced in Congress aimed at restricting or prohibiting the use of non-compete agreements.[6]  Some of those bills

---

[6] *See, e.g.*, Domestic Workers Bill of Rights Act, H.R. 8732, 118th Cong. (2024); Domestic Workers Bill of Rights Act, S. 4552, 118th Cong. (2024); End Employer Collusion Act, S. 2535, 118th Cong. (2023); Freedom To Compete Act of 2023, S. 379, 118th Cong. (2023); Workforce Mobility Act of 2023, S. 220, 118th Cong. (2023); Workforce Mobility Act of 2023, H.R. 731, 18th Cong. (2023); Restoring Workers' Rights Act of 2022, H.R. 8755, 117th Cong. (2022); Workforce

are broad, mirroring the Rule's sweeping prohibition on non-compete agreements. *See, e.g.*, Workforce Mobility Act of 2023, S. 220, 118th Cong. (2023). Others propose narrower restrictions, targeting non-compete agreements for particular categories of workers, *see, e.g.*, Domestic Workers Bill of Rights Act, H.R. 8732, 118th Cong. (2024), or in specific economic sectors, *see, e.g.*, Digital Consumer Protection Commission Act of 2023, S. 2597, 118th Cong. (2023). And Congress has adopted none of them. Non-compete agreements have thus been the subject of a robust political debate—one that Congress has not resolved or clearly tasked the FTC with resolving. *See* Ferguson, *supra*, at 14 (criticizing the Commission's "termination of the democratic process").

### 3. *Disrupts the Federal-State Balance*

A federal regulatory "intru[sion] into an area that is the particular domain of state law" may also suggest a major questions case. *Ala. Ass'n of Realtors*, 594 U.S. at 764. For example, the Supreme Court has required clear congressional authorization for agency actions that purport to restrict the landlord-tenant relationship, *see id.*, or regulate utilities, *see West Virginia*, 597 U.S. at 746

---

Mobility Act of 2021, S. 483, 117th Cong. (2021); Workforce Mobility Act of 2021, H.R. 1367, 117th Cong. (2021); Employment Freedom for All Act, H.R. 5851, 117th Cong. (2021); Domestic Workers Bill of Rights Act, S. 2569, 117th Cong. (2021); Domestic Workers Bill of Rights Act, H.R. 4826, 117th Cong. (2021); Restoring Worker Power Act of 2020, H.R. 7638, 116th Cong. (2020); Freedom for Workers to Seek Opportunity Act, H.R. 4254, 114th Cong. (2015); Mobility and Opportunity for Vulnerable Employees Act, S. 1504, 114th Cong. (2015).

(Gorsuch, J., concurring).  Those major questions cases apply the closely related federalism canon, which—based on similar presumptions about how Congress legislates—requires that Congress "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power."  *Ala. Ass'n of Realtors*, 594 U.S. at 764 (citation omitted); *see also, e.g.*, *Sackett v. EPA*, 598 U.S. 651, 679-80 (2022).

For most of our Nation's history, the States have developed their own legal frameworks—by statute or common law—for evaluating the legality of non-compete agreements.  When the Non-Compete Rule was promulgated, 46 of the 50 States—including Florida—*permitted* non-compete agreements in at least some circumstances.  And the appropriate regulatory treatment of non-compete agreements has recently been a vigorously debated subject of state legislation.  For example, Minnesota recently banned non-compete agreements, *see* Minn. Stat. § 181.988 (2023), while other States, such as Georgia, have made non-compete agreements easier to enforce, *see* Ga. Code Ann. § 13-8-50-54.  But the Non-Compete Rule would more than "intrude" into this traditional area of state law, *Ala. Ass'n of Realtors*, 594 U.S. at 764—the Rule would completely displace it with a categorical federal ban.

*4.    The Commission's Counterarguments Are Unavailing.*

Because the major questions doctrine clearly applies here, the Commission, in an "attempt to relitigate *West Virginia*" and other major questions cases, *Nebraska*, 600 U.S. at 504, presses a revisionist take on the doctrine that the Supreme Court has already rejected.

First, the Commission argues that the doctrine does not apply because regulation of non-compete agreements falls within its "wheelhouse"—*i.e.*, its "core expertise and mandate." FTC Br. 36-39. But the Supreme Court has twice rejected that very argument, instead focusing on the nature of the specific agency action at issue. Most recently, in *Biden v. Nebraska*, the dissent contended that the major questions doctrine should not apply to the Secretary of Education's loan cancellation plan because "[s]tudent loans are in the Secretary's wheelhouse." *Nebraska*, 600 U.S. at 545 (Kagan, J., dissenting). The majority disagreed: "[I]n light of the sweeping and unprecedented impact of the Secretary's loan forgiveness program, it would seem more accurate to describe the program as being in the 'wheelhouse' of the House and Senate Committees on Appropriations." *Id*. at 504 (majority opinion). And before, in *West Virginia*, the dissent opined that no clear statement should be required because "[t]he Clean Power Plan falls within EPA's wheelhouse." *West Virginia*, 597 U.S. at 765 (Kagan, J., dissenting). Again, the majority rejected the argument. "[R]educ[ing] air pollution from power plants," the Court explained, may

be the EPA's "bread and butter," but the "decision of how much coal-based generation there should be over the coming decades" involved "basic and consequential tradeoffs" that "Congress would likely have intended for itself." *Id*. at 729-30 (majority opinion).

Similarly here, the relevant question is not whether regulation of non-compete agreements—or, at the expansive level of generality the FTC prefers, regulation of "unfair methods of competition"—is within the FTC's "wheelhouse" generally. The question is whether the FTC Act authorizes the Commission to issue *this* Rule. And given its economic and political importance, a nationwide ban of non-compete agreements is more aptly described as in the "wheelhouse" of Congress—or the States as the traditional regulators in this area. The major questions doctrine thus demands clear congressional authorization for the Non-Compete Rule.

To support its "wheelhouse" argument, the Commission invokes this Court's opinion in *Florida v. HHS*, 19 F.4th 1271, 1288 (11th Cir. 2021), which addressed the validity of the U.S. Department of Health and Human Services' ("HHS") COVID-19 vaccine mandate. *See* FTC Br. 38-39. But that decision, which predated both *West Virginia* and *Nebraska*, involved a far narrower agency action that did "not bring about an enormous and transformative expansion" of regulatory authority. *Florida*, 19 F.4th at 1287-88 (cleaned up). The Supreme Court later reviewed the validity of the HHS vaccine mandate without applying the major questions doctrine

and emphasized the agency's "longstanding practice" of "implementing the relevant statutory authorities" with similar regulations. *See Biden v. Missouri*, 595 U.S. 87, 94-95 (2022).

No comparable regulatory tradition exists here. If regulation of non-compete agreements on such a broad scale fell within the Commission's "core expertise and mandate," one would expect a meaningful history of such regulation. Yet except for one failed adjudication, *see Snap-On Tools*, 321 F.2d at 837, the Commission had never addressed non-competes until the day before it proposed the Rule, when it "rushed out" a handful of consent agreements, *see* 88 Fed. Reg. 3482, 3542 (Jan. 19, 2023) (Comm'r Wilson, dissenting).

*Second*, the Commission argues that if it has the authority to promulgate a substantive unfair competition rule of "small magnitude," then it must *also* have the authority to promulgate a broad rule—like the Non-Compete Rule—with massive economic and political effects. FTC Br. 35. But this view is simply a "frontal assault" on the existence of the major questions doctrine itself. *Nebraska*, 600 U.S. at 504. The whole point of the doctrine is that even if a "plausible textual basis for the agency action" might theoretically provide sufficient authority to ground a typical regulation, "something more than a merely plausible textual basis for the agency action is necessary" when an agency attempts an action with great economic and political significance. *West Virginia*, 597 U.S. at 723.

**B.     The Commission Lacks a Clear Grant of Statutory Authority for the Non-Compete Rule.**

Because the major questions doctrine applies, the Commission "must point to 'clear congressional authorization' for the power it claims." *Id.* (quoting *Util. Air*, 573 U.S. at 324). That is a high bar. Not once has the Supreme Court applied the major questions doctrine and found it satisfied. Yet aside from a few conclusory assertions that the statute is "clear," *see* FTC Br. 34-35, the Commission does not even attempt to meet its heavy burden.

Nor could the Commission do so because no clear statement of authority exists. The language on which the Commission relies instead bears all three hallmarks of a statute that does *not* provide "clear authorization": the language is "vague" and "subtle," *West Virginia*, 597 U.S. at 723, it is found in an "ancillary" statutory provision, *id.* at 730, and the Commission's interpretation of it would establish a previously "unheralded" power that the Commission has never before asserted, *id.* at 724.

### 1.     *Vague and General Language*

Such "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *Id*. at 723 (second alteration in original) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001)). And "[e]ven if Congress has delegated an agency *general* rulemaking or adjudicatory power, judges presume that Congress does *not* delegate its authority to

settle or amend major social and economic policy decisions." *Id.* at 730 (emphasis added) (citation omitted).

Here, the Commission relies on text that is as vague as could be. It hangs its hat on Section 6(g), which allows it to "[f]rom time to time classify corporations and … to make rules and regulations for the purpose of carrying out the provisions of this subchapter." 15 U.S.C. § 46(g). Nothing in this provision references either unfair methods of competition or the regulation of non-compete agreements. "Such a vague statutory grant is not close to the sort of clear authorization required" under the major questions doctrine. *West Virginia*, 597 U.S. at 732; *see also Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) ("catchall delegation language" conferring "generic" authority to "issue such regulations as may be necessary or appropriate to carry out" statute was "insufficient" under major questions doctrine (citing 42 U.S.C. § 802(f))).

Had Congress wanted to delegate such sweeping authority to the Commission, it knew how to do so, as demonstrated by specific grants of substantive rulemaking authority elsewhere in the Act. For example, Congress provided that the Commission "may from time to time issue rules" regulating products labeled as "Made in the U.S.A." or "Made in America," and even directed the Commission to "consider an appropriate percentage of imported components which may be included in [such] product[s]." 15 U.S.C. § 45a. Similarly, Congress clearly authorized

rulemaking authority "with respect to the collection, verification, or disclosure of information" related to "high-volume third party seller[s]" on "online marketplaces." *Id*. § 45f(c)(3). By any measure, the power to issue a blanket non-compete ban is far more significant than these circumscribed authorities. Yet the Commission points to no statutory language approaching the specificity of these more modest, yet undeniably concrete, delegations.

Indeed, the Commission cannot even identify a provision specifically authorizing *competition* rulemaking, major or otherwise. Again, Congress knew how to write such a provision; in Section 18, it authorized the Commission to prescribe "rules which define with specificity acts or practices which are unfair or deceptive." *Id*. § 57a(1)(B). But Congress elected not to delegate similar authority respecting "unfair methods of competition." And even if it had, such a general provision *still* would not clearly authorize the Commission to define as an "unfair method of competition" a widespread practice embodied in tens of millions of contracts and affecting hundreds of billions of dollars across the economy.

Nor does Section 5's equally vague direction to "prevent" the use of "unfair methods of competition" provide the necessary clear authorization. *Id*. § 45(a)(2). In the Commission's view, the word "prevent" must "contemplate[] forward-looking, prophylactic rulemaking," including a nationwide ban on non-compete agreements. FTC Br. 22. True, "shorn of all context, the word is an empty vessel."

*West Virginia*, 597 U.S. at 732. But in context, "prevent" cannot be read to permit prospective competition rulemaking when Section 5 itself provides for only case-by-case adjudication. *See, e.g.*, 15 U.S.C. § 45(a)(2), (b)-(c), (f)-(g), (*l*)-(n). And regardless, the Commission's limitless reading of "prevent" is just the sort of "subtle device" that does not qualify as a clear grant of *specific* statutory authority for a sweeping ban on non-competes. *Nebraska*, 600 U.S. at 496 (cleaned up).

None of the other stray textual provisions that the Commission cites fits the bill, either. For example, the Commission (at 28) points to the Magnuson-Moss Warranty Act's savings clause, which provides that the Act "shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition in or affecting commerce." 15 U.S.C. § 57a(a)(2). But that provision does not confer authority at all, let alone specific power to eradicate non-compete agreements nationwide. It simply preserves "any" preexisting competition rulemaking power that might exist—without confirming that such power in fact exists. And despite referencing "interpretive rules," it conspicuously omits any reference to substantive or legally binding rules. This congressional silence cannot provide the clear "*textual* basis" the Commission needs. *West Virginia*, 597 U.S. at 723 (emphasis added).[7]

---

[7] For the same reason, the Commission's argument (at 25-29) that Congress somehow ratified its supposed substantive competition rulemaking authority in the

## 2.    *Ancillary Provision*

Courts do not expect Congress to delegate important powers to agencies in "ancillary provision[s]," "gap filler[s]," or statutory "backwater[s]."  *Id*. at 730 (citation omitted).  Yet an ancillary provision—Section 6(g)—is exactly where the Commission turns for its asserted authority to promulgate the Non-Compete Rule.

Section 6(g) provides that the FTC shall have power to "[f]rom time to time classify corporations and … to make rules and regulations for the purpose of carrying out the provisions of this subchapter."  15 U.S.C. § 46(g).  On its face, the power to "classify corporations" is ancillary—a mere housekeeping task.  And in light of those closely "neighboring words," *United States v. Williams*, 553 U.S. 285, 294 (2008), "common sense intuition" suggests that the remainder of Section 6(g) is best understood as conveying related, limited housekeeping authority, *Fischer v. United States*, 603 U.S. 480, 487 (2024).[8]  A provision meant to confer such minor authority

---

1970s fails to supply the "clear authorization" required for the Non-Compete Rule. Ratification arguments are nothing more than inferences about the meaning of statutory silence.  *See, e.g.*, *Brown & Williamson*, 529 U.S. at 157-58.  In any event, the Commission's ratification argument fails on its own terms.  *See infra* pp. 47-49.

[8] Section 6(g)'s history confirms its limited scope.  It was added to a version of the bill that required any corporation with more than $5 million in capital to file certain reports, while allowing the Commission to identify—by establishing "rules" "classifying corporations"—which corporations below that threshold were also required to file.  *See* Report of the Conference Committee, H.R. Rep. No. 63-1142, at 11-12 (Sept. 4, 1914), *in 5 The Legislative History of the Federal Antitrust Laws and Related Statutes* 4682 (Part I, Earl W. Kintner ed., 1982).  The only member of Congress to make a contemporaneous public statement on the clause's meaning

is a "wafer-thin reed on which to rest" any substantive rulemaking powers, let alone a transformative measure like the Non-Compete Rule. *West Virginia*, 597 U.S. at 721 (cleaned up).

Moreover, Section 6(g) is found in an "ancillary" and "gap-filler" location within the statute. *Id.* at 730. It is housed not within Section 5, which directs the Commission to "prevent" the use of "unfair methods of competition" and details its core adjudicatory powers, *see* 15 U.S.C. § 45, but within Section 6, which lists miscellaneous "[a]dditional powers," *id.* § 46, related to the Commission's ministerial and reporting authority. And far from a place of prominence in that list, Section 6(g) appears seventh out of roughly a dozen miscellaneous powers. *See infra* pp. 43-44. The notion that Congress would have placed its authorization for the Commission to restructure the American labor market in such an obscure and ancillary position flouts the familiar adage that Congress does not "hide elephants in mouseholes." *Whitman*, 531 U.S. at 468.

### 3. *Previously Unheralded Power*

After more than a century of inaction, the Commission has suddenly asserted the power to wipe out 30 million non-compete agreements nationwide and categorically prohibit their future use. Put differently, the Commission now

---

explained that it permitted only rules "with regard to the classification of corporations." 51 Cong. Rec. 9048 (1914) (statement of Rep. Towner).

"claim[s] to discover in a long-extant statute" a power that was entirely "unheralded" before. *West Virginia*, 597 U.S. at 724 (cleaned up). That is a strong signal that no such power has ever existed, for "the want of assertion of power by those who presumably would be alert to exercise it" is "significant in determining whether such power was actually conferred." *Id.* at 725 (cleaned up).

Before the Non-Compete Rule (and the smattering of consent agreements that directly preceded it), the FTC had only once before sought to regulate non-compete agreements. But that attempt involved a single adjudication affecting a single tool manufacturer—and the FTC lost in court, because the restriction at issue was reasonable. *See Snap-On Tools*, 321 F.2d at 836-37. Never before has the Commission attempted to regulate non-compete agreements nationwide in one fell swoop. The Commission's belated assertion of this previously "unheralded" power is "dubious" given that history. *Nebraska*, 600 U.S. at 519 (Barrett, J., concurring).

In fact, the putative power to promulgate *any* substantive competition rule under Section 6(g)—let alone one with the massive impact of the Non-Compete Rule—was itself "unheralded" before now. Although Section 6(g) was enacted as part of the FTC's organic statute in 1914, the Commission initially disclaimed any substantive rulemaking authority under that provision (or any other). *See supra* p. 11. Only beginning in 1962 did it invoke Section 6(g) to promulgate a substantive rule. And in the brief rulemaking experiment that followed during the 1960s and

1970s, the Commission almost exclusively issued narrow consumer protection rules, none of which was remotely comparable in scope or impact to the Non-Compete Rule. For example, during that period, the FTC issued rules declaring the following to be UDAPs: (1) misleading consumers about sleeping bag sizes, (2) misrepresenting extension ladder sizes, (3) misrepresenting table cloth "cut sizes", (4) misrepresenting television viewable area sizes, (5) describing household electric sewing machines as "automatic," and (6) failing to disclose certain effects from inhaling certain aerosol sprays. 89 Fed. Reg. at 38349.[9]

Just once during this period—indeed, just once during the Commission's entire 110-year history before the Non-Compete Rule—did the Commission promulgate a standalone unfair competition rule. And that rule, issued in 1967, is hardly meaningful precedent for the extensive authority the Commission now claims. Spanning just two pages of the Federal Register and without even citing Section 6(g), it addressed the antitrust implications of certain advertising or promotional payments from men's and boys' clothing manufacturers. *See Discriminatory Practices in Men's and Boys' Tailored Clothing Industry, 32 Fed.*

---

[9] The Commission has never contended that the Non-Compete Rule regulates a practice that is both an unfair method of competition and a UDAP. Thus, the Section 6(g) rules it issued in the 1960s and 1970s that relied on both sources of authority are not relevant precedent for that reason in addition to the far narrower scope of those rules.

Reg. 15584, 15585 (Nov. 9, 1967).  It was never enforced and was subsequently

repealed.  *See* Repeal of Trade Regulation Rule: Discriminatory Practices in Men's

and Boys' Tailored Clothing Industry, 59 Fed. Reg. 8527 (Feb. 23, 1994).  And—

like the rule the Supreme Court rejected as meaningful precedent for the EPA's

Clean Power Plan in *West Virginia*—its legality "was never addressed by a court."

597 U.S. at 725.

### C. Ordinary Tools of Statutory Construction Confirm that the Commission Lacks Authority to Issue Substantive Unfair Competition Rules.

The major questions doctrine makes this an easy case.  But even applying only

the ordinary tools of statutory interpretation, the Commission lacks the authority to

promulgate the Non-Compete Rule.  The text, structure, and history of Section 6(g)

instead confirm that it is a mere "housekeeping" rulemaking provision that does not

authorize the FTC to issue legally binding rules proscribing unfair methods of

competition.  *Ryan*, 2024 WL 3879954, at *8-12.

Beginning with the text, Section 6(g) authorizes the FTC to "[f]rom time to

time classify corporations and … to make rules and regulations for the purpose of

carrying out the provisions of this subchapter."  15 U.S.C. § 46(g).  Tellingly, the

FTC omits entirely from its brief the "classify corporations" language from this

provision.  But that context is essential.  By tying the Commission's Section 6(g)

authority to those "neighboring words," *Williams*, 553 U.S. at 294, the statute limits Section 6(g) rulemaking to similarly ministerial matters. *See supra* pp. 38-39.

The statutory structure points to the same conclusion. As discussed, the Act contains several explicit grants of rulemaking authority, including Section 18's authorization of "rules which define with specificity acts or practices which are *unfair or deceptive acts or practices*." 15 U.S.C. § 57a(1)(B) (emphasis added). Yet neither Section 6(g), nor any other provision, contains similarly express language authorizing the FTC to issue rules "which define with specificity acts which are" *unfair methods of competition*. Instead, Section 5 empowers the Commission only to conduct case-by-case *adjudication* to "prevent" "unfair methods of competition." *Id.* § 45(a)(2). And it is not "likely that Congress, without mentioning the matter, would have granted the Commission authority so readily to circumvent its traditional § 5 administrative proceedings." *AMG Cap. Mgmt.*, 593 U.S. at 78. Moreover, reading Section 6(g) to confer such sweeping authority would "render superfluous" the Act's various concrete rulemaking authorizations. *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 314 (2020); *see Ryan*, 2024 WL 3879954, at *11.

Section 6(g)'s inconspicuous location is instructive too. Again, the provision is divorced from Section 5 and housed instead in a list of ancillary, "[a]dditional powers of [the] Commission," 15 U.S.C. § 46, and does not appear until the *second half* of the *seventh* provision:

- Investigation of Persons, Partnerships, or Corporations (§ 46(a));
- Reports of Persons, Partnerships, and Corporations (§ 46(b));
- Investigation of Compliance with Antitrust Decrees (§ 46(c));
- Investigations of Violations of Antitrust Statutes (§ 46(d));
- Readjustment of Business of Corporations Violating Antitrust Statutes (§ 46(e));
- Publication of Information; Reports (§ 46(f));
- ***Classification of Corporations; Regulations (§ 46(g));***
- Investigations of Foreign Trade Conditions; Reports (§ 46(h));
- Investigations of Foreign Antitrust Law Violations (§ 46(i));
- Investigative Assistance for Foreign Law Enforcement Agencies (§ 46(j));
- Referral of Evidence for Criminal Proceedings (§ 46(k)); and
- Expenditures for Cooperative Arrangements (§ 46(*l*)).

The placement of Section 6(g) confirms its limited scope, as "it would be odd indeed if Congress had tucked" such an "important expansion" of the FTC's competition authority into such an "obscure" provision. *Sackett*, 598 U.S. at 677.

It would be similarly odd for Congress to confer such authority while failing to prescribe consequences for violations of Section 6(g). Yet the Act includes no provision setting out such consequences. That omission "indicates a lack of substantive force," because when "authorizing legislative rulemaking," Congress "historically prescribes sanctions for violations of the agency's rules." *Ryan*, 2024 WL 3879954, at *10. For example, Congress authorized the Commission to immediately enforce violations of "any" substantive rule "respecting unfair or deceptive acts or practices" in federal court, without first obtaining a cease-and-desist order through the adjudicative process. *See* 15 U.S.C. § 57b(a)(1). There is no analogous penalty provision for Section 6(g). *See* Thomas W. Merrill & Kathryn

Tongue Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 550 (2002) (observing that Section 6(g) lacks "any statutory sanctions to put teeth into the regulations," which further confirms "that Congress did not grant the FTC legislative rulemaking powers under the original [FTC Act]").

If any doubt remained, the statute's history would resolve it. As POV has detailed above, the FTC has carried out its competition mandate throughout its history almost exclusively through case-by-case adjudication under Section 5. *See supra* pp. 10-13, 40-42. The FTC's near-total failure to ever use its purported competition rulemaking authority, despite having every incentive to do so, suggests that it lacks any such authority. *See West Virginia*, 597 U.S. at 725. And so, too, do the FTC's repeated assertions in the decades after Section 6(g)'s enactment that it *lacked* substantive rulemaking authority under that provision. *See supra* p. 11; *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) (agency "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning").

Resisting these points, the Commission falls back on two main counterarguments. *First*, it points to purportedly similar "statutory language in other contexts" that has been read to confer legislative rulemaking authority. FTC Br. 23-25. *Second*, it argues that Congress somehow "ratified" the Commission's unlawful

rulemaking experimentation from the 1960s and 1970s. *Id*. at 25-29. Both arguments fail.

The Commission's first argument relies on statutes with little relevance here. Unlike Section 6(g), none of the FTC's cited rulemaking provisions are nested in a list of ancillary "[a]dditional powers" and tied to a ministerial authority like the Commission's power to "classify corporations." Instead, they are standalone sections or subsections devoted specifically to the conferral of substantive rulemaking authority.[10] Moreover, the relevant agencies have consistently issued substantive rules under the cited provisions—and, in some cases, the Supreme Court has blessed that authority. *See, e.g.*, *FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 793 (1978) (noting that FCC's substantive rulemaking authority was "well established" given earlier Supreme Court precedents affirming the validity of prior FCC regulations promulgated under the same statutory provision). As explained above, there is no such history here. *See supra* pp. 10-13, 40-42. In short, the provisions on which the Commission relies come from fundamentally "different statutes—they have different language, different histories, and were enacted in

---

[10] *See, e.g.*, 15 U.S.C. § 1604 (Federal Reserve Board) ("Regulations"); 42 U.S.C. § 1408 (Department of Housing and Urban Development) ("[R]ules and regulations"); 29 U.S.C. § 156 (National Labor Relations Board) ("Rules and regulations"); 47 U.S.C. § 303(r) (Federal Communications Commission) (conferring power to make "rules and regulations").

different contexts." *DHS v. MacLean*, 574 U.S. 383, 398 (2015). They therefore "ha[ve] no impact whatsoever" on the proper interpretation of Section 6(g). *Id.*[11]

The Commission's second argument—that Congress somehow "ratified" its unlawful rulemaking experimentation from the 1960s and 1970s by re-enacting Section 6(g) as part of the Magnuson-Moss Warranty Act in 1975—fares no better. FTC Br. 25-29. Indeed, it falters at the start, given the Supreme Court's skepticism that even a "smattering of lower court opinions could ever represent the sort of judicial consensus so broad and unquestioned that we must presume Congress knew of and endorsed it." *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230, 244 (2021) (cleaned up). The Commission's ratification argument turns not on a "smattering" of lower court rulings, but on *one* highly questionable decision: the D.C. Circuit's 1973 decision in *National Petroleum*, which employed now-defunct methods of statutory interpretation to conclude that Section 6(g) authorizes substantive rulemaking. *See supra* p. 12.

Further weakening any inference of ratification is the fact that Congress did not reenact the FTC Act "without pertinent change." *CFTC v. Schor*, 478 U.S. 833, 846 (1986). On the contrary, when it enacted the Magnuson-Moss Warranty Act

---

[11] Additionally, none of the cases on which the Commission relies considered whether the rulemaking language at issue constituted "clear congressional authorization" for a rulemaking as economically and politically significant as the Non-Compete Rule. *West Virginia*, 597 U.S. at 723.

after *National Petroleum*, Congress included a new provision, Section 18, that gave the Commission express authority to issue "rules which define with specificity acts or practices which are unfair or deceptive." 15 U.S.C. § 57a(1)(B). But again, it enacted no corresponding authorization for unfair methods of competition rulemaking, nor any of the heightened procedural requirements or penalty provisions that accompany the Commission's UDAP rulemaking authority. *See id*. § 57a(b)-(c); 15 U.S.C. § 45(m)(1)(A). In other words, in the same law in which it re-enacted Section 6(g), Congress demonstrated that it knew how to expressly create a substantive rulemaking scheme with respect to one side of the FTC's mandate (UDAPs), yet declined to do so with respect to its mandate over unfair methods of competition. As Representative Broyhill, a member of the Magnuson-Moss Warranty Act's Conference Committee, contemporaneously explained, "the new bill does not deal with the antitrust laws," because antitrust rules "would obviously have a far more pervasive effect than rules defining unfair or deceptive acts or practices." 120 Cong. Rec. 41407 (1974). These statutory changes therefore did not "ratify" a broad interpretation of Section 6(g), but instead confirm that the Commission lacks substantive competition rulemaking authority.[12]

---

[12] Similar reasoning applies to the FTC's additional ratification arguments premised on Congress's 1980 amendments defining a "rule" under the FTC Act and setting out procedural requirements applicable to certain rulemakings, each of which pertained to UDAP rules. *See* FTC Br. 30-31; *supra* n.5.

The Commission ultimately seeks refuge in Section 18's savings clause, which provides that Section 18's authorization of UDAP rulemaking, and its clarification that Section 6(g) does *not* authorize such rulemaking, "shall not affect any authority of the Commission to prescribe rules (including interpretive rules), and general statements of policy, with respect to unfair methods of competition."  15 U.S.C. § 57a(a)(2).  But that clause does not save the Commission's ratification argument.  As POV has explained, *see supra* pp. 37, the clause is not itself a grant of authority of any kind—and certainly not authority to issue *substantive* rules, which (unlike "interpretive" rules) it does not mention.[13]

The Commission's ratification argument—like its reliance on rulemaking provisions from entirely different statutory schemes—does not displace the conclusion that the statutory text, structure, and history compel:  The Commission lacks the authority to issue substantive rules defining unfair methods of competition.

### D.    Constitutional Avoidance Requires the Same Conclusion.

Under the canon of constitutional avoidance, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly

---

[13] As Professor Thomas Merrill has noted, this "savings clause" was likely included to preserve "the Merger Guidelines, which are general statements of policy, not legislative rules."  Thomas W. Merrill, *Antitrust Rulemaking: The FTC's Delegation Deficit*, 75 Admin. L. Rev. 277, 307 (2023).

contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988). The Commission's expansive view of its Section 6(g) authority raises constitutional concerns under both the nondelegation doctrine and the Commerce Clause. Because it is plausible to read the FTC Act *not* to confer substantive competition rulemaking authority, *see supra* pp. 42-49, these constitutional concerns provide an independent basis to reject the Commission's interpretation.

The understanding the Commission offers of its own authority would resurrect, under the banner of the FTC Act, the same nondelegation problem that doomed the National Industrial Recovery Act ("NIRA") in *Schechter Poultry*, 295 U.S. at 537-38. There, the Supreme Court held that the NIRA violated the nondelegation doctrine in part because it lacked case-by-case administrative procedures and instead empowered the President to impose "codes of fair competition" by across-the-board fiat. *Id.* at 532-34, 541. The Court explained that FTC Act, in contrast, did not raise such concerns because the FTC acted as a "quasi-judicial body" determining "unfair methods of competition" based on "particular instances, upon evidence, in the light of particular competitive conditions" acting on "formal complaint" with "notice and hearing" and "judicial review." *Id.* at 532-33; *see also Pan Am. World Airways, Inc. v. United States*, 371 U.S. 296, 306-08 (1963). In promulgating its blanket Rule, however, the Commission jettisons the FTC Act's

constitutionally critical guardrails, which allowed it to escape the nondelegation

concerns that defeated the NIRA in *Schechter*.  By asserting essentially "unfettered

discretion" to regulate the economy without any "intelligible principle," the

Commission's interpretation of the Act would violate the nondelegation doctrine.

*Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion).

The Commission's assertion of power to issue competition rules without any

individualized inquiry as to geographic scope or effects on interstate commerce

separately raises concerns under the Commerce Clause.  Although Congress is only

permitted to regulate "those activities that substantially affect interstate commerce,"

*United States v. Lopez*, 514 U.S. 549, 557, 559 (1995), the Non-Compete Rule

reaches agreements like POV's, which operate on a purely intrastate labor market

(covering less than 1% of Florida) involving the sale of stationary objects (homes)

that do not travel in interstate commerce.  *See also United States v. Darby*, 312 U.S.

100, 118-23 (1941) (requiring a connection to the shipment of goods in interstate

commerce when Congress seeks to regulate a labor market).

This Court can avoid reaching the merits of these constitutional questions by

adopting the much more natural interpretation of the FTC Act: that the Commission

lacks substantive competition rulemaking authority.  *See, e.g.*, *Solid Waste Agency*

*v. U.S. Army Corps of Engineers*, 531 U.S. 159, 174 (2001) (adopting a narrower

statutory interpretation "to avoid the significant constitutional and federalism

questions"—including under the Commerce Clause—raised by the government's interpretation).

## II. The District Court Correctly Weighed the Remaining Preliminary Injunction Factors in POV's Favor.

### A. The District Court Correctly Concluded that POV Would Suffer Irreparable Harm Absent the Injunction.

The district court correctly concluded that POV would suffer irreparable harm, including unrecoverable compliance costs and irreversible damage to its business, absent an injunction.

Should the Rule take effect, POV would incur "unrecoverable costs of compliance," which "constitute irreparable harm" because POV is unable to recover monetary damages due to the Commission's sovereign immunity. *E.g.*, *Georgia v. President of the U.S.*, 46 F.4th 1283, 1302 (11th Cir. 2022).[14] For example, because the Rule requires POV to provide "clear and conspicuous notice" to affected workers*, 16 C.F.R. § 910.2(b)(1), POV would need to identify and notify all Sales Associates (including former Sales Associates, wherever they may live) subject to non-compete agreements—an effort that would require significant time and attention from POV's small management staff. *See* Declaration of Brian D. Hudson, Dkt. No.

---

[14] In contending otherwise, the FTC offers only out-of-circuit authority that is not controlling here. *See* FTC Br. 43.

57-1 at 2; Dkt. No. 25-1 at 12. This "time and effort" is a direct and "obvious cost[] of complying" with the Rule. *Georgia*, 46 F.4th at 1302.

The Commission contends (at 42) that these harms are merely *de minimis*. But the district court found otherwise, explaining that "common sense" dictates that companies would have "compliance cost[s] that are more than *de minimis*" and that "in fact, the Commission recognized those costs in its own rulemaking." Dkt. No. 59 at 26-27. The district court's finding was well supported and, in any event, was not clearly erroneous. Indeed, this Court has already determined that similar compliance harms from agency rulemaking warrant a preliminary injunction. *See Georgia*, 46 F.4th at 1302.

Moreover, as the district court recognized, POV would also incur "compliance costs to change contracts, to enter into decisions on how to go forward from here, [and] to figure out how to deal with existing contracts." Dkt. No. 59 at 27; *see also* Dkt. No. 25-1 at 12-13. That companies would need to expend resources to redraft existing and future contracts, and otherwise overhaul their long-established business models, to comply with the Commission's eradication of longstanding, legitimate commercial agreements is a predictable consequence of the Rule.

Revising its contracts with Sales Associates, and losing the benefits of its existing contractual bargain with those Sales Associates, is particularly critical for POV in light of its unique business model. Unlike other real estate brokers, POV

hires Sales Associates, often with no real estate experience, and provides them with extensive training, confidential information, and prospective clients specific to The Villages. Dkt. No. 25-1 at 3-9. But POV could not do so without protection against the risk of competitors poaching Sales Associates and free-riding on these substantial investments. *Id.* at 9-11. And POV's bargain with Sales Associates has long provided that essential protection through tailored non-compete agreements. *Id.* That model would no longer be viable, though, should the Rule take effect and nullify those agreements. POV would be forced to redesign its training model, which would be "costly and likely result in less effective Sales Associates." *Id.* at 13. At a bare minimum, POV would need to redraft Sales Associate contracts that are compliant with the new Rule. Indeed, POV had already begun that work, which POV estimated would cost between $20,000 and $50,000 in outside counsel's legal fees and require at least 45 hours of time from POV's four-person legal team. *See* Dkt. No. 57-1 at 2-3.

The Commission responds that these contract-related compliance costs are "self-inflicted." FTC Br. 44. Because the Commission did not raise that argument below, it is forfeited.[15] It is also incorrect. The need to hire counsel to review and

---

[15] In opposing POV's motion for a preliminary injunction, the Commission did not contend that POV's compliance costs were self-inflicted. *See* Dkt. No. 50 at 36-37. Because the Commission asserts this argument for the first time on appeal,

revise contracts with Sales Associates is a necessary step to comply with a novel rule that spans 165 pages in the Federal Register—especially where those long-accepted terms (recently upheld under Florida law) have been essential to POV's business model.[16]  The district court did not clearly err in finding that these costs constituted irreparable harm.  In any event, the Commission does not and cannot dispute that the costs of providing notice are directly attributable to the Rule.  *See* 16 C.F.R. § 910.2(b)(1).    And under Eleventh Circuit precedent, those unrecoverable notification costs are sufficient to demonstrate irreparable harm.  *See Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).

In addition to these compliance-related costs, POV also faces irreparable harm from the loss of employees, proprietary information, customers, and goodwill should the Rule go into effect.  The Commission overlooks entirely the substantial risk that employees previously subject to a non-compete clause will immediately leave with POV's clients and proprietary information.   Such harm is both irreparable and

---

this Court need not consider it.  *Bailey v. Metro Ambulance Servs.*, 992 F.3d 1265, 1274 (11th Cir. 2021).

[16]   The government has previously acknowledged that "reading and understanding the regulations, revising policies," training employees, and "updating training materials" are "compliance-based costs."  Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33474, 33851 (Apr. 29, 2024) (U.S. Department of Education rule previously enjoined by this Court); *see Alabama v. U.S. Sec'y of Educ.*, 2024 WL 3981994 (11th Cir. 2024).

outside POV's control.  *See Georgia*, 46 F.4th at 1302 (loss of employees who declined to get vaccinated pursuant to government mandate constituted irreparable harm); *see also* Fla. Stat. § 542.335(1)(j) (recognizing that a violation of a reasonable non-compete agreement "creates a presumption of irreparable injury").  The Rule would also erode POV's reputation as a place where Sales Associates have close relationships with customers and a deep knowledge of The Villages.  Dkt. No. 25-1 at 14.  This Court has recognized that the "loss of customers and goodwill is an irreparable injury."  *BellSouth Telecommc'ns, Inc. v. MCI Metro Access Trans. Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005) (cleaned up).

**B.    The District Court Reasonably Weighed the Equities and the Public Interest.**

The balance of equities and the public interest factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435-36 (2009).  Those factors support affirming the district court's grant of an injunction because POV will suffer concrete harm to its business model and operations absent an injunction, while "neither the government nor the public has any legitimate interest in enforcing an unconstitutional" order.  *LaCroix v. Town of Ft. Myers Beach*, 38 F.4th 941, 955 (11th Cir. 2022); *see also Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (there is "no public interest in the perpetuation of unlawful agency action").

Nor does the Commission identify any specific harms that would result from the district court's narrow injunction, which temporarily bars enforcement of the

Rule only against POV. Just as the Rule fails to consider the individual circumstances of non-compete agreements, the Commission focuses (at 46-47) solely on the purported benefits of banning non-competes generally—even though the injunction only applies to POV's non-compete agreements that were recently upheld as reasonable under Florida law. The Commission does not, and cannot, explain how POV's reasonable agreements with its Sales Associates cause public harm. To the contrary, those limited agreements have facilitated personal, professional, and economic growth in POV's workforce and benefit the customers and community that POV serves.

In short, as the district court recognized, "the FTC will not be substantially harmed by the maintenance of the status quo until a final decision on the validity of the final rule is reached." Dkt. No. 59 at 28. "Maintenance of the status quo is the primary purpose of preliminary injunctive relief." *Cate v. Oldham*, 707 F.2d 1176, 1185 (11th Cir. 1983). And the status quo in this case has been in place for over a century; notwithstanding the enactment of the FTC Act in 1914, the agency has only just now decided that virtually all non-compete agreements are illegal. The public would benefit from a careful evaluation of the Commission's breathtaking assertion of regulatory authority before that status quo is upended.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's order preliminarily enjoining enforcement of the Rule against POV.

January 15, 2025

Respectfully submitted,

*/s/ Lauren Willard Zehmer*

Stacey K. Grigsby
Lauren Willard Zehmer
Matthew J. Glover
Daniel G. Randolph
Eli Nachmany
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000
sgrigsby@cov.com
lzehmer@cov.com
mglover@cov.com
drandolph@cov.com
enachmany@cov.com

Patrick M. Muldowney
Meagan L. Martin
BAKER & HOSTETLER LLP
200 South Orange Avenue, Suite 2300
Orlando, FL 32802
(407) 649-4000
pmuldowney@bakerlaw.com
mmartin@bakerlaw.com

*Counsel for Plaintiff-Appellee*
*Properties of the Villages, Inc.*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,953 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 360 MSO, Version 2402, in 14-point Times New Roman font.

January 15, 2025 */s/ Lauren Willard Zehmer* 
Lauren Willard Zehmer

*Counsel for Plaintiff-Appellee*
*Properties of the Villages, Inc.*

**ADDENDUM**

# TABLE OF CONTENTS

Page

15 U.S.C. § 45 ................................................................. A-1

15 U.S.C. § 46 ................................................................ A-10

15 U.S.C. § 57b(a) ........................................................ A-17

**15 U.S.C. § 45**

§ 45. Unfair methods of competition unlawful; prevention by Commission

**(a) Declaration of unlawfulness; power to prohibit unfair practices; inapplicability to foreign trade**

>**(1)** Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.

>**(2)** The Commission is hereby empowered and directed to prevent persons, partnerships, or corporations, except banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to part A of subtitle VII of Title 49, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended, except as provided in section 406(b) of said Act, from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.

>**(3)** This subsection shall not apply to unfair methods of competition involving commerce with foreign nations (other than import commerce) unless--

>>**(A)** such methods of competition have a direct, substantial, and reasonably foreseeable effect--

>>>**(i)** on commerce which is not commerce with foreign nations, or on import commerce with foreign nations; or

>>>**(ii)** on export commerce with foreign nations, of a person engaged in such commerce in the United States; and

>>**(B)** such effect gives rise to a claim under the provisions of this subsection, other than this paragraph.

If this subsection applies to such methods of competition only because of the operation of subparagraph (A)(ii), this subsection shall apply to such conduct only for injury to export business in the United States.

**(4)** **(A)** For purposes of subsection (a), the term "unfair or deceptive acts or practices" includes such acts or practices involving foreign commerce that--

> **(i)** cause or are likely to cause reasonably foreseeable injury within the United States; or
>
> **(ii)** involve material conduct occurring within the United States.
>
> **(B)** All remedies available to the Commission with respect to unfair and deceptive acts or practices shall be available for acts and practices described in this paragraph, including restitution to domestic or foreign victims.

## (b) Proceeding by Commission; modifying and setting aside orders

Whenever the Commission shall have reason to believe that any such person, partnership, or corporation has been or is using any unfair method of competition or unfair or deceptive act or practice in or affecting commerce, and if it shall appear to the Commission that a proceeding by it in respect thereof would be to the interest of the public, it shall issue and serve upon such person, partnership, or corporation a complaint stating its charges in that respect and containing a notice of a hearing upon a day and at a place therein fixed at least thirty days after the service of said complaint. The person, partnership, or corporation so complained of shall have the right to appear at the place and time so fixed and show cause why an order should not be entered by the Commission requiring such person, partnership, or corporation to cease and desist from the violation of the law so charged in said complaint. Any person, partnership, or corporation may make application, and upon good cause shown may be allowed by the Commission to intervene and appear in said proceeding by counsel or in person. The testimony in any such proceeding shall be reduced to writing and filed in the office of the Commission. If upon such hearing the Commission shall be of the opinion that the method of competition or the act or practice in question is prohibited by this subchapter, it shall make a report in writing in which it shall state its findings as to the facts and shall issue and cause to be served on such person, partnership, or corporation an order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice. Until the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, or, if a petition for review has been filed within such time then until the record in the

proceeding has been filed in a court of appeals of the United States, as hereinafter provided, the Commission may at any time, upon such notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any report or any order made or issued by it under this section. After the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time, the Commission may at any time, after notice and opportunity for hearing, reopen and alter, modify, or set aside, in whole or in part, any report or order made or issued by it under this section, whenever in the opinion of the Commission conditions of fact or of law have so changed as to require such action or if the public interest shall so require, except that (1) the said person, partnership, or corporation may, within sixty days after service upon him or it of said report or order entered after such a reopening, obtain a review thereof in the appropriate court of appeals of the United States, in the manner provided in subsection (c) of this section; and (2) in the case of an order, the Commission shall reopen any such order to consider whether such order (including any affirmative relief provision contained in such order) should be altered, modified, or set aside, in whole or in part, if the person, partnership, or corporation involved files a request with the Commission which makes a satisfactory showing that changed conditions of law or fact require such order to be altered, modified, or set aside, in whole or in part. The Commission shall determine whether to alter, modify, or set aside any order of the Commission in response to a request made by a person, partnership, or corporation under paragraph (2) not later than 120 days after the date of the filing of such request.

## (c) Review of order; rehearing

Any person, partnership, or corporation required by an order of the Commission to cease and desist from using any method of competition or act or practice may obtain a review of such order in the court of appeals of the United States, within any circuit where the method of competition or the act or practice in question was used or where such person, partnership, or corporation resides or carries on business, by filing in the court, within sixty days from the date of the service of such order, a written petition praying that the order of the Commission be set aside. A copy of such petition shall be forthwith transmitted by the clerk of the court to the Commission, and thereupon the Commission shall file in the court the record in the proceeding, as provided in section 2112 of Title 28. Upon such filing of the petition the court shall have jurisdiction of the proceeding and of the question determined therein concurrently with the Commission until the filing of the record and shall have power to make and enter a decree affirming, modifying, or setting aside the order of the Commission, and enforcing the same to the extent that such order is affirmed and to issue such writs as are ancillary to its jurisdiction or are necessary in its judgement

to prevent injury to the public or to competitors pendente lite. The findings of the Commission as to the facts, if supported by evidence, shall be conclusive. To the extent that the order of the Commission is affirmed, the court shall thereupon issue its own order commanding obedience to the terms of such order of the Commission. If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts, or make new findings, by reason of the additional evidence so taken, and it shall file such modified or new findings, which, if supported by evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of its original order, with the return of such additional evidence. The judgment and decree of the court shall be final, except that the same shall be subject to review by the Supreme Court upon certiorari, as provided in section 1254 of Title 28.

### (d) Jurisdiction of court

Upon the filing of the record with it the jurisdiction of the court of appeals of the United States to affirm, enforce, modify, or set aside orders of the Commission shall be exclusive.

### (e) Exemption from liability

No order of the Commission or judgement of court to enforce the same shall in anywise relieve or absolve any person, partnership, or corporation from any liability under the Antitrust Acts.

### (f) Service of complaints, orders and other processes; return

Complaints, orders, and other processes of the Commission under this section may be served by anyone duly authorized by the Commission, either (a) by delivering a copy thereof to the person to be served, or to a member of the partnership to be served, or the president, secretary, or other executive officer or a director of the corporation to be served; or (b) by leaving a copy thereof at the residence or the principal office or place of business of such person, partnership, or corporation; or (c) by mailing a copy thereof by registered mail or by certified mail addressed to such person, partnership, or corporation at his or its residence or principal office or

place of business. The verified return by the person so serving said complaint, order, or other process setting forth the manner of said service shall be proof of the same, and the return post office receipt for said complaint, order, or other process mailed by registered mail or by certified mail as aforesaid shall be proof of the service of the same.

**(g) Finality of order**

An order of the Commission to cease and desist shall become final--

> **(1)** Upon the expiration of the time allowed for filing a petition for review, if no such petition has been duly filed within such time; but the Commission may thereafter modify or set aside its order to the extent provided in the last sentence of subsection (b).

> **(2)** Except as to any order provision subject to paragraph (4), upon the sixtieth day after such order is served, if a petition for review has been duly filed; except that any such order may be stayed, in whole or in part and subject to such conditions as may be appropriate, by--

>> **(A)** the Commission;

>> **(B)** an appropriate court of appeals of the United States, if (i) a petition for review of such order is pending in such court, and (ii) an application for such a stay was previously submitted to the Commission and the Commission, within the 30-day period beginning on the date the application was received by the Commission, either denied the application or did not grant or deny the application; or

>> **(C)** the Supreme Court, if an applicable petition for certiorari is pending.

> **(3)** For purposes of subsection (m)(1)(B) and of section 57b(a)(2) of this title, if a petition for review of the order of the Commission has been filed--

>> **(A)** upon the expiration of the time allowed for filing a petition for certiorari, if the order of the Commission has been affirmed or the petition for review has been dismissed by the court of appeals and no petition for certiorari has been duly filed;

**(B)** upon the denial of a petition for certiorari, if the order of the Commission has been affirmed or the petition for review has been dismissed by the court of appeals; or

**(C)** upon the expiration of 30 days from the date of issuance of a mandate of the Supreme Court directing that the order of the Commission be affirmed or the petition for review be dismissed.

**(4)** In the case of an order provision requiring a person, partnership, or corporation to divest itself of stock, other share capital, or assets, if a petition for review of such order of the Commission has been filed--

**(A)** upon the expiration of the time allowed for filing a petition for certiorari, if the order of the Commission has been affirmed or the petition for review has been dismissed by the court of appeals and no petition for certiorari has been duly filed;

**(B)** upon the denial of a petition for certiorari, if the order of the Commission has been affirmed or the petition for review has been dismissed by the court of appeals; or

**(C)** upon the expiration of 30 days from the date of issuance of a mandate of the Supreme Court directing that the order of the Commission be affirmed or the petition for review be dismissed.

## (h) Modification or setting aside of order by Supreme Court

If the Supreme Court directs that the order of the Commission be modified or set aside, the order of the Commission rendered in accordance with the mandate of the Supreme Court shall become final upon the expiration of thirty days from the time it was rendered, unless within such thirty days either party has instituted proceedings to have such order corrected to accord with the mandate, in which event the order of the Commission shall become final when so corrected.

## (i) Modification or setting aside of order by Court of Appeals

If the order of the Commission is modified or set aside by the court of appeals, and if (1) the time allowed for filing a petition for certiorari has expired and no such petition has been duly filed, or (2) the petition for certiorari has been denied, or (3) the decision of the court has been affirmed by the Supreme Court, then the order of

the Commission rendered in accordance with the mandate of the court of appeals shall become final on the expiration of thirty days from the time such order of the Commission was rendered, unless within such thirty days either party has instituted proceedings to have such order corrected so that it will accord with the mandate, in which event the order of the Commission shall become final when so corrected.

**(j) Rehearing upon order or remand**

If the Supreme Court orders a rehearing; or if the case is remanded by the court of appeals to the Commission for a rehearing, and if (1) the time allowed for filing a petition for certiorari has expired, and no such petition has been duly filed, or (2) the petition for certiorari has been denied, or (3) the decision of the court has been affirmed by the Supreme Court, then the order of the Commission rendered upon such rehearing shall become final in the same manner as though no prior order of the Commission had been rendered.

**(k) "Mandate" defined**

As used in this section the term "mandate", in case a mandate has been recalled prior to the expiration of thirty days from the date of issuance thereof, means the final mandate.

**(*l*) Penalty for violation of order; injunctions and other appropriate equitable relief**

Any person, partnership, or corporation who violates an order of the Commission after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $10,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the Attorney General of the United States. Each separate violation of such an order shall be a separate offense, except that in a case of a violation through continuing failure to obey or neglect to obey a final order of the Commission, each day of continuance of such failure or neglect shall be deemed a separate offense. In such actions, the United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission.

**(m) Civil actions for recovery of penalties for knowing violations of rules and cease and desist orders respecting unfair or deceptive acts or practices;**

**jurisdiction; maximum amount of penalties; continuing violations; de novo determinations; compromise or settlement procedure**

    **(1)**    **(A)** The Commission may commence a civil action to recover a civil penalty in a district court of the United States against any person, partnership, or corporation which violates any rule under this subchapter respecting unfair or deceptive acts or practices (other than an interpretive rule or a rule violation of which the Commission has provided is not an unfair or deceptive act or practice in violation of subsection (a)(1)) with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule. In such action, such person, partnership, or corporation shall be liable for a civil penalty of not more than $10,000 for each violation.

    **(B)** If the Commission determines in a proceeding under subsection (b) that any act or practice is unfair or deceptive, and issues a final cease and desist order, other than a consent order, with respect to such act or practice, then the Commission may commence a civil action to obtain a civil penalty in a district court of the United States against any person, partnership, or corporation which engages in such act or practice--

        **(1)** after such cease and desist order becomes final (whether or not such person, partnership, or corporation was subject to such cease and desist order), and

        **(2)** with actual knowledge that such act or practice is unfair or deceptive and is unlawful under subsection (a)(1) of this section.

In such action, such person, partnership, or corporation shall be liable for a civil penalty of not more than $10,000 for each violation.

        **(C)** In the case of a violation through continuing failure to comply with a rule or with subsection (a)(1), each day of continuance of such failure shall be treated as a separate violation, for purposes of subparagraphs (A) and (B). In determining the amount of such a civil penalty, the court shall take into account the degree of culpability, any history of prior such conduct, ability to pay, effect on ability to continue to do business, and such other matters as justice may require.

**(2)** If the cease and desist order establishing that the act or practice is unfair or deceptive was not issued against the defendant in a civil penalty action under paragraph (1)(B) the issues of fact in such action against such defendant shall be tried de novo. Upon request of any party to such an action against such defendant, the court shall also review the determination of law made by the Commission in the proceeding under subsection (b) that the act or practice which was the subject of such proceeding constituted an unfair or deceptive act or practice in violation of subsection (a).

**(3)** The Commission may compromise or settle any action for a civil penalty if such compromise or settlement is accompanied by a public statement of its reasons and is approved by the court.

## (n) Standard of proof; public policy considerations

The Commission shall have no authority under this section or section 57a of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination.

## 15 U.S.C. § 46

§ 46. Additional powers of Commission

The Commission shall also have power--

**(a) Investigation of persons, partnerships, or corporations**

To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any person, partnership, or corporation engaged in or whose business affects commerce, excepting banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, and common carriers subject to the Act to regulate commerce, and its relation to other persons, partnerships, and corporations.

**(b) Reports of persons, partnerships, and corporations**

To require, by general or special orders, persons, partnerships, and corporations, engaged in or whose business affects commerce, excepting banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, and common carriers subject to the Act to regulate commerce, or any class of them, or any of them, respectively, to file with the Commission in such form as the Commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the Commission such information as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective persons, partnerships, and corporations filing such reports or answers in writing. Such reports and answers shall be made under oath, or otherwise, as the Commission may prescribe, and shall be filed with the Commission within such reasonable period as the Commission may prescribe, unless additional time be granted in any case by the Commission.

**(c) Investigation of compliance with antitrust decrees**

Whenever a final decree has been entered against any defendant corporation in any suit brought by the United States to prevent and restrain any violation of the antitrust Acts, to make investigation, upon its own initiative, of the manner in which the decree has been or is being carried out, and upon the application of the Attorney General it shall be its duty to make such investigation. It shall transmit to the

Attorney General a report embodying its findings and recommendations as a result of any such investigation, and the report shall be made public in the discretion of the Commission.

## (d) Investigations of violations of antitrust statutes

Upon the direction of the President or either House of Congress to investigate and report the facts relating to any alleged violations of the antitrust Acts by any corporation.

## (e) Readjustment of business of corporations violating antitrust statutes

Upon the application of the Attorney General to investigate and make recommendations for the readjustment of the business of any corporation alleged to be violating the antitrust Acts in order that the corporation may thereafter maintain its organization, management, and conduct of business in accordance with law.

## (f) Publication of information; reports

To make public from time to time such portions of the information obtained by it hereunder as are in the public interest; and to make annual and special reports to the Congress and to submit therewith recommendations for additional legislation; and to provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use: *Provided*, That the Commission shall not have any authority to make public any trade secret or any commercial or financial information which is obtained from any person and which is privileged or confidential, except that the Commission may disclose such information (1) to officers and employees of appropriate Federal law enforcement agencies or to any officer or employee of any State law enforcement agency upon the prior certification of an officer of any such Federal or State law enforcement agency that such information will be maintained in confidence and will be used only for official law enforcement purposes, and (2) to any officer or employee of any foreign law enforcement agency under the same circumstances that making material available to foreign law enforcement agencies is permitted under section 57b-2(b) of this title.

**(g) Classification of corporations; regulations**

From time to time classify corporations and (except as provided in section 57a(a)(2) of this title) to make rules and regulations for the purpose of carrying out the provisions of this subchapter.

**(h) Investigations of foreign trade conditions; reports**

To investigate, from time to time, trade conditions in and with foreign countries where associations, combinations, or practices of manufacturers, merchants, or traders, or other conditions, may affect the foreign trade of the United States, and to report to Congress thereon, with such recommendations as it deems advisable.

**(i) Investigations of foreign antitrust law violations**

With respect to the International Antitrust Enforcement Assistance Act of 1994, to conduct investigations of possible violations of foreign antitrust laws (as defined in section 12 of such Act).

**(j) Investigative assistance for foreign law enforcement agencies**

**(1) In general**

Upon a written request from a foreign law enforcement agency to provide assistance in accordance with this subsection, if the requesting agency states that it is investigating, or engaging in enforcement proceedings against, possible violations of laws prohibiting fraudulent or deceptive commercial practices, or other practices substantially similar to practices prohibited by any provision of the laws administered by the Commission, other than Federal antitrust laws (as defined in section 12(5) of the International Antitrust Enforcement Assistance Act of 1994 (15 U.S.C. 6211(5))), to provide the assistance described in paragraph (2) without requiring that the conduct identified in the request constitute a violation of the laws of the United States.

**(2) Type of assistance**

In providing assistance to a foreign law enforcement agency under this subsection, the Commission may--

**(A)** conduct such investigation as the Commission deems necessary to collect information and evidence pertinent to the request for assistance, using all investigative powers authorized by this subchapter; and

**(B)** when the request is from an agency acting to investigate or pursue the enforcement of civil laws, or when the Attorney General refers a request to the Commission from an agency acting to investigate or pursue the enforcement of criminal laws, seek and accept appointment by a United States district court of Commission attorneys to provide assistance to foreign and international tribunals and to litigants before such tribunals on behalf of a foreign law enforcement agency pursuant to section 1782 of Title 28.

### (3) Criteria for determination

In deciding whether to provide such assistance, the Commission shall consider all relevant factors, including--

**(A)** whether the requesting agency has agreed to provide or will provide reciprocal assistance to the Commission;

**(B)** whether compliance with the request would prejudice the public interest of the United States; and

**(C)** whether the requesting agency's investigation or enforcement proceeding concerns acts or practices that cause or are likely to cause injury to a significant number of persons.

### (4) International agreements

If a foreign law enforcement agency has set forth a legal basis for requiring execution of an international agreement as a condition for reciprocal assistance, or as a condition for provision of materials or information to the Commission, the Commission, with prior approval and ongoing oversight of the Secretary of State, and with final approval of the agreement by the Secretary of State, may negotiate and conclude an international agreement, in the name of either the United States or the Commission, for the purpose of obtaining such assistance, materials, or information. The Commission may undertake in such an international agreement to--

**(A)** provide assistance using the powers set forth in this subsection;

**(B)** disclose materials and information in accordance with subsection (f) and section 57b-2(b) of this title; and

**(C)** engage in further cooperation, and protect materials and information received from disclosure, as authorized by this subchapter.

## (5) Additional authority

The authority provided by this subsection is in addition to, and not in lieu of, any other authority vested in the Commission or any other officer of the United States.

## (6) Limitation

The authority granted by this subsection shall not authorize the Commission to take any action or exercise any power with respect to a bank, a savings and loan institution described in section 57a(f)(3) of this title, a Federal credit union described in section 57a(f)(4) of this title, or a common carrier subject to the Act to regulate commerce, except in accordance with the undesignated proviso following the last designated subsection of this section.

## (7) Assistance to certain countries

The Commission may not provide investigative assistance under this subsection to a foreign law enforcement agency from a foreign state that the Secretary of State has determined, in accordance with section 4605(j) of Title 50, has repeatedly provided support for acts of international terrorism, unless and until such determination is rescinded pursuant to section 4605(j)(4) of Title 50.

# (k) Referral of evidence for criminal proceedings

## (1) In general

Whenever the Commission obtains evidence that any person, partnership, or corporation, either domestic or foreign, has engaged in conduct that may constitute a violation of Federal criminal law, to transmit such evidence to the Attorney General, who may institute criminal proceedings under appropriate

statutes. Nothing in this paragraph affects any other authority of the Commission to disclose information.

## (2) International information

The Commission shall endeavor to ensure, with respect to memoranda of understanding and international agreements it may conclude, that material it has obtained from foreign law enforcement agencies acting to investigate or pursue the enforcement of foreign criminal laws may be used for the purpose of investigation, prosecution, or prevention of violations of United States criminal laws.

## (*l*) Expenditures for cooperative arrangements

To expend appropriated funds for--

**(1)** operating expenses and other costs of bilateral and multilateral cooperative law enforcement groups conducting activities of interest to the Commission and in which the Commission participates; and

**(2)** expenses for consultations and meetings hosted by the Commission with foreign government agency officials, members of their delegations, appropriate representatives and staff to exchange views concerning developments relating to the Commission's mission, development and implementation of cooperation agreements, and provision of technical assistance for the development of foreign consumer protection or competition regimes, such expenses to include necessary administrative and logistic expenses and the expenses of Commission staff and foreign invitees in attendance at such consultations and meetings including--

**(A)** such incidental expenses as meals taken in the course of such attendance;

**(B)** any travel and transportation to or from such meetings; and

**(C)** any other related lodging or subsistence.

*Provided*, That the exception of "banks, savings and loan institutions described in section 57a(f)(3) of this title, Federal credit unions described in section 57a(f)(4) of this title, and common carriers subject to the Act to regulate commerce" from the

Commission's powers defined in subsections (a), (b), and (j) of this section, shall not be construed to limit the Commission's authority to gather and compile information, to investigate, or to require reports or answers from, any person, partnership, or corporation to the extent that such action is necessary to the investigation of any person, partnership, or corporation, group of persons, partnerships, or corporations, or industry which is not engaged or is engaged only incidentally in banking, in business as a savings and loan institution, in business as a Federal credit union, or in business as a common carrier subject to the Act to regulate commerce.

The Commission shall establish a plan designed to substantially reduce burdens imposed upon small businesses as a result of requirements established by the Commission under clause (b) relating to the filing of quarterly financial reports. Such plan shall (1) be established after consultation with small businesses and persons who use the information contained in such quarterly financial reports; (2) provide for a reduction of the number of small businesses required to file such quarterly financial reports; and (3) make revisions in the forms used for such quarterly financial reports for the purpose of reducing the complexity of such forms. The Commission, not later than December 31, 1980, shall submit such plan to the Committee on Commerce, Science, and Transportation of the Senate and to the Committee on Energy and Commerce of the House of Representatives. Such plan shall take effect not later than October 31, 1981.

No officer or employee of the Commission or any Commissioner may publish or disclose information to the public, or to any Federal agency, whereby any line-of-business data furnished by a particular establishment or individual can be identified. No one other than designated sworn officers and employees of the Commission may examine the line-of-business reports from individual firms, and information provided in the line-of-business program administered by the Commission shall be used only for statistical purposes. Information for carrying out specific law enforcement responsibilities of the Commission shall be obtained under practices and procedures in effect on May 28, 1980, or as changed by law.

Nothing in this section (other than the provisions of clause (c) and clause (d)) shall apply to the business of insurance, except that the Commission shall have authority to conduct studies and prepare reports relating to the business of insurance. The Commission may exercise such authority only upon receiving a request which is agreed to by a majority of the members of the Committee on Commerce, Science, and Transportation of the Senate or the Committee on Energy and Commerce of the House of Representatives. The authority to conduct any such study shall expire at the end of the Congress during which the request for such study was made.

**15 U.S.C. § 57b(a)**

§ 57b. Civil actions for violations of rules and cease and desist orders respecting unfair or deceptive acts or practices

**(a) Suits by Commission against persons, partnerships, or corporations; jurisdiction; relief for dishonest or fraudulent acts**

> **(1)** If any person, partnership, or corporation violates any rule under this subchapter respecting unfair or deceptive acts or practices (other than an interpretive rule, or a rule violation of which the Commission has provided is not an unfair or deceptive act or practice in violation of section 45(a) of this title), then the Commission may commence a civil action against such person, partnership, or corporation for relief under subsection (b) in a United States district court or in any court of competent jurisdiction of a State.

> **(2)** If any person, partnership, or corporation engages in any unfair or deceptive act or practice (within the meaning of section 45(a)(1) of this title) with respect to which the Commission has issued a final cease and desist order which is applicable to such person, partnership, or corporation, then the Commission may commence a civil action against such person, partnership, or corporation in a United States district court or in any court of competent jurisdiction of a State. If the Commission satisfies the court that the act or practice to which the cease and desist order relates is one which a reasonable man would have known under the circumstances was dishonest or fraudulent, the court may grant relief under subsection (b).

\* \* \*