**No. 24-13102**

# In the United States Court of Appeals for the Eleventh Circuit

---

PROPERTIES OF THE VILLAGES, INC.,
*Plaintiff-Appellee,*

v.

FEDERAL TRADE COMMISSION,
*Defendant-Appellant.*

---

On Appeal from the United States District Court for the
Middle District of Florida, Ocala Division
(No. 5:24-cv-316) (The Hon. Timothy J. Corrigan)

---

**BRIEF OF AMICI CURIAE THE CHAMBER OF
COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS
ROUNDTABLE, TEXAS ASSOCIATION OF BUSINESS, AND
THE LONGVIEW CHAMBER OF COMMERCE
IN SUPPORT OF APPELLEE**

---

JORDAN L. VON BOKERN
CHRISTOPHER J. WALKER
U.S. CHAMBER LITIGATION
CENTER
1615 H Street NW
Washington, D.C.  20062

LIZ DOUGHERTY
BUSINESS ROUNDTABLE
1000 Maine Avenue SW
Washington, D.C. 20024

JEFFREY B. WALL
JUDSON O. LITTLETON
DANIEL J. RICHARDSON
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Washington, D.C.  20006
(202) 956-7500
wallj@sullcrom.com

*Properties of the Villages, Inc.* v. *Federal Trade Commission*, No. 24-13102

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT AND CERTIFICATE OF INTERESTED PERSONS

The Chamber of Commerce of the United States of America ("Chamber") is a non-profit, tax-exempt organization incorporated in the District of Columbia.  The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

Business Roundtable is a non-profit, tax-exempt organization incorporated in the District of Columbia.  Business Roundtable has no parent organization, and no publicly held company has 10% or greater ownership of the organization.

Texas Association of Business is a non-profit, tax-exempt organization incorporated in Texas.  It has no parent organization, and no publicly held company has 10% or greater ownership of the organization.

The Longview Chamber of Commerce is a non-profit, tax-exempt organization incorporated in Texas.  It has no parent organization, and no publicly held company has 10% or greater ownership of the organization.

*Properties of the Villages, Inc.* v. *Federal Trade Commission*, No. 24-13102

I also hereby certify that I am aware of no persons or entities, in addition to those listed in the party and amicus briefs filed in this case, that have an interest in the outcome of this litigation other than the signatories to this brief and their counsel:

Business Roundtable

Dougherty, Liz

Littleton, Judson O.

Richardson, Daniel J.

Texas Association of Business

The Chamber of Commerce of the United States of America

The Longview Chamber of Commerce

Von Bokern, Jordan L.

Walker, Christopher J.

Wall, Jeffrey B.

> /s/ *Jeffrey B. Wall*
> JEFFREY B. WALL

JANUARY 22, 2025

C-2 of 2

# TABLE OF CONTENTS

Page

Interest of amici curiae .................................................................................1

Introduction....................................................................................................3

Argument........................................................................................................6

I.   The FTC Act Does Not Authorize Binding Competition
     Regulations.............................................................................................6

     A.   The Text, Structure, And History Of The FTC Act Refute
          The Commission's Claim Of Substantive Rulemaking
          Authority .........................................................................................7

     B.   The District Court's Interpretation Of Section 6(g) Was
          Incorrect........................................................................................14

II.  The FTC Act Does Not Permit The Commission To Condemn All
     Noncompetes As Unfair Methods Of Competition .....................................24

     A.   The Noncompete Rule Exceeds The Commission's
          Authority Under Section 5............................................................25

     B.   Under The Commission's Interpretation, Section 5 Would
          Be Unconstitutional .....................................................................29

Conclusion....................................................................................................33

# TABLE OF AUTHORITIES

Page(s)

CASES

*A.L.A. Schechter Poultry Corp.* v. *United States*,
295 U.S. 495 (1935)........................................................................31, 32

*American Hosp. Ass'n* v. *NLRB*,
499 U.S. 606 (1991)..........................................................................16, 17

*ATS Tree Servs., LLC* v. *FTC*,
2024 WL 3511630 (E.D. Pa. Jul. 23, 2024) .........................................22

*Barnhart* v. *Sigmon Coal Co.*,
534 U.S. 438 (2002).................................................................................22

*Boise Cascade Corp.* v. *FTC*,
637 F.2d 573 (9th Cir. 1980)...................................................................27

*BP P.L.C.* v. *Mayor & City Council of Baltimore*,
593 U.S. 230 (2021).................................................................................19

*Broadcast Music, Inc.* v. *Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979).....................................................................................26

*Brown* v. *United States*,
748 F.3d 1045 (11th Cir. 2014)...............................................................32

*California Dental Ass'n* v. *FTC*,
526 U.S. 756 (1999).................................................................................27

*Chrysler Corp.* v. *Brown*,
441 U.S. 281 (1979)...................................................................................9

*E.I. Du Pont de Nemours & Co.* v. *FTC*,
729 F.2d 128 (2d Cir. 1984) ...................................................................25

*FCC* v. *National Citizens Comm. for Broad.*,
436 U.S. 775 (1978).................................................................................16

*FTC* v. *Actavis*,
570 U.S. 136 (2013)..................................................................26

*FTC* v. *Superior Ct. Trial Lawyer's Ass'n*,
493 U.S. 411 (1990)..................................................................26

*Gundy* v. *United States*,
588 U.S. 128 (2019)..................................................................29

*Humphrey's Executor* v. *United States*,
295 U.S. 602 (1935)..................................................................12

*Jama* v. *ICE*,
543 U.S. 335 (2005)..................................................................19

*Loper Bright Enters.* v. *Raimondo*,
603 U.S. 369 (2024)..................................................................15

*McWane, Inc.* v. *FTC*,
783 F.3d 814 (11th Cir. 2015).................................................25

*Miles* v. *Apex Marine Corp.*,
498 U.S. 19 (1990)....................................................................28

*Mourning* v. *Family Publ'ns. Serv., Inc.*,
411 U.S. 356 (1973)............................................................16, 17

*National Petroleum Refiners* v. *FTC*,
482 F.2d 672 (D.C. Cir. 1973).......................................19, 21, 22

*NFIB* v. *OSHA*,
595 U.S. 109 (2022)...........................................................15, 29

*Palmer* v. *BRG of Georgia, Inc.*,
784 F.3d 1417 (11th Cir. 1989).................................................26

*Pan Am. World Airways, Inc.* v. *United States*,
371 U.S. 296 (1963)..................................................................31

*PDVSA U.S. Litig. Tr.* v. *LukOil Pan Americas LLC*,
65 F.4th 556 (11th Cir. 2023) ..................................................25

-iii-

*Pierce* v. *Fuller*,
    8 Mass. 223 (1811) ................................................................28

*Regions Bank* v. *Legal Outsource PA*,
    936 F.3d 1184 (11th Cir. 2019) ...............................................9

*Ross* v. *Blake*,
    572 U.S. 632 (2016) .................................................................8

*Ryan, LLC* v. *FTC*,
    2024 WL 3297524 (N.D. Tex. July 3, 2024) ...........................3

*Ryan, LLC* v. *FTC*,
    2024 WL 3879954 (N.D. Tex. Aug. 20, 2024) ..........4, 10, 14, 15, 18

*Seila Law LLC* v. *CFPB*,
    591 U.S. 197 (2020) ...............................................................12

*Snap-on Tools Corp.* v. *FTC*,
    321 F.2d 825, 837 (7th Cir. 1963) .........................................28

*Thorpe* v. *Housing Auth. of the City of Durham*,
    393 U.S. 268 (1969) ...............................................................16

*United States* v. *JS & A Grp., Inc.*,
    716 F.2d 451 (7th Cir. 1983) ............................................19, 22

*USFS* v. *Cowpasture River Preservation Assn.*,
    590 U.S. 604 (2020) ...............................................................28

*West Virginia* v. *EPA*,
    597 U.S. 697 (2022) ...............................................................18

*Whitman* v. *American Trucking Ass'ns.*,
    531 U.S. 457 (2001) ...........................................................15, 18

**STATUTES**

15 U.S.C.
    § 45.................................................................................................8, 23
    § 46.................................................................................................8, 10
    § 57a...........................................................................................12, 13, 20
    § 1604................................................................................................17

29 U.S.C. § 156 ...........................................................................................17

47 U.S.C. § 303(b)........................................................................................17

Act of Feb. 28, 1871, ch. 100, § 23, 16 Stat. 440 ......................................8

Act of July 22, 1813, Ch. 16 § 4, 3 Stat. 22................................................8

Federal Trade Commission Act Amendments of 1994, Pub. L.
    103-312 (1994)..................................................................................13

Flammable Fabrics Act, amendment, Pub. L. 90-189 (1967) ...........................12

Longshore and Harbor Workers' Compensation Act, ch. 509,
    Pub. L. 69-803, 44 Stat. 1424 (1927).................................................9

**LEGISLATIVE MATERIALS**

120 Cong. Rec. 41,407 .................................................................................19

H.R. Rep. 103-138 .......................................................................................14

S. Rep. 103-130 ...........................................................................................13

**REGULATIONS**

Non-Compete Clause Rule,
    89 Fed. Reg. 38,342 (May 7, 2024) ...............................................21, 24, 27, 30

**OTHER AUTHORITIES**

Annual Report of the Federal Trade Commission (1922)..................................11

Final Report on the Administrative Procedure Act: Monograph
    No. 6, The Federal Trade Commission (1939) ...............................................11

FTC, *In the Matter of Guardian Services Industries, Inc.*
(Dec. 4, 2024) .......................................................................................31

FTC, *Policy Statement Regarding the Scope of Unfair Methods
of Competition* (Nov. 2022)..............................................................30

Merrill & Watts, *Agency Rules with the Force of Law: The
Original Convention*, 116 Harv. L. Rev. 467 (2002).......................9

Milner, *Defining Unfair Methods of Competition in the Federal
Trade Commission Act*, 2023 Wisc. L. Rev. 109 (2023) ...............25

Phillips, *Against Antitrust Regulation*, American Enterprise
Inst. (Oct. 2022)................................................................................11

Report of the Att'y Gen.'s Comm. on Admin. Pro (Jan. 22, 1941)......................9

Scalia & Garner, *Reading Law* (2012)...............................................................9

## INTEREST OF AMICI CURIAE

Amici are four associations that together represent businesses in every sector and region of the United States.

The Chamber is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. The Chamber has numerous members who use noncompete agreements for entirely legitimate purposes and will be adversely affected by the Federal Trade Commission's Noncompete Rule.

Business Roundtable is a 501(c)(6) non-profit association of chief executive officers of America's leading companies representing every sector of the U.S. economy. Business Roundtable works to promote a thriving United States economy and economic opportunity for all Americans by advocating for sound public policies. Many of the members of Business Roundtable are CEOs of companies that have noncompete agreements and will be adversely affected by the Noncompete Rule.

Texas Association of Business is the state chamber of commerce for Texas and the largest general business association in the state. It represents member companies—large and small—to create a policy, legal, and regulatory environment that allows them to thrive in business.

The Longview Chamber of Commerce represents Longview-area businesses. It also has members that utilize noncompete agreements and will be adversely affected by the Noncompete Rule.

Amici filed their own lawsuit challenging the Noncompete Rule under the Administrative Procedure Act. The district court in amici's case granted summary judgment and set aside the Noncompete Rule, and the Commission has appealed that decision to the U.S. Court of Appeals for the Fifth Circuit. *See Ryan, LLC* v. *FTC*, No. 24-10951 (5th Cir.).[1]

---

[1] Amici affirm that no party or counsel for any party authored this brief in whole or in part and that no one other than amici, their members, or their counsel contributed any money that was intended to fund the preparation or submission of this brief. The parties have consented to this filing.

**INTRODUCTION**

The Federal Trade Commission's Noncompete Rule is a staggering assertion of regulatory power. By the Commission's own estimates, the Noncompete Rule would retroactively invalidate more than 30 million existing contracts, imposing massive costs on workers and businesses alike. If upheld as a valid exercise of the Commission's authority, it would mean that the Commission has the power to outlaw common business practices nationwide, overriding the considered and varied policies of all 50 States. The district court below correctly concluded that Congress never gave the Commission such extraordinary powers.

To stop the Commission's unlawful rulemaking, amici filed suit challenging the Noncompete Rule the day after it was finalized. Though unmentioned in the Commission's brief to this Court, that litigation has proceeded ahead of—and, absent reversal on appeal, will moot—this case. On July 3, 2024, more than a month before the district court in this case issued its preliminary injunction, the court in amici's case preliminarily enjoined the Commission from enforcing the Rule. *See Ryan, LLC* v. *FTC*, 2024 WL 3297524 (N.D. Tex. July 3, 2024). Unlike in this case, the Commission did not appeal that decision. Then, on August 20, 2024, the

-3-

Texas court granted summary judgment setting aside the Noncompete Rule on a nationwide basis. *See Ryan, LLC* v. *FTC*, 2024 WL 3879954 (N.D. Tex. Aug. 20, 2024). Under that judgment, the Commission cannot enforce the Noncompete Rule against any business in the United States, including appellee Properties of the Villages. The Commission has now appealed that decision, though perplexingly, it waited until the day before its deadline—almost a month after filing its notice of appeal early in this case—to file its notice of appeal to the Fifth Circuit. *See Ryan, LLC* v. *FTC*, No. 24-10951 (5th Cir.). Despite the delayed start, briefing in the Fifth Circuit appeal is underway and will conclude a few weeks after briefing in this case.

Amici respectfully submit this brief to address two issues relevant to the Court's resolution of this appeal. First, although the district court was right to hold that the Noncompete Rule cannot survive scrutiny under the major-questions doctrine, the court erred in determining that Section 6(g) gives the Commission *any* authority to issue binding competition regulations. As the Texas court in amici's suit correctly explained, the text, structure, and history of the FTC Act of 1914 demonstrate that Section 6(g) authorizes only procedural housekeeping rules, not substantive regulations. *See Ryan*, 2024 WL 3879954, at \*9-11. And Congress's subsequent amendments to the FTC

-4-

Act confirm that the Commission has no freestanding authority to issue binding regulations on any subject within its jurisdiction. *See id.* at *11-12. This Court can thus affirm the decision below without even addressing the major-questions doctrine.

Second, although the district court did not reach the issue, the Commission exceeded its statutory authority in another way. Specifically, Section 5 of the FTC Act does not empower the Commission to broadly decree that a longstanding business practice with obvious procompetitive benefits is *categorically* an unfair method of competition. Under the settled interpretation of Section 5, as recognized by both federal courts and the Commission for many decades before this Rule, conduct amounts to an "unfair method of competition" only if it hurts competition more than it helps it. The Commission did not even attempt to make such a showing for *all* noncompetes banned under the Commission's rule (nor could it possibly have done so). If Section 5 empowered the Commission to categorically declare all noncompetes unlawful without such a showing, it would amount to an unconstitutional delegation of legislative power to the Commission. The Commission's flouting of Section 5 accordingly provides another independent ground for finding the Rule unlawful.

## ARGUMENT

### I.   The FTC Act Does Not Authorize Binding Competition Regulations.

The district court correctly concluded that the Noncompete Rule is invalid under the major-questions doctrine, because Congress did not clearly authorize the Commission to issue economy-altering competition regulations. Op. 15; *see* POV Br. 24-42.  It is hard to imagine a more major question than whether an agency may through rulemaking decide what business practices constitute fair competition throughout "'a significant portion of the American economy'—indeed, nearly the entire economy."  *Dissenting Statement of Andrew N. Ferguson*, In the Matter of the Non-Compete Clause Rule, at 12 (June 28, 2024) (Ferguson Dissent).  This case shows just how vast that power is:  by a vote of 3-2, the Commission has overridden the laws of all 50 States and declared tens of millions of noncompete agreements unenforceable, no matter the goals they serve or what benefits employees received in exchange.  Of course, if a majority of Commissioners can decree that all noncompetes are unfair methods of competition, it can do the same for any other business practice.  Such a power demands explicit authorization from Congress.

Contrary to the district court's order, however, this Court does not need to rely on the major-questions doctrine to find the Rule unlawful. As the district court in the Northern District of Texas explained, Section 6(g) authorizes only procedural, housekeeping rules governing the Commission's own operations, not substantive rules that bind private parties. And the Commission has not identified any provision other than Section 6(g) that would empower it to issue substantive competition regulations.

In concluding that Section 6(g) gives the Commission some substantive rulemaking authority, the district court reasoned that Section 6(g)'s reference to "rules and regulations" should be *presumed* to mean legislative rules; that binding competition regulations are necessary for the Commission to fulfill its statutory mandate; and that Congress tacitly endorsed the Commission's claim of rulemaking authority when enacting subsequent amendments to the statute. As POV explains (at 42-49), each of those arguments either misreads the FTC Act or misapplies binding precedent.

### A.    The Text, Structure, And History Of The FTC Act Refute The Commission's Claim Of Substantive Rulemaking Authority.

As its authority to issue the Noncompete Rule, the Commission relied exclusively on Section 6(g) of the FTC Act. That provision authorizes the Commission to "[f]rom time to time classify corporations and . . . make rules

and regulations for the purpose of carrying out the provisions of [the Act]." 15 U.S.C. § 46(g). Basic principles of statutory construction demonstrate that Section 6(g) authorizes only procedural housekeeping rules, not binding competition regulations.

1.  Statutory interpretation "always . . . begins with the text." *Ross* v. *Blake*, 572 U.S. 632, 638 (2016). By its plain terms, Section 6(g) allows the Commission to issue rules only "for the purpose of carrying out" its other duties. *Id*. That provision makes no reference to Section 5 or any other substantive authority of the Commission. Nor does it provide any other indication that rules issued under Section 6(g) might bind private parties, let alone a standard to guide the Commission like the "interest of the public" standard the Commission must consider when pursuing enforcement under Section 5. 15 U.S.C. § 45(b).

In these ways, Section 6(g) is markedly different from other statutes that provide agencies with the power to issue binding regulations. For centuries, Congress has expressly conferred substantive rulemaking authority by stating that the agency may "establish regulations" that "shall be binding." Act of July 22, 1813, Ch. 16 § 4, 3 Stat. 22, 26; *see* Act of Feb. 28, 1871, ch. 100, § 23, 16 Stat. 440, 449 (stating that regulations have the "force

of law"). Throughout the early part of the twentieth century, Congress also conferred substantive rulemaking authority by prescribing sanctions that attached to violations of an agency's rules. *See, e.g.*, Longshore and Harbor Workers' Compensation Act, ch. 509, Pub. L. 69-803, 44 Stat. 1424 (1927); *see also Report of the Att'y Gen.'s Comm. on Admin. Pro.* 27 (Jan. 22, 1941) ("[T]he striking characteristic of the legislation [authorizing] substantive regulations . . . is that it attaches sanctions to compel observance of the regulations."); Merrill & Watts, *Agency Rules with the Force of Law: The Original Convention*, 116 Harv. L. Rev. 467, 494-495 (2002) (discussing a "drafting convention" whereby Congress "would subject the offending party to some sanction" to confer substantive rulemaking authority). By contrast, rulemaking provisions like Section 6(g)—which neither expressly mention substantive authority nor prescribe sanctions for violations of the agency's rules—are "simply a grant of authority to the agency to regulate its own affairs." *Chrysler Corp.* v. *Brown*, 441 U.S. 281, 309 (1979).

2. The structure of the FTC Act and "the physical and logical relation of its many parts" confirm that Section 6(g) does not confer substantive rulemaking authority. *Regions Bank* v. *Legal Outsource PA*, 936 F.3d 1184, 1192 (11th Cir. 2019) (quoting Scalia & Garner, *Reading Law*

167 (2012)).  Section 6(g) is the seventh in a list of twelve lettered subsections setting forth "[a]dditional powers" of the Commission, which largely consist of investigative powers to request information and produce reports.  *See, e.g.*, 15 U.S.C. § 46(c) and (h).  And the provision starts by conferring the authority to "from time to time classify corporations"—a mundane power that has nothing to do with regulating private parties' conduct—before mentioning "rules and regulations" in the second half of the provision.  This would be an exceedingly strange way for the 1914 Congress to give the Commission the power to substantively bind the entire national economy, but it all makes perfect sense if Section 6(g) confers only the power to issue procedural, housekeeping rules.  *See* POV Br. 43 (discussing Section 6(g)'s "inconspicuous location"); *Ryan*, 2024 WL 3879954, at *10 ("[V]iewing the statute as a whole, the location of the alleged substantive rulemaking authority is suspect.").

3.    The history of the FTC Act further confirms this understanding of Section 6(g).  Section 6 emerged from an agreement between those in Congress who wanted the new Commission to pursue its own enforcement actions (ultimately reflected in Section 5) and those who wanted the Commission to serve as a purely investigative body (reflected in Section 6).

-10-

*See* Merrill & Watts, *supra*, at 505; Phillips, *Against Antitrust Regulation*, American Enterprise Inst. 2-3 (Oct. 2022).  Throughout the deliberations on the FTC Act, neither camp even suggested giving the Commission the power to issue substantive *rules* governing private parties' conduct.

In fact, both during and after the Act's passage, all three branches expressed their view that the Commission *lacked* such rulemaking authority. Representative Covington advocated for the FTC Act by arguing that the Commission would "not be exercising power of a legislative nature."  Merrill & Watts, *supra*, at 506 (quoting 51 Cong. Rec. 14,932 (1914)).  After the Act's enactment, both the Commission and the Attorney General affirmatively stated that the law did not confer substantive rulemaking authority. *See* Annual Report of the Federal Trade Commission 36 (1922) (explaining that "[o]ne of the most common mistakes is to suppose that the [C]ommission can issue orders, rulings, or regulations unconnected with any proceeding before it"); Final Report on the Administrative Procedure Act: Monograph No. 6, The Federal Trade Commission 67 (1939) ("Nothing in the statutes administered by the Commission makes any provision for the promulgation of rules applicable to whole industries.").  And the Supreme Court expressly relied on the Commission's lack of rulemaking power when rejecting a

constitutional challenge to the structure of the agency. *See Humphrey's Executor* v. *United States*, 295 U.S. 602, 627-628 (1935); *see also Seila Law LLC* v. *CFPB*, 591 U.S. 197, 218 (2020). In short, the longstanding consensus across every branch of government has held that Section 6(g) does not authorize substantive rules.

4.    Finally, Congress has repeatedly amended the FTC Act in ways that confirm the Commission's lack of any general, freestanding authority to issue binding regulations under Section 6(g). First, Congress has enacted targeted amendments that expressly authorize rulemaking over specific subjects, such as product labeling or dangerous items in the marketplace. *See, e.g.*, Flammable Fabrics Act, amendment, Pub. L. 90-189, § 4 (1967). Those amendments would be superfluous if Section 6(g) already gave the Commission substantive rulemaking authority over any subject under its jurisdiction. And they confirm that "Congress kn[ows] how to explicitly authorize the Commission to make substantive rules" when it wants to. POV Br. 20.

Second, in the Magnuson-Moss Act of 1975, Congress granted the Commission rulemaking authority related to "unfair or deceptive acts and practices"—but *not* "unfair methods of competition." 15 U.S.C. § 57a(a).

Congress then imposed procedural requirements before the Commission could exercise this new rulemaking authority. *See, e.g.*, *id.* § 57a(b)(2) (requiring "advance notice" of the proposed rule to a congressional committee). It is implausible that Congress would have expressly granted substantive rulemaking authority subject to procedural hurdles for "unfair and deceptive acts or practices," while implicitly allowing the Commission to make binding "unfair method of competition" rules with no constraints. *See Statement of Commissioner Melissa Holyoak*, In the Matter of the Non-Compete Clause Rule, at 12-13 (Apr. 23, 2024) (noting that the Commission's interpretation results in "the strange situation where Congress would impose heightened requirements for *unfair* acts or practices rulemaking while leaving undisturbed *unfair* methods of competition rulemaking"). Notably, at no point between 1975 and the Noncompete Rule did the Commission claim the power to evade Magnuson-Moss's procedural requirements by issuing *any* kind of binding regulations under Section 6(g).

Third, Congress revisited the Commission's rulemaking authority in 1994, codifying the substantive analysis the agency must undertake when defining "unfair or deceptive acts and practices." *See* Pub. L. 103-312, § 9; S. Rep. 103-130 at 12. Again, Congress gave no indication that it believed the

Commission retained some other, entirely unconstrained authority to issue rules defining "unfair methods of competition." *See* H.R. Rep. 103-138, at 4 (the Commission's authority related to "unfair methods of competition is "limited . . . to case-by-case adjudication").

*    *    *

All of these indicators point in the same direction:  that Section 6(g) is simply "a 'housekeeping statute,' authorizing what the APA terms 'rules of agency organization procedure or practice' as opposed to 'substantive rules.'" *Ryan*, 2024 WL 3879954, at *9.  For that reason, this Court should affirm the decision below regardless of whether the major-questions doctrine applies.

## B.    The District Court's Interpretation Of Section 6(g) Was Incorrect.

The district court allowed that the arguments against the Commission's claim of rulemaking authority "have some force," but ultimately found them insufficient to demonstrate "a substantial likelihood of success on the merits."  Op. 11-12.  That conclusion was based on four arguments, many of which the Commission now echoes on appeal.  None have merit.

-14-

1.　　The court first relied on the fact that "[n]othing in Section 6 says it is limiting the FTC's rulemaking to 'procedural' rules."　Op. 12.　That reasoning is backwards.　"Administrative agencies are creatures of statute [and] possess only the authority that Congress has provided."　*NFIB* v. *OSHA*, 595 U.S. 109, 117 (2022).　The Commission must point to statutory text affirmatively authorizing its sweeping assertion of rulemaking authority, not simply claim that Congress did not rule it out.　*See Whitman* v. *American Trucking Ass'ns.*, 531 U.S. 457, 468 (2001) (requiring agencies to identify a "textual commitment of authority"); *see also Loper Bright Enters.* v. *Raimondo*, 603 U.S. 369, 412 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority.").　A passing reference to "rules and regulations" alongside the mundane power to "classify corporations" is not enough. *See Ryan*, 2024 WL 3879954, at *10.

For its part, the Commission asks this Court (at 23-25) to adopt a presumption that references to "rules and regulations" in federal statutes authorize legislative rulemaking, unless Congress indicates otherwise.　That argument is based on a misreading of the cases the Commission cites and

-15-

overlooks the differences between the FTC Act and statutes that *do* authorize substantive rulemaking.

As for the decisions relied on by the Commission, the agency's power to issue binding regulations was not contested in any of them. Instead, the only question was whether the specific regulation at issue was "reasonably related to the purpose of the enabling legislation." *Mourning* v. *Family Publ'ns. Serv., Inc.*, 411 U.S. 356, 361 (1973) (disclosure regulation adopted by the Federal Reserve was sufficiently related to the Truth in Lending Act); *see American Hosp. Ass'n* v. *NLRB*, 499 U.S. 606, 608 (1991) (rejecting argument that a provision of the National Labor Relations Act "prohibit[ed] the Board from using general rules to define bargaining units"); *FCC* v. *National Citizens Comm. for Broad.*, 436 U.S. 775, 794 (1978) (FCC rule was consistent with its authority "to regulate broadcasting in the public interest"); *Thorpe* v. *Housing Auth. of the City of Durham*, 393 U.S. 268, 277-278 (1969) (circular issued by the Department of Housing and Urban Development was sufficiently related to the United States Housing Act of 1937). These cases thus did not have any reason to address the key question here: whether the agency had the power to promulgate binding regulations in the first place.

-16-

On top of that, the New-Deal era statutes at issue in these decisions looked nothing like the 1914 FTC Act. *See* POV Br. 46. The Truth in Lending Act expressly stated that the agency could issue regulations to "prevent circumvention or evasion" of its policies. *See Mourning*, 411 U.S. at 361-362 (interpreting 15 U.S.C. § 1604). The National Labor Relations Act includes a cross-reference to the APA, which establishes procedures for issuing binding regulations. *See American Hosp. Ass'n*, 499 U.S. at 609 (citing 29 U.S.C. § 156). And the Communications Act of 1934 lists rulemaking authority alongside the FCC's other regulatory powers over private parties. *See, e.g.*, 47 U.S.C. § 303(b) (authorizing the FCC to "[p]rescribe the nature of the service to be rendered by each class of licensed stations"). In stark contrast to these statutes, the text, structure, and subsequent amendments to the FTC Act all cut *against* the Commission's claim that Section 6(g) confers substantive rulemaking authority to bind private parties—an authority that would have been unprecedented when Congress enacted that provision in 1914.

To be sure, some language in these decisions assumes that references to "rules and regulations" may confer binding rulemaking authority. *See American Hosp. Ass'n*, 499 U.S. at 609-610. But because the existence of

-17-

the agency's rulemaking authority was not at issue, those offhand statements were unnecessary to the decisions. In any event, any such presumption based on statutory silence would be contrary to more recent Supreme Court precedent explaining that "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *See West Virginia* v. *EPA*, 597 U.S. 697, 723 (2022) (quoting *Whitman*, 531 U.S. at 468). Under current law, the Commission plainly cannot rely on mere silence in the FTC Act as affording it "unlimited power to accomplish its policy preferences." *Ryan, LLC*, 2024 WL 3297524, at *10.

2.　The district court also reasoned that Magnuson-Moss tacitly blessed the Commission's claim of rulemaking authority by amending the FTC Act without altering the Commission's authority respecting unfair methods of competition. Op. 12. But that simply begs the question of what authority Congress granted the Commission in 1914. As explained above, the original FTC Act did not empower the Commission to issue substantive competition regulations, so there was no such power to leave undisturbed. *See supra*, at pp. 8-12.

To defend the court's analysis, the Commission argues that Magnuson-Moss "ratified" its interpretation of Section 6(g) because the Commission had

promulgated "trade regulation rules" in the preceding decade and two courts of appeals had embraced its reading of the FTC Act. FTC Br. 25-29 (citing *National Petroleum Refiners* v. *FTC*, 482 F.2d 672 (D.C. Cir. 1973) and *United States* v. *JS & A Grp., Inc.*, 716 F.2d 451, 454 (7th Cir. 1983)). But that argument misunderstands the law. Courts interpret statutes to ratify judicial interpretations only when there is a "judicial consensus so broad and unquestioned that [courts] must presume Congress knew of and endorsed it." *Jama* v. *ICE*, 543 U.S. 335, 349 (2005). Two courts of appeals decisions obviously fall short of that standard. *See BP P.L.C.* v. *Mayor & City Council of Baltimore*, 593 U.S. 230, 244 (2021) ("It seems most unlikely to us that a smattering of lower court opinions could ever represent the sort of 'judicial consensus so broad and unquestioned that we must presume Congress knew of and endorsed it.'") (quoting *Jama*, 453 U.S. at 349).

To overcome that precedent, the Commission asserts (at 28) that "Congress was specifically aware of the Commission's and D.C. Circuit's understanding of the scope of Section 6(g)" when it enacted Magnuson-Moss. But all that shows is that Congress knew of that interpretation—it does nothing to suggest that Congress endorsed it. In fact, the legislative record is clear that Members of Congress *disagreed* with *National Petroleum*'s

-19-

reading of Section 6(g).  *See* 120 Cong. Rec. 41,407 (Statement of Rep. Broyhill).

If there were any doubt, the text of Magnuson-Moss itself confirms that Congress took no position on the Commission's rulemaking authority under Section 6(g).  In expressly granting rulemaking authority related to unfair and deceptive acts and practices, Congress specified that the statute "shall not affect *any authority* of the Commission to prescribe rules . . . with respect to unfair methods of competition."  15 U.S.C. § 57a(a)(2) (emphasis added).  Had Congress understood Section 6(g) to authorize legislative rulemaking or intended to endorse the Commission's assertion of regulatory power, it obviously would have referenced "*the* authority of Commission." Instead, Congress punted, referring only to "any" such authority.

The Commission's Magnuson-Moss argument also has no explanation for why Congress erected high procedural barriers for unfair-or-deceptive-acts rulemaking while allowing the Commission free rein to issue competition rules with no such constraints.  The Commission (at 28-29) points to legislative history in which one Senator referenced "*National Petroleum* and the Commission's competition rulemaking authority."  But the Commission does not even try to explain *why* Congress would have drawn this supposed

distinction—particularly in an era when the Commission would simply tack an unfair-method-of-competition label onto rules defining unfair or deceptive acts, undermining any purported significance of the distinction between the two kinds of rules. *See* 89 Fed. Reg. 38,349-38,350.

3. The district court also relied on the reasoning of *National Petroleum* to support its conclusion that Section 6(g) authorizes some substantive rulemaking. Op. 12. That decision was wrong on the day it was decided and is obviously so now. *See* Holyoak Dissent, at 15 (explaining that "*National Petroleum*'s framing, approach to statutory interpretation, and delegation questions were never adopted by the Supreme Court and fell out of favor decades ago"). In holding that Section 6(g) "empowered [the Commission] to promulgate substantive rules of business conduct," *National Petroleum* relied heavily on Congress's failure to expressly *exclude* that authority. 482 F.2d at 673, 686. As explained above, that approach has long been rejected in modern jurisprudence.

The court of appeals in *National Petroleum* also reasoned that its "duty [was] to favor an interpretation which would render the statutory design effective in terms of the policies behind its enactment and to avoid an interpretation which would make such policies more difficult of fulfillment."

-21-

482 F.2d at 689.  The perils of that thumb-on-the-scale approach are one reason why today courts "will not alter the text in order to satisfy the policy preferences" of policymakers.  *Barnhart* v. *Sigmon Coal Co.*, 534 U.S. 438, 462 (2002).  In any event, D.C. Circuit's policy-based reasoning should have cut the other way: in 1914, Congress designed Sections 5 and 6 to grant adjudicative and investigative powers, but not substantive rulemaking authority.

The district court also pointed to the Seventh Circuit's decision in *JS & A*, but that case does not move the needle.  Rather than offering independent analysis to defend the Commission's interpretation, the court simply "incorporated" *National Petroleum* "by reference" on the ground that "Congress [did not] intend[]" "the issue of Section 6(g) rulemaking power" "to be litigated each time the Commission seeks to enforce [a] rule." *JS & A Grp.*, 716 F.3d at 454.  In other words, JS & A declined to consider the issue at all, and instead blindly followed *National Petroleum*.

4.    Finally, the district court found that Section 5 of the FTC Act— which directs the Commission to "prevent" unfair methods of competition— supported reading Section 6(g) to authorize binding regulations.  Op. 13 (citing *ATS Tree Servs., LLC* v. *FTC*, 2024 WL 3511630 (E.D. Pa. July 23,

-22-

2024)); *see* FTC Br. 22-23. The premise underlying this reasoning is that the only way to "prevent" unfair competition is to issue rules. That logic is most obviously refuted by Section 5 itself, which tells the Commission exactly how to prevent violations without issuing binding regulations.

Section 5 has a simple structure. It "declare[s] unlawful" certain conduct (*i.e.*, unfair methods of competition) and instructs the Commission "to prevent persons, partnerships, or corporations" from engaging in that conduct. 15 U.S.C. § 45(a). To fulfill that directive, Section 5 empowers the Commission to pursue individual enforcement actions against alleged violators and to obtain "an order requiring such person . . . to *cease and desist* from the violation of the law so charged in the complaint." *Id.* at § 45(a) and (b) (emphasis added). In other words, Section 5 itself explains the meaning of the word "prevent": the Commission "prevent[s]" unfair methods of competition by obtaining cease-and-desist orders that put an end to ongoing violations of the law.

The Commission, like the district court, wrongly claims that it can "prevent" violations of the law only by promulgating substantive regulations. But the Commission never explains how simply announcing new rules "prevents" violations of those rules. Nor does it explain why enforcement

-23-

actions authorized by Section 5 do not "prevent" unlawful conduct. Indeed, if it were true that binding regulations are the only way to "prevent" unlawful conduct under Section 5, then the Commission has been neglecting its statutory mandate for the last 50 years (and in the agency's first five decades until the 1960s).

## II.  The FTC Act Does Not Permit The Commission To Condemn All Noncompetes As Unfair Methods Of Competition.

The Noncompete Rule exceeds the Commission's statutory authority in a second, independent way. It has long been settled that conduct constitutes an "unfair method of competition" under Section 5 of the FTC Act only when it harms competition more than it helps it. Some individual noncompete agreements may impose harms that are not outweighed by procompetitive benefits, but plainly not all of them do—as the Commission itself recognizes. *See* 89 Fed. Reg. 38,464 ("It may be difficult or impossible for a worker to establish that their individual non-compete—or a single firm's use of a non-compete—adversely affected competition in a labor market or product/service market sufficiently to violate the Sherman Act."). Accordingly, the Commission cannot simply declare all noncompetes *per se* unlawful under Section 5 without even attempting to make the evidentiary showing that could support a *per se* rule. If the Commission's boundless

-24-

interpretation of Section 5 were correct, the statute would reflect an unconstitutional delegation of legislative power to the agency. This issue—which POV preserved below but the district court did not reach—offers an independent ground to affirm the district court's judgment. *See PDVSA U.S. Litig. Tr.* v. *LukOil Pan Americas LLC*, 65 F.4th 556, 562 (11th Cir. 2023).

## A.    The Noncompete Rule Exceeds The Commission's Authority Under Section 5.

1.    When Congress enacted Section 5 in 1914, it made it "the function of the court[s] to determine the scope" of the phrase "unfair methods of competition." *E.I. Du Pont de Nemours & Co.* v. *FTC*, 729 F.2d 128, 136 (2d Cir. 1984). To distinguish "anticompetitive" from "legitimate conduct," *id.*, courts have consistently required the Commission to prove in each case that the challenged conduct (i) produces anticompetitive effects and (ii) is not offset by procompetitive justifications. *See id.* at 140-141; *McWane, Inc.* v. *FTC*, 783 F.3d 814, 826 (11th Cir. 2015) (reviewing "the Commission's determination that [defendant's] conduct harmed competition and lacked offsetting procompetitive benefits"); *see also* Milner, *Defining Unfair Methods of Competition in the Federal Trade Commission Act*, 2023 Wisc. L. Rev. 109, 114 (explaining that, at the time of the FTC Act's

passage, the phrase "unfair methods of competition" was meant to capture "actions that appeared to inflict losses on rivals or impede their entry into a market without any offsetting justification").

By categorically banning *all* noncompetes, the Commission is effectively attempting to deem them *per se* unlawful. But in light of Section 5's focus on unjustified competitive harm, business practices can be declared *per se* unlawful only when "every" instance of that conduct "poses some threat to the free market." *FTC* v. *Superior Ct. Trial Lawyer's Ass'n*, 493 U.S. 411, 434 (1990); *see Broadcast Music, Inc.* v. *Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979) (*per se* treatment is reserved for practices that "always or almost always tend to restrict competition and decrease output").[2] To avoid penalizing beneficial conduct, courts will not recognize new *per se* rules without extensive experience and evidence showing that the specific practice at issue *always* harms competition. *See FTC* v. *Actavis*, 570 U.S. 136 (2013) (rejecting a *per se* rule where the "likelihood of . . . anticompetitive effects" caused by certain conduct "depends upon" a number of factors).

---

[2] For decades, courts have recognized that only a limited class of horizontal agreements—such as price fixing, market allocations, and bid rigging—are *per se* violations of the antitrust laws. *See Palmer* v. *BRG of Georgia, Inc.*, 784 F.3d 1417, 1423-1424 (11th Cir. 1989), *rev'd on other grounds*, 498 U.S. 46 (1990).

The Noncompete Rule flouts these constraints. The Commission did not even try to make the necessary showing for a *per se* rule. It did not show that *all* noncompetes harm competition, nor did it point to a well-developed body of law that would support *per se* condemnation. 89 Fed. Reg. 38,422. Instead, the Commission concluded only that noncompetes harm competition in the *aggregate*—even if some of those agreements are indisputably not harmful on their own. *See* 89 Fed. Reg. 38,379-38,380.

The Commission's "aggregation" approach is unlawful, because it makes indisputably legitimate conduct illegal. As the Ninth Circuit explained 35 years ago, "to allow a finding of a Section 5 violation on the theory that the mere widespread use of [a] practice[] makes it [unlawful] would blur the distinction between guilty and innocent commercial conduct." *Boise Cascade Corp.* v. *FTC*, 637 F.2d 573, 582 (9th Cir. 1980). Upholding this use of Section 5 would empower the Commission to create new *per se* rules that expressly do not meet the demanding showing required by Supreme Court precedent. *See California Dental Ass'n* v. *FTC*, 526 U.S. 756, 772 (1999) (*per se* treatment is inappropriate whenever an agreement "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition").

-27-

Simply put, under long-established understandings of Section 5, if some noncompetes harm competition and others do not, only the former are "unfair methods of competition." *See Snap-On Tools Corp.* v. *FTC*, 321 F.2d 825, 837 (7th Cir. 1963). Because the Noncompete Rule violates that principle, it contravenes Section 5.

2. Several canons of construction further undermine the Commission's attempt to deem noncompetes *per se* unlawful under Section 5.

First, courts "assume that Congress is aware of existing law" when it enacts a statute. *Miles* v. *Apex Marine Corp.*, 498 U.S. 19, 32 (1990). Noncompete agreements date back to the Founding, and have always been generally enforceable, even if subject to exceptions. There is no indication that Congress in 1914 (or at any time thereafter) intended to empower the Commission to outlaw a common, well-accepted business practice.

Second, Congress must use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *USFS* v. *Cowpasture River Preservation Assn.*, 590 U.S. 604, 622 (2020). States have regulated noncompete agreements for centuries, *see, e.g.*, *Pierce* v. *Fuller*, 8 Mass. 223 (1811), while federal law has had nothing to say on the subject.

-28-

Third, the Commission's interpretation of Section 5 creates another problem under the major-questions doctrine. By establishing a new *per se* rule for noncompetes, the Commission is claiming the authority to seek civil penalties against any company that uses noncompetes, without affording the defendant an opportunity to establish legitimate justifications for its agreements. Even without rulemaking power, that unbounded view of Section 5 would have tremendous economic and political significance and would greatly expand the Commission's enforcement authority beyond its historical limits. *See NFIB*, 595 U.S. at 117 (holding that OSHA's general authority to set "*occupational* safety and health standards" could not support the agency's effort to resolve a public health debate).

## B. Under The Commission's Interpretation, Section 5 Would Be Unconstitutional.

If the Commission were right that Section 5 gives it the authority to categorically prohibit all noncompetes without any need to show that all of those agreements are actually anticompetitive, the statute would amount to an unconstitutional delegation of legislative power. When Congress grants authority to an agency, it must provide an "intelligible principle" to guide the Executive's discretion. *Gundy* v. *United States*, 588 U.S. 128, 135-136 (2019). The Commission's interpretation of Section 5—which allows it to outlaw

-29-

conduct "ex ante[,] without regard for the distinguishing features of individual circumstances"—lacks such a principle. *See* Ferguson Dissent, at 28-32.

To defend the Noncompete Rule, the Commission relies (at 6-7) on its 2022 Policy Statement, which states that conduct violates Section 5 any time it (i) is "undertaken by an actor in the marketplace," (ii) is "coercive, exploitative, collusive, abusive, deceptive, [or] predatory," and (iii) "tend[s] to negatively affect competitive conditions" by, for example, "impair[ing] the opportunities" of a competitor. FTC, *Policy Statement Regarding the Scope of Unfair Methods of Competition* 8-9 (Nov. 2022); *see* 89 Fed. Reg. 38,358. As relevant here, the Policy Statement also takes the position that conduct that is lawful on its own may become unlawful when "examined in the aggregate along with the conduct of others." Policy Statement, at 10.

That reading of Section 5 removes all guardrails on the agency's power. Armed with such an interpretation, the Commission would be able to target conduct under Section 5 without showing that it actually harmed competition in any way. *See* Dissenting Statement of Christine S. Wilson, at 9-12. It would also be empowered to condemn entire categories of conduct as a class, as it has done here, thereby discarding the Supreme Court's instruction that

Section 5 takes its "meaning from the facts of each case." *Pan Am. World Airways, Inc.* v. *United States*, 371 U.S. 296, 307 (1963).

The implications of the Commission's approach are staggering. If the Commission can condemn conduct any time it determines that conduct may "impair the opportunities" of a competitor or may affect competition in the "aggregate," nothing would stop the Commission from outlawing all mergers and acquisitions, multi-product discounts, or other ordinary business activities that only rarely harm competition. The Commission has already started down this path, challenging a company's "no-hire" agreement with its customer based on nothing more than the majority's view that no-hire agreements are *categorically* unlawful. *See* Dissenting Statement of Commissioner Andrew N. Ferguson, *In the Matter of Guardian Services Industries, Inc.* (Dec. 4, 2024) (explaining that the Commission had "allege[d] nothing" about the competitive effects of the specific agreement).

Notably, the Commission's novel interpretation of Section 5 rejects the very limits the Supreme Court relied on in resolving a nondelegation challenge. In the seminal case of *A.L.A. Schechter Poultry Corp.* v. *United States*, the Supreme Court explained that Section 5 was a lawful delegation of power precisely because each of the "unfair methods of competition"

prohibited by the statute would be "determined in particular instances, upon evidence, in the light of particular competitive conditions." 295 U.S. 495, 532-533 (1935). The Commission's Policy Statement dispenses with that requirement, thereby "resurrect[ing], under the banner of the FTC Act, the same nondelegation problem that doomed" the statute in *Schechter Polutry*. POV Br. 50; *see* Ferguson Dissent, at 28-32 ("*Schechter Poultry* confirms the unconstitutionality of *rulemaking authority* under Section 5."). These "concerns regarding the constitutionality" of Section 5 under the Commission's reading provide one more reason to reject it here. *See Brown* v. *United States*, 748 F.3d 1045, 1069 (11th Cir. 2014).

## CONCLUSION

The district court's decision should be affirmed.

Respectfully submitted,

/s/ *Jeffrey B. Wall*

| | |
|---|---|
| JORDAN L. VON BOKERN | JEFFREY B. WALL |
| CHRISTOPHER J. WALKER | JUDSON O. LITTLETON |
| U.S. CHAMBER LITIGATION CENTER | DANIEL J. RICHARDSON |
| 1615 H Street NW | SULLIVAN & CROMWELL LLP |
| Washington, D.C.  20062 | 1700 New York Avenue, NW |
| | Washington, D.C.  20006-5215 |
| LIZ DOUGHERTY | (202) 956-7500 |
| BUSINESS ROUNDTABLE | wallj@sullcrom.com |
| 1000 Maine Avenue SW | |
| Washington, D.C. 20024 | |

JANUARY 22, 2025

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because it consists of 6,382 words, excluding parts exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Expanded BT.

/s/ *Jeffrey B. Wall*
JEFFREY B. WALL

JANUARY 22, 2025

## CERTIFICATE OF SERVICE

I, Jeffrey B. Wall, counsel for *amici* and a member of the Bar of this Court, certify that, on January 22, 2025, a copy of the attached Brief was filed electronically through the CM/ECF system with the Clerk of this Court. The participants in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

 /s/ *Jeffrey B. Wall*
JEFFREY B. WALL

JANUARY 22, 2025