**COVINGTON**

BEIJING  BOSTON  BRUSSELS  DUBAI  FRANKFURT
JOHANNESBURG  LONDON  LOS ANGELES  NEW YORK
PALO ALTO  SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC  20001-4956
T  +1 202 662 6000

January 29, 2025

**By CM/ECF**
David J. Smith
Clerk of Court
U.S. Court of Appeals for the 11th Circuit
56 Forsyth St., N.W.
Atlanta, Georgia 30303

        **Re:** *Properties of the Villages, Inc. v. Federal Trade Commission*,
        **No. 24-13102 Citation of Supplemental Authorities**

Dear Mr. Smith:

        Pursuant to Federal Rule of Appellate Procedure 28(j), Plaintiff-Appellee Properties of the Villages, Inc. ("POV") writes to inform the Court of an order of the United States Court of Appeals for the Fifth Circuit that is germane to the pending motion to intervene in the above captioned case.  *See* ECF 75.

        In *Ryan L.L.C. v. Federal Trade Commission*, No. 24-10951, the Fifth Circuit, in an order signed by Judge Southwick, denied a motion to intervene by Proposed Intervenors Small Business Majority, John Roffino, and Danielle Emmer ("Proposed Intervenors").[1]  That case involves a similar legal challenge to the same Federal Trade Commission ("FTC") rule at issue in this case.  The intervention motion rejected by the Fifth Circuit was filed by the same Proposed Intervenors here and was largely identical to the motion filed in this Court: it asserted the same legal arguments and included substantially identical declarations.  *Compare* ECF 75, *with* Exhibit B.

---

[1] The Fifth Circuit's Order is attached as Exhibit A and the motion to intervene is attached as Exhibit B.

**COVINGTON**

David J. Smith
January 29, 2025
Page 2

      Here, as in *Ryan*, the intervention motion should be denied as Proposed Intervenors lack an interest in the outcome of this case and their motion is untimely. *See* POV Opposition to Motion to Intervene, ECF 97; FTC Opposition to Motion to Intervene, ECF 96. Indeed, the argument for intervention here is weaker than in *Ryan* as the *Ryan* case is the appeal of a final judgment vacating the rule, while this appeal concerns a preliminary injunction issued only as to POV. *See* ECF 97 at 4-10, 20-21.

                                          Sincerely,

                                          */s/ Stacey K. Grigsby*
                                          Stacey K. Grigsby

                                          *Counsel for Appellee*

# EXHIBIT A

# United States Court of Appeals
# for the Fifth Circuit

---

No. 24-10951

---

United States Court of Appeals
Fifth Circuit

**FILED**

January 28, 2025

Lyle W. Cayce
Clerk

RYAN, L.L.C.,

*Plaintiff—Appellee,*

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
BUSINESS ROUNDTABLE; TEXAS ASSOCIATION OF BUSINESS;
LONGVIEW CHAMBER OF COMMERCE,

*Intervenor Plaintiffs—Appellees,*

*versus*

FEDERAL TRADE COMMISSION,

*Defendant—Appellant.*

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:24-CV-986

---

ORDER:

IT IS ORDERED that the opposed motion of Small Business
Majority to intervene as appellants is DENIED.

IT IS FURTHER ORDERED that the opposed motion of Small Business Majority to have the government provide at least 10 days' notice to proposed intervenors and the Court before any voluntary dismissal of the appeal, stipulating to judgment, or taking any similar action is DENIED.

*Leslie H. Southwick*

_____

LESLIE H. SOUTHWICK
*United States Circuit Judge*

**EXHIBIT B**

**Case No. 24-10951**

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

RYAN L.L.C.,

*Plaintiff-Appellee*,

CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; BUSINESS ROUNDTABLE; TEXAS ASSOCIATION OF BUSINESS; LONGVIEW CHAMBER OF COMMERCE,

*Intervenor Plaintiffs-Appellees*,

*v.*

FEDERAL TRADE COMMISSION,

*Defendant-Appellant*.

On Appeal from the United States District Court
For the Northern District of Texas (Brown, J.)
No. 3:24-cv-986

**MOTION FOR PERMISSIVE INTERVENTION AS INTERVENOR APPELLANTS OR, IN THE ALTERNATIVE, CONDITIONAL MOTION FOR INTERVENTION AS OF RIGHT BY SMALL BUSINESS MAJORITY, JOHN ROFFINO, AND DANIELLA EMMER**

David H. Seligman
Rachel Dempsey
TOWARDS JUSTICE
PO Box 371680, PMB 44465
Denver, CO 80237
david@towardsjustice.org
rachel@towardsjustice.org
(720) 441-2236

Michael Lieberman
    *Counsel of Record*
Jamie Crooks
FAIRMARK PARTNERS, LLP
1001 G Street NW, Suite 400 East
Washington, DC 20001
michael@fairmarklaw.com
jamie@fairmarklaw.com
(818) 585-2903

*Counsel for Proposed Intervenors*

January 13, 2025

## CERTIFICATE OF INTERESTED PERSONS

*Ryan LLC v. Federal Trade Commission*, No. 24-10951

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

1.  Fairmark Partners, LLP
2.  Michael Lieberman
3.  Jamie Crooks
4.  Towards Justice
5.  David Seligman
6.  Rachel Dempsey
7.  John Roffino
8.  Daniella Emmer
9.  Small Business Majority
10. Ryan L.L.C.
11. Chamber of Commerce of the United States of America
12. Business Roundtable
13. Texas Association of Business
14. Longview Chamber of Commerce
15. Gibson, Dunn & Crutcher, L.L.P.
16. The Fillmore Law Firm, L.L.P.
17. Sullivan & Cromwell L.L.P.
18. Potter Minton, PC
19. Eugene Scalia
20. Amir C. Tayrani
21. Andrew G.I. Kilberg
22. Aaron Hauptman
23. Joshua R. Zuckerman
24. Allyson N. Ho
25. Elizabeth A. Kiernan
26. Charles W. Fillmore
27. H. Dustin Fillmore III

28. Jeffrey B. Wall
29. Judson O. Littleton
30. Jordan Von Bokern
31. Tyler Badgley
32. Liz Dougherty
33. Michael E. Jones
34. Shaun W. Hassett
35. Robert Lee Sayles


*/s/ Michael Lieberman*

Attorney of Record for Proposed Intervenors Small
    Business Majority, John Roffino, and Daniella Emmer

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................................... i

PRELIMINARY STATEMENT ................................................................. 1

LEGAL STANDARD .......................................................................... 3

INTERESTS OF PROPOSED INTERVENORS ..................................................... 4

ARGUMENT ................................................................................. 7

I.      There Is A Substantial Risk That The Government Will Stop Defending The Non-Compete Rule. ................................................. 7

II.     Proposed Intervenors Satisfy The Requirements For Permissive Intervention. ........................................................................ 10

      A.     Proposed Intervenors' Defense of the Rule Shares Common Questions With the Main Action. ....................................... 10

      B.     This Motion is Timely. ................................................. 11

III.    In The Alternative, The Court Should Defer Decision On Proposed Intervenors' Conditional Motion To Intervene By Right. ..................... 13

      A.     If Permissive Intervention is Denied, the Conditional Motion is Necessary to Protect Proposed Intervenors' Interests. .............. 14

      B.     Proposed Intervenors Satisfy the First Three Requirements For Intervention By Right, and Would Satisfy the Fourth if the Government Stops Defending the Rule. ............................... 16

CONCLUSION ............................................................................. 22

CERTIFICATE OF COMPLIANCE ............................................................. i

CERTIFICATE OF SERVICE ................................................................ ii

## PRELIMINARY STATEMENT

This appeal concerns the legality of the Federal Trade Commission's Non-Compete Clause Rule ("Rule"), which makes certain non-compete clauses in employment contracts unenforceable. Proposed Intervenors are Small Business Majority, John Roffino, and Daniella Emmer. Small Business Majority is a national small business organization that represents many businesses disadvantaged by noncompete clauses, which impede them in finding and hiring new talent. Mr. Roffino is a veteran of the war in Afghanistan who is currently subject to a non-compete clause from his former employer, which prevents him from starting his own business selling medical devices to veterans.  Ms. Emmer is a therapist who is unable to pursue more appealing and higher-paying jobs because of a non-compete clause in her current employment agreement.

Proposed Intervenors have strong interests in protecting the Rule from legal challenge. As explained below, the forthcoming change in Administration and anticipated changes in the FTC's membership create a substantial likelihood that the government will stop defending the Rule in the near future. Proposed Intervenors cannot sit on the sidelines waiting for that time to arrive before asserting their interests. If Proposed Intervenors wait until the government stops defending the Rule, it may be too late to intervene at that point. For example, if the government were to voluntarily dismiss its appeal, the dismissal may take effect before Proposed

Intervenors have any opportunity to seek intervention. Moreover, if Proposed Intervenors wait any longer to seek intervention, they would risk their motion being denied on timeliness grounds. To avoid those risks, Proposed Intervenors seek intervention now.

First, Proposed Intervenors seek permissive intervention. They currently satisfy the requirements for permissive intervention and their entry into the case would not unduly delay or prejudice the adjudication of any parties' rights. *Cf.* Fed. R. Civ. P. 24(b). Indeed, Proposed Intervenors do not intend to make any substantive filings in this case unless and until the government stops defending the Rule.

Second, in the alternative, Proposed Intervenors conditionally seek intervention by right. *Cf.* Fed. R. Civ. P. 24(a). Because the government is currently protecting their interests, Proposed Intervenors ask the Court to defer consideration of their request for intervention by right, not ruling on it unless and until the government stops defending the Rule in whole or in part. *See Solid Waste Agency v. United States Army Corps of Eng'rs*, 101 F.3d 503, 509 (7th Cir. 1996) (approving this "conditional application for leave to intervene" procedure). At that time, Proposed Intervenors would satisfy all requirements for intervention by right.

Intervention would not only allow Proposed Intervenors to protect their interests in the Rule, but would also ensure the continued adversarial presentation of the important issues in this case. Absent intervention, the Rule could remain

permanently invalidated nationwide based on the ruling of a single district court, despite a ruling from a co-equal district court upholding the same Rule, *see ATS Tree Servs., LLC v. FTC*, No. 24-1743, 2024 WL 3511630 (E.D. Pa. July 23, 2024), and a ruling by the D.C. Circuit upholding the agency's statutory authority to issue substantive competition rules, in conflict with the decision below, *Nat'l Petroleum Refiners, Ass'n v. FTC*, 482 F.2d 672, 673 (D.C. Cir. 1973). Proposed Intervenors submit that the better course would be to allow intervention and ensure the continued adversarial presentation necessary for this Court to weigh in on the issues this case presents.[1]

## LEGAL STANDARD

Intervention in the district court is governed by Federal Rule of Civil Procedure 24, which contains separate provisions for permissive intervention, *see* Fed. R. Civ. P. 24(b), and intervention by right, *see* Fed. R. Civ. P. 24(a). Although "[n]o specific provision in the Federal Rules of Appellate Procedure or the Rules of this Circuit provides for intervention on appeal, … the Supreme Court has recognized that the policies underlying intervention in the district courts may be

---

[1]    In accordance with Fifth Circuit Rule 27.4, Proposed Intervenors contacted counsel for all parties regarding this motion. Counsel for Plaintiff-Appellee stated that Plaintiff-Appellee opposes the motion and will file an opposition. Counsel for Intervenor Plaintiffs-Appellees stated that Intervenor Plaintiffs-Appellees oppose the motion and reserve the right to file an opposition within the time limits provided by the rules. Counsel for Defendant-Appellant did not provide a position.

applicable in appellate courts." *United States v. Bursey*, 515 F.2d 1228, 1238 (5th Cir. 1975); *see also Baker v. Wade*, 769 F.2d 289, 291-92 (5th Cir. 1985) (finding intervention on appeal "justified because [intervenor's] position satisfied the requirements of both Fed. R. Civ. P. 23(d)(2) and 24(a)(2)"). Other courts of appeals considering intervention motions likewise apply Rule 24. *See, e.g.*, *Bates v. Jones*, 127 F.3d 870, 873 (9th Cir. 1997).

To "prevent … procedural gamesmanship," however, this Court allows "intervention on appeal only in an exceptional case for imperative reasons." *Richardson v. Flores*, 979 F.3d 1102, 1105 (5th Cir. 2020). This Court deemed that elevated standard necessary because without it, parties might seek to intervene directly on appeal instead of seeking review of a district court's decision denying their first effort at intervention, thereby trying to avoid the abuse of discretion standard. *Id.* at 1105 & n.2 (citing *Hutchinson v. Pfeil*, 211 F.3d 515, 519 (10th Cir. 2000)).

## INTERESTS OF PROPOSED INTERVENORS

Proposed Intervenors are Small Business Majority ("SBM"), John Roffino, and Daniella Emmer, all of whom have an interest in the outcome of this litigation and the validity of the Rule.

SBM is a national small business organization that empowers America's diverse entrepreneurs to build a thriving and equitable economy. *See* Exh. A,

4

Declaration of John C. Arensmeyer ¶ 4. SBM engages its network of more than 85,000 small businesses and 1,500 business and community organizations to deliver resources to entrepreneurs and advocate for public policy solutions that promote inclusive small business growth, including by advocating specifically for limits on non-compete agreements. *Id.* ¶¶ 4, 10. Noncompetes harm thousands of small businesses in SBM's network by impeding their efforts to recruit and hire new talent to help innovate and grow their businesses. *Id.* ¶¶ 11-17. Non-compete agreements also stop aspiring entrepreneurs from starting their own businesses, which further hampers the small business growth and innovation that SBM supports. *Id.* ¶ 12.

Mr. Roffino is a disabled veteran. He served in the United States Army and was deployed to Afghanistan for Operation Enduring Freedom. He earned a bronze star medal in recognition of his distinguished performance. *See* Exh. B, Declaration of John Roffino, at ¶¶ 3-6. When he returned to civilian life, Mr. Roffino sought to enter a profession that would allow him to continue helping people, especially other veterans. *Id.* ¶ 7. After a stint working in in a pediatric neuro intensive care unit, he was hired by a company that sells a medical device to help patients regain mobility after surgery. *Id.* ¶¶ 8-10. This job was especially appealing to him because many of the patients he worked with were veterans. *Id.* ¶ 10. Eventually, however, he grew frustrated with the company's model of renting devices on a month-to-month basis

instead of selling them, which placed undue financial strain on customers and caused some to cease treatment altogether. *Id.* ¶¶ 12-15.

Because Mr. Roffino felt inhibited from serving veterans the way he wanted, he sought to leave the company and start his own business providing mobility devices to veterans for a one-time payment, but his prior employer had required him to sign a non-compete agreement when it first hired him. *Id.* ¶ 16-19; *see also* Exh. 1 to Roffino Decl. His noncompete agreement is extraordinarily broad, prohibiting him from engaging "directly or indirectly" in an expansive list of activities relating to any orthopedic medical device. *Id.* ¶¶ 17-21. The restricted activities include far-reaching, hard-to-define activities like "business development" and "strategic planning." *Id.* The agreement covers any territory in which he had any material responsibility, regardless of its proximity to his prior employer. *Id.*

Mr. Roffino eventually did leave the company, but because of the noncompete, had to take a substantial pay cut and leave his preferred field. *Id.* ¶ 25. He also has been prohibited from taking any concrete steps toward opening his own business. *Id.* ¶¶ 14, 16, 23-28. And because the noncompete also covers activities like strategic planning and business development, he worries that his employer would try to enforce it against him if he did start his business after the noncompete's term expires, for example by arguing that he began to develop his ideas for the new business during the noncompete's term. *Id.*

Ms. Emmer is a pre-licensed therapist currently working for a group therapy practice. *See* Exh. C, Declaration of Daniella Emmer ¶¶ 3-4. As a condition of her hiring, she was required to sign a non-compete agreement that, upon termination of her employment, would prohibit her from serving as a therapist for any patient she started treating while at her current employer for a two-year period. *Id.* ¶ 5. This restriction is in addition to a non-solicitation agreement; thus, if a patient proactively seeks out her services at her new employer, the non-compete agreement would still require her to turn down that patient. *Id.* ¶ 5. Because of the non-compete agreement, she has been unable to pursue more attractive and higher-paying job opportunities. *Id.* ¶¶ 9-10. She would like to leave her current employer, but because she cannot afford to turn down clients who sought her out at a new employer, and because doing so would be clinically detrimental to her patients in many circumstances, her non-compete agreement prevents her from obtaining a new job despite her desire to do so. *Id.* ¶ 10.

## ARGUMENT

### I.    There Is A Substantial Risk That The Government Will Stop Defending The Non-Compete Rule.

The government recently filed its opening brief seeking reversal of the judgment below. However, there is good reason to believe that the government may stop defending the Rule, in whole or in part, shortly after the forthcoming change in Administration.

The FTC is "composed of five Commissioners, who shall be appointed by the President, by and with the advice and consent of the Senate." 15 U.S.C. § 41 ("FTC Act"). No more than "three of the Commissioners [may] be members of the same political party," *id.*, and standard practice is for three Commissioners to be members of the same political party as the President. That practice will continue in the next Trump Administration: two of the current Commissioners are Republicans, two are Democrats, and President Trump has announced his intention to nominate Mark Meador, a Republican, to the vacant fifth seat. *See* @realDonaldTrump, TRUTH SOCIAL (Dec. 10, 2024, 6:24 PM), https://tinyurl.com/4vdcd5wp.

The two current Republican commissioners have made clear that they do not support the Rule. Commissioner Andrew Ferguson, whom President Trump has selected to be the FTC's next Chair, dissented from the Commission's issuance of the Rule and filed a 45-page statement expressing his view that the FTC "[has] neither the authority nor the evidence to sustain the Final Rule." Dissenting Statement of Commissioner Ferguson, In the Matter of the Non-Compete Clause Rule, Matter No. P201200 (June 28, 2024), at 1, 45.

Commissioner Melissa Holyoak—whose term will continue until late next year—likewise dissented from the Commission's issuance of the Rule and filed a statement "agree[ing] with Commissioner Ferguson's reasons for rejecting the Rule" and further arguing that the FTC Act does not authorize competition rulemaking.

Dissenting Statement of Commissioner Holyoak, In the Matter of the Non-Compete

Clause Rule, Matter No. P201200 (June 28, 2024), at 3.

Based in part on these statements, media outlets and legal commentators

widely report that the Rule "will most likely be reversed under a Donald Trump

administration." Paul Mulholland, *Trump Likely to Reverse Non-Compete Ban,*

*Independent Contactor Rule, Worker Safety Rules*, Plan Sponsor Council of America

(Nov. 6, 2024), https://tinyurl.com/2snwj4pw; *see also, e.g.*, Mark L. Daniels, *The*

*Future of Federal Non-Compete Bans in a Trump Administration*, National Law

Review (Nov. 26, 2024), https://tinyurl.com/mtar9f8s ("Mr. Ferguson and Ms.

Holyoak … both would likely direct the Department of Justice to withdraw the

FTC's pending appeals.").

There is ample precedent for a new administration declining to defend the

prior administration's regulatory actions. For example, the Biden Administration

moved to dismiss the government's Seventh Circuit appeal in a case challenging the

first Trump Administration's Public Charge Rule. *See* Unopposed Motion To

Voluntarily Dismiss Appeal, *Cook Cty. v. Wolf*, No. 20-3150 (7th Cir. Mar. 9, 2021).

Similarly, the first Trump Administration declined to seek rehearing or Supreme

Court review of this Court's decision vacating the Obama-era Fiduciary Rule. *See*

*Chamber of Commerce v. Dep't of Labor*, 885 F.3d 360 (5th Cir. 2018).

At the very least, there undeniably is a *risk* that the government will stop defending the Rule—whether by voluntarily dismissing this appeal, seeking to hold these proceedings in abeyance, stipulating to judgment, declining to seek Supreme Court review of an adverse decision, or otherwise. Proposed Intervenors accordingly seek to defend their interests in the Rule and move to intervene in this matter before it is too late.

## II.    Proposed Intervenors Satisfy The Requirements For Permissive Intervention.

The only requirements for permissive intervention are (1) the would-be intervenor's claim shares a question of law or fact with the main action, and (2) timely application. Fed. R. Civ. P. 24(b)(1); *see United States ex rel. Hernandez v. Team Fin., L.L.C.*, 80 F.4th 571, 577 (5th Cir. 2023). Proposed Intervenors satisfy both requirements, and because of the likelihood that the government declines to continue protecting their interests, the Court should exercise its discretion to allow them to intervene now.

### A.    Proposed Intervenors' Defense of the Rule Shares Common Questions With the Main Action.

The first requirement for permissive intervention is that the proposed intervenor "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). This requirement is given a "liberal construction." *Stallworth v. Monsanto Co.*, 558 F.2d 257, 269 (5th Cir.

1977). Here, Proposed Intervenors' anticipated defense of the Rule shares every question of law and fact in common with the main action: They seek to defend the Rule as a lawful exercise of FTC's authority to "make rules and regulations for the purpose of carrying out the provisions of [the FTC Act]," which prohibits "unfair methods of competition." 15 U.S.C. §§ 45(a)(2), 46(g).

**B.      This Motion is Timely.**

This Court assesses the timeliness of a motion for permissive intervention by applying four factors: "(1) the length of time the movant waited to file, (2) the prejudice to the existing parties from any delay, (3) the prejudice to the movant if the intervention is denied, and (4) any unusual circumstances." *Hernandez*, 80 F.4th at 578.

The first factor, length of time, is measured not from the start of the case, but from "the moment that the prospective intervenor knew that his interests would no longer be protected." *Id.*; *accord Edwards v. City of Houston*, 78 F.3d 983, 1000 (5th Cir. 1996); *cf. United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977). This motion is timely under that standard because it is being filed even before it becomes certain that Proposed Intervenors' interests will no longer be protected by an existing party, *i.e.*, before the government stops defending the Rule. Furthermore, even if timeliness were measured from Election Day (on the theory that the writing has been on the wall since then), this Court has recognized on multiple occasions that a two-

month "delay" is not long enough to make a motion untimely. *See, e.g.*, *Nextera Energy Capital Holdings, Inc. v. D'Andrea*, 2022 WL 17492273, at *3 (5th Cir. Dec. 7, 2022) (two months); *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (two months); *Ass'n of Pro. Flight Attendants v. Gibbs*, 804 F.2d 318, 321 (5th Cir. 1986) (five months).

The second factor, prejudice to existing parties from any delay, also favors intervention. Prejudice under this factor "must be measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation." *Espy*, 18 F.3d at 1206. There was no delay here, but even if there was, it did not cause prejudice. Proposed Intervenors do not intend to make any substantive filings in this case unless and until the government stops defending the Rule. In addition, Proposed Intervenors are willing to adopt the government's opening brief as their own, ensuring that their entry into the case "will not create delay by inject[ing] new issues into the litigation" or "threaten to broaden the scope of the case going forward." *Day v. Apoliona*, 505 F.3d 963, 965 (9th Cir. 2007). All intervention will do is "ensure that [the] determination of an already existing issue is not insulated from review simply due to the posture of the parties." *Id.*

The third factor, prejudice to the movant if intervention is denied, also supports intervention. A proposed intervenor's interest in a regulatory scheme "is

impaired by the *stare decisis* effect of the district court's judgment" as to the scheme's validity. *Espy*, 18 F.3d at 1207 (quoting *Ceres Gulf v. Cooper*, 957 F.2d 1199, 1204 (5th Cir. 1992)). That is the case here. If the government were to voluntarily dismiss its appeal or otherwise acquiesce in the district court's injunction, Proposed Intervenors' economic interests would be adversely affected without their having any opportunity to protect those interests by taking up the Rule's defense. *See Brumfield v. Dodd*, 749 F.3d 339, 345 (5th Cir. 2014) ("The very purpose of intervention is to allow interested parties to air their views so that a court may consider them before making potentially adverse decisions.").

Fourth, Proposed Intervenors are not aware of any "unusual circumstances" relevant to the timeliness determination.

In sum, three of the timeliness factors weigh in favor of intervention and the fourth is neutral.

## III. In The Alternative, The Court Should Defer Decision On Proposed Intervenors' Conditional Motion To Intervene By Right.

If the Court does not grant permissive intervention, Proposed Intervenors respectfully request that the Court defer decision on their alternative, conditional motion to intervene by right until the government stops defending the Rule, should

that occur.[2] At that time, Proposed Intervenors would satisfy all requirements for intervention by right.

### A. If Permissive Intervention is Denied, the Conditional Motion is Necessary to Protect Proposed Intervenors' Interests.

Because the government is *currently* representing their interests adequately, Proposed Intervenors cannot currently satisfy the requirement for intervention by right. *See, e.g.*, *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015) (intervention by right permitted only when interests are "inadequately represented by the existing parties").[3] However, Proposed Intervenors cannot wait until the government stops defending the Rule, for two reasons. First, if Proposed Intervenors waited until then, it may be too late to intervene. If the government were to voluntarily dismiss its appeal under FRAP 42(b)(1), for example, the dismissal might take effect immediately, leaving no opportunity for intervention. *See* Fed. R. App. 42(b)(1) ("The circuit clerk *must* dismiss a docketed appeal if the parties file a signed dismissal agreement…" (emphasis added)). Alternatively, if the government

---

[2] Absent contrary direction from the Court, Proposed Intervenors would plan to file a Notice if and when they believe the government's representation has become inadequate. If the Court does not grant the motion for permissive intervention, Proposed Intervenors ask the Court to order the government to provide at least 10 days' notice to Proposed Intervenors and the Court before voluntarily dismissing this appeal or stipulating to judgment.

[3] This "inadequate representation" requirement does not apply to requests for permissive intervention.

defended the Rule before the panel but then declined to seek *en banc* or Supreme Court review of an adverse judgment, post-judgment intervention might not be possible. *See* Fed R. App. P. 40(a) (only a "party" may seek rehearing); Sup. Ct. R. 12.6 (same as to certiorari). That appears to be what doomed the would-be intervenors in the aforementioned case regarding the Fiduciary Rule: After the new administration declined to seek review of this Court's panel decision, several "state attorneys general sought leave to intervene to appeal the decision," but this Court "denied those motions because litigation had already been completed." Bethany A. Davis Noll & Richard L. Revesz, *Presidential Transitions: The New Rules*, 39 Yale J. On Reg. 1100, 1127-28 (2022).

Second, if Proposed Intervenors wait until the government stops defending the Rule, they would risk their motion being denied on timeliness grounds. As noted above, parties seeking intervention must do so soon after becoming aware that their interests will "no longer be protected." *Edwards*, 78 F.3d at 1000. If Proposed Intervenors waited to file, Appellees might oppose the motion by arguing that Proposed Intervenors had such knowledge before the government formally stopped defending the Rule. That is what the plaintiffs in the Fiduciary Rule case argued when the AARP sought to intervene after the government formally stopped defending the rule: "Although the Justice Department vigorously defended the Rule in the district court and before this Court, Movants were on notice long ago that the

new Administration was not so deeply committed to the Fiduciary Rule." Appellants'
Consolidated Opposition To Motion Of AARP To Intervene 13, *Chamber of
Commerce v. U.S. Department of Labor*, No. 17-10238 (Apr. 30, 2018).

For both of those reasons, filing this Motion now is necessary to protect
Proposed Intervenors' interests. However, because they cannot currently satisfy the
requirements for intervention by right, Proposed Intervenors move to intervene as of
right on a conditional basis, pursuant to the approach set out by the Seventh Circuit
in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*,
101 F.3d 503 (7th Cir. 1996). In *Solid Waste*, the court recognized "aspiring
intervenors' concern that at some future point in this litigation the government's
representation of their interest may turn inadequate yet it would be too late to do
anything about it." *Id.* at 508. The court explained that "[t]he proper way to handle
such an eventuality" is for the would-be intervenor to file "a standby or conditional
application for leave to intervene and ask the [] court to defer consideration of the
question of adequacy of representation until the applicant is prepared to demonstrate
inadequacy." *Id.* at 509. Proposed Intervenors are doing exactly that.

**B.     Proposed Intervenors Satisfy the First Three Requirements For
         Intervention By Right, and Would Satisfy the Fourth if the
         Government Stops Defending the Rule.**

To intervene by right, a prospective intervenor must satisfy four requirements:

(1) the application for intervention must be timely; (2) the applicant must have an

interest relating to the property or transaction which is the subject of the action; (3) the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; (4) the applicant's interest must be inadequately represented by the existing parties. *Texas*, 805 F.3d at 657. Proposed Intervenors satisfy the first three requirements and would satisfy the fourth if the government stopped defending the Rule.

### 1. The Motion is Timely.

The timeliness requirement for intervention by right is the same as for permissive intervention. Accordingly, for the same reasons noted above, Proposed Intervenors' request is timely. *See supra* Part II.B.

### 2. Proposed Intervenors Have An Interest in the Rule.

Rule 24(a)'s second requirement is that Proposed Intervenors "must have an interest relating to the property or transaction which is the subject of the action." Fed. R. Civ. P. 24(a)(2). The "property or transaction that is the subject of the action" here is the Rule, so the question is whether Proposed Intervenors have an "interest" relating to the Rule. Any interest that is "concrete, personalized, and legally protectable," as opposed to merely ideological, "is sufficient to support intervention." *Texas*, 805 F.3d at 657. And while the interest must be "legally protectable," it need not be legally *enforceable—i.e.*, as long as the intervenor's

interest is "of the type that the law deems worthy of protection," it is immaterial that the intervenor may not have "an enforceable legal entitlement." *Id.* at 659.

### a. Small Business Majority

SBM's interests in this case are clear. Noncompete agreements harm thousands of small businesses that SBM represents by impeding them from identifying, recruiting, and hiring the workers that will add the most value to their businesses. *See* Exh. A ¶¶ 11-16; *see also, e.g.*, Rule, 89 Fed. Reg. at 38,496 ("[T]he evidence indicates the final rule will, in the aggregate, benefit both small businesses and workers who work for small businesses."). Indeed, according to a recent survey SBM conducted of the businesses in its network, about half of small businesses with employees have been prevented from hiring a desired worker due to a noncompete agreement. *Id.* ¶ 14. Moreover, nearly half of respondents reported that a noncompete agreement had prevented them from starting or growing a business of their own. *Id.* Because of the harms non-compete agreements inflict on small businesses, SBM has advocated extensively in favor of the Rule, including by submitting a comment letter on the proposed rule and filing amicus briefs in support of the Rule. *Id.* ¶ 10.

If the Rule remains enjoined, the businesses SBM represents will suffer the costs associated with being unable to hire the workers they most desire, and in many cases will be forced to hire less qualified and less productive workers, resulting in economic harm to their businesses. *Id.* ¶¶ 11-15. The injunction takes literally

millions of workers subject to noncompetes out of the labor market, restraining competition and making it harder for small businesses to innovate and grow. *Id.* ¶ 15. Small businesses will also have to take on financial and legal burdens associated with ensuring that new hires do not have existing non-compete agreements and paying litigation costs if, for example, an new hire's former employer claims that the business tortiously interfered with a contract by inadvertently hiring a former employee subject to a noncompete. *Id.* ¶ 16. *See* Rule, 89 Fed. Reg. at 38,392.

These interests are sufficient for intervention by right. *See Wal–Mart Stores v. Texas Alcoholic Beverage Comm'n*, 834 F.3d 562, 569 (5th Cir. 2016) (holding that an association may intervene because it has a "'legally protectable' interest" in a regulatory scheme); *City of Houston v. Am. Traffic Solutions, Inc.*, 668 F.3d 291, 294 (5th Cir. 2012) (holding a civic organization that successfully petitioned for adoption of a law may intervene to vindicate its interest in protecting that law); *cf. Cooper v. Tex. Alcoholic Bev. Comm'n*, 820 F.3d 730, 738 (5th Cir. 2016) (economic actors have Article III standing "to challenge official actions that change the amount of competition in [the] market").

### b.  John Roffino

Mr. Roffino has a sufficient interest to intervene because he is subject to a non-compete agreement that is currently hindering his economic freedom and inflicting economic harm. The Rule would eliminate those harms by freeing him

from his noncompete agreement and its collateral consequences. Mr. Roffino has been unable to pursue employment in his preferred field and, as a result, is making substantially less money than he would if his noncompete were invalidated. Exh. B ¶¶ 17-26. Mr. Roffino is also prevented by his noncompete from developing his innovative business idea for a company selling mobility devices that specifically caters to the needs of veterans. *Id.* ¶ 26. These are exactly the kinds of harms this Court deemed sufficient for intervention in *Texas v. United States*, where the intervenors had "an interest in the employment opportunities that would be available to them" if the executive action they sought to defend was upheld. 805 F.3d at 660; *see id.* ("[T]heir interest in having access to job opportunities is sufficiently concrete and personalized to support intervention."). Furthermore, even after his noncompete's restrictions expire, Mr. Ruffino will be hampered by the prospect of litigation if he were to start his business: because the noncompete covers activities like strategic planning and business development, Mr. Ruffino justifiably worries that his former employer would "try to enforce [the noncompete] against [him] … by arguing that [he] began to develop [his] ideas for a new business during the restricted post-employment period." Exh. B ¶ 26.

In addition, Mr. Ruffino is an intended beneficiary of the Rule and therefore possesses a legally protectable interest in its defense. *See Texas*, 805 F.3d at 660 (intervenors' interest sufficient because they "are the intended beneficiaries of the

challenged federal policy"); *Cal. ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006) ("[The proposed intervenors] are the intended beneficiaries of this law…. The proposed intervenors' interest thus is neither 'undifferentiated' nor 'generalized.'")); *see also Cooper*, 820 F.3d at 737-40; *Sierra Club v. Glickman*, 82 F.3d 106, 109-10 (5th Cir. 1996); Rule, 89 Fed. Reg. at 38,375.

### c.    Daniella Emmer

Ms. Emmer has a sufficient interest to intervene for the same reasons as Mr. Roffino—because she is subject to a non-compete agreement that is currently hindering her economic freedom and inflicting economic harm. *See* Exh, C ¶¶ 4-10. The Rule, along with a judgment vacating the district court's injunction, would eliminate those harms by freeing her from her non-compete agreement and its collateral consequences. Her "interest in having access to job opportunities is sufficiently concrete and personalized to support intervention." *Texas*, 805 F.3d at 660. In addition, Ms. Emmer is an intended beneficiary of the Rule and therefore possesses a legally protectable interest in its defense. *Id.*; *see also Cooper*, 820 F.3d 730, 737-40; *Glickman*, 82 F.3d at 109-10; Rule, 89 Fed. Reg. at 38,375.

### 3.    Disposition of this Action May Impair Proposed Intervenors' Ability to Protect Their Interests.

Upon demonstrating an interest in the pending lawsuit, an intervenor must show that the "disposition of the action may, as a practical matter, impair [its] ability to protect that interest." *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306-07

(5th Cir. 2022). That test is met so long as "there is a *possibility* that [the movant's] interest could be impaired or impeded." *Id.* at 307 (emphasis added). Proposed Intervenors satisfy this requirement because any result that leaves the district court's injunction in place would directly harm their financial and economic interests, including their right to economic self-determination.

### 4.    If the Government Stops Defending The Rule, Representation By Existing Parties Will Be Inadequate.

If the contingency on which the Conditional Motion is premised comes to pass—*i.e.*, if the government seeks to voluntarily dismiss this appeal, hold these proceedings in abeyance, stipulate to judgment, decline to seek *en banc* or Supreme Court review of an adverse decision, or take similar action—then by definition, the existing parties will no longer be adequately representing Proposed Intervenors' interests in the case.

### CONCLUSION

Proposed Intervenors respectfully request that the Court grant their motion for permissive intervention. In the alternative, Proposed Intervenors respectfully request that the Court defer consideration of their conditional motion for intervention as of right and then, if the government stops defending the Rule in whole or in part, grant the motion at that time.

In addition, Proposed Intervenors respectfully request that the Court order the government to provide at least 10 days' notice to Proposed Intervenors and the Court

before voluntarily dismissing this appeal, stipulating to judgment, or taking any similar action.

Dated: January 13, 2025                     Respectfully Submitted,

/s/    *Michael Lieberman*

**FAIRMARK PARTNERS, LLP**
Michael Lieberman
Jamie Crooks
1001 G Street NW, Suite 400 East
Washington, DC 20001
michael@fairmarklaw.com
jamie@fairmarklaw.com
(818) 585-2903

**TOWARDS JUSTICE**
David H. Seligman
Rachel Dempsey
PO Box 371680, PMB 44465
Denver, CO 80237
david@towardsjustice.org
rachel@towardsjustice.org
(720) 441-2236

*Attorneys for Proposed Intervenors*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,196 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ Michael Lieberman*
Michael Lieberman

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*/s/ Michael Lieberman*
Michael Lieberman

# Exhibit A

Pursuant to 28 U.S.C. § 1746, I, John C. Arensmeyer, hereby declare as follows:

1.      I am over 21 years old and reside in Washington, D.C.

2.      I am offering this declaration in support of Small Business Majority's Motion For Permissive Intervention Or, In The Alternative, Conditional Motion For Intervention As Of Right in Case No. 24-10951.

3.      I am the founder and CEO of Small Business Majority ("SBM"). In that capacity, I oversee SBM's work on all issues, including its work related to non-compete clauses.

4.      SBM is a national small business organization that empowers America's diverse entrepreneurs to build a thriving and equitable economy. From our 12 offices across the country, SBM engages its network of more than 85,000 small businesses and 1,500 business and community organizations to deliver resources to entrepreneurs and advocate for public policy solutions that promote inclusive small business growth.

5.      Businesses and community organizations join SBM's network in multiple ways, including, for example, by registering for events hosted by SBM, directly contacting SBM or its employees, submitting information through one of two SBM websites, or signing up for SBM's newsletter.

6.      Small businesses serve on our national and state Small Business Councils, where they provide valuable input into our work and guide our priorities as an organization. Our National Small Business Council consists of small business owners from various industries across the nation. Council members volunteer their time and entrepreneurial expertise at council meetings, public events, visits and other direct communication with policymakers, testimony before legislative committees and administrative bodies, and in the media to help SBM identify and address the biggest issues facing small businesses today. Our state Small Business Councils are similar, with council members volunteering their time and entrepreneurial expertise to help SBM identify and address the most pressing state-level issues facing small businesses today.

7.      SBM has also invited some of our most active small business owners to serve on our Board of Directors.  SBM's Board of Directors is composed entirely of seasoned professionals who work in the small business ecosystem and whose experiences and perspectives inform the direction of Small Business Majority. Each Board member has cultivated successful business and non-profit ventures and/or has worked extensively in small business public policy, which has equipped each one with the knowledge and expertise to help guide the organization, provide valuable insight and advise us on our most important decisions.

8.      SBM has a range of involvement from the other small businesses in its network. Some small business owners simply attend events and subscribe to our newsletters. Others are part of our spokesperson program where they speak with reporters, submit letters and op-eds to newspapers, meet with policymakers, testify at state and federal legislative hearings, and more. Others join our network to learn more about the technical issues on which we provide education or to get referred to legal, financial, or technical resources they need to operate their businesses. Some small business owners in our network co-host events with us as co-presenters and help us develop educational content. And hundreds respond to regular online surveys through which we seek valuable input about their needs and concerns. This information directly impacts our decisions about policies on which to focus and drives the positions that we take in support of or in opposition to those policies.

9.      SBM's work is bolstered by extensive research into the issues identified by our council members and the small businesses in our network—including a recent survey concerning noncompetes—and deep connections with the small business community that enable it to educate stakeholders about key issues impacting America's entrepreneurs, with a special focus on the smallest businesses and those facing systemic inequities.

10.      As part of its purpose to advocate for public policy solutions that promote inclusive small business growth, SBM has engaged in public policy

advocacy related to non-compete agreements, including by supporting the Federal Trade Commission's recent rule that makes certain non-compete clauses in employment contracts unenforceable. *See, e.g.*, John Arensmeyer, *Written Statement For The Record Before The U.S. Senate Committee On Banking, Housing, And Urban Affairs Subcommittee On Economic Policy*, at 2 (Aug. 8, 2024), *available at* https://tinyurl.com/mvub8t5u ("Small businesses support banning non-compete agreements because they are antithetical to the free, fair and open competition that is essential to a thriving and equitable economy."); Letter from Small Business Majority to FTC Commissioners (April 22, 2024), *available at* https://tinyurl.com/3tb8r6sn ("Established small businesses can't find employees to grow and compete on a level playing field with a dominant corporation that traps their skilled employees through non-compete agreements."). SBM filed a comment letter supporting the proposed rule during the notice-and-comment period, and the FTC cited that letter in its final rule. *See, e.g.*, Non-Compete Clause Rule, 89 Fed. Reg. 38,342, 38,347 n.104 (May 7, 2024). SBM has also filed amicus briefs in support of the Rule. We also speak at conferences and webinars to advocate directly to policymakers regarding the harms inflicted by noncompete agreements.

11.    Thousands of small businesses in SBM's network are harmed by noncompetes and would benefit from the Non-Compete Clause Rule. Noncompete provisions are harmful to the free, fair, and open competition that is fundamental to

a thriving and equitable economy. By artificially restricting labor market mobility, noncompetes impede small businesses in SBM's network from finding new talent to innovate and grow their businesses. Many businesses in SBM's network have been unable to hire their preferred employees because of noncompetes, and others have incurred legal fees to investigate the applicability of a noncompete or respond to allegations that they or their employees violated one. If noncompete clauses continue to be enforceable, these harms will continue into the future.

12.    Non-compete agreements also impede the ability of individuals to maximize their skills and technical expertise by pursuing new job opportunities or starting their own businesses, which further hampers small business growth and innovation.

13.    Noncompetes harm not only small businesses and individuals, but also the economic ecosystem in which they operate. If a small business cannot hire sufficient staff because noncompetes bind qualified lateral hires, then they cannot operate in an economy that is ever more dominated by huge corporations. They cannot offer goods and services at competitive prices, and they cannot hire workers at competitive wages. Some small businesses will go out of business. Others sell to private equity firms that "roll up" competing small businesses and create monopolies out of them. The monopolistic harm caused by such roll-ups is well-documented,

and makes it even more difficult for small businesses to compete with competitors with higher market share.

14.    SBM recently conducted a nationwide survey of small businesses in its network to gauge their views on and experiences with  non-compete clauses. The survey results are attached here as Exhibit 1. Our survey found that found that 59% of respondents in our network support FTC's Non-Compete Clause Rule, with only 14% opposing it. In addition, more than one-third of respondents in SBM's network have been prevented from hiring an employee they wanted to hire due to a non-compete agreement. This result understates the problem, as 35% of survey respondents were sole proprietors who do not have employees. Accordingly, the survey's results imply that more than half of businesses with more than one employee have been prevented from hiring an employee due to a non-compete agreement.  The Non-Compete Clause Rule would have delivered substantial benefits to these businesses by eliminating labor market constraints that were hindering their businesses' growth and economic freedoms. Furthermore, 46% of respondents said that they have been subject to a non-compete agreement that prevented them from starting or growing a business of their own. These findings are backed by real stories and anecdotes from our membership which underscore the importance of noncompete bans to empower entrepreneurs to start, grow, and expand their business.

15.     By invalidating the Rule, the injunction in this case inflicted immediate and harmful effects on many of the businesses in SBM's network. Their ability to recruit and hire new employees is now considerably more constrained than it would have been absent the injunction, as millions of workers subject to noncompetes are effectively kept off the labor market. By their nature, small businesses depend more on the quality and productivity of the few workers they hire. Yet noncompetes will now continue to shut small businesses out of hiring workers with the most relevant skills and knowledge—even if those workers would be a better fit in the small business. In short, the injunction reimposes labor market restraints that prevent the small businesses in SBM's network identifying, recruiting, and hiring the workers that will add the most value to their businesses, resulting in economic harm.

16.     Furthermore, if the Non-Compete Clause Rule remains enjoined, many small businesses in SBM's network will incur unrecoverable costs, including administrative and legal fees, ensuring that any new or potential hires are not subject to existing non-compete agreements, as well as to understand the scope and terms of any such agreements. These small businesses will also incur legal fees and litigation expenses if an employee's former employer claims that the business tortiously interfered with a contract by inadvertently hiring a former employee subject to a noncompete.

17.    Several of the businesses and business owners in SBM's network have authorized me to share their experiences with noncompetes in connection with this filing:

    a.    Leo Carr, president of The Elite Group in Southfield, MI: As an employer, Elite does not believe in non-compete agreements and doesn't require any employee to sign such an agreement. One of our subsidiary companies has experienced challenges in hiring employees who were under non-compete agreements with their previous company.  For example, we were hiring for the position of Recruiter, and the individual would work in the educational sector primarily. Here's what happened: We selected our new hire, but she was unable to join us for about 6 months, or so, or until the date her non-compete agreement ended. In the interim, that position was essentially vacant for the company, which of course resulted in our company not being as effective and efficient as we should have been. But since we hired this person, knowing that the non-compete would be a factor, it's our fault for proceeding forward. At the same time, we knew that this person had the skills necessary for the position and would be a good cultural fit for our company, so we waited until her non-compete ended, and then hired her. This did have a negative impact on our ability to deliver timely service both internally and externally.

    b.    Stephen Quintal, business owner: Shortly after starting work for Handy House in 1999, I was required to sign a non-compete agreement before being promoted to manager. When I left and started my own thing many years later, five to six months went by, and all of a sudden they produced a non-compete agreement that was signed and sued me. They took me to court, and the judge in Massachusetts basically told them, you don't have a leg to stand on. They tried making me run out of money. I spent $160,000 in representing myself after just opening and feeding my family. It was a nightmare. I just couldn't believe that in America. It wasn't like I was a shareholder. I understand a non-compete if I sold them a company and I signed something because they paid me $5 million, and I can't go into business for five years. I get that. But when you're just an hourly employee. By the time I left, I was a salary employee.

I was a manager, so my job title changed three times. It should have been a new non-compete, according to the law, from what I understood, each time they changed my title or my position. The money that I should have made in profit at my new business, instead of buying more equipment, another truck, or more porta potties to rent to customers, I was shoveling it to the lawyers. I mean, how many secrets are there in renting plastic porta potties and cleaning them at a job site or event? There're no trade secrets there.

c.   Tracy DuCharme, owner of Color Me Mine in Colorado Springs, CO: For 14 years, I have owned a small business that allows customers to paint their own ceramics. I have experience with non-compete agreements from both sides. I have previously required new employees to sign them, and I have one in force on me to this day in my franchise agreement. I had a change of heart about requiring employees to sign a non-compete agreement, ironically, when I had an employee violate it. Years ago I had a very talented employee who quit so she could set up a business very similar to mine only a few miles away. The entire reason she came to work for me was to gain experience and learn the business before she opened her own store. I never took any action to enforce the agreement because the reality is that, at least in retail, you will always have competition. I had no desire to harm her new business or see it fail. We are not operating in a vacuum. A market without competition is a market without growth, innovation, or economic moderators. As I've grown as a business owner over the years, I've come to see the absurdity of non-competes for what they are. It is a tool that, when in force, can create stagnation. This is not the way to grow a vibrant and thriving economy. I no longer have employees sign non-compete agreements. I strongly believe that workers should be free to use their skills and talents to earn a living in their preferred field without being restricted by a non-compete. I should be able to hire talent regardless of where they acquired the skills I'm looking for. And no one should be barred from pursuing their entrepreneurial dreams due to a non-compete agreement.

d.   Shirley Modlin, owner of 3D Design and Manufacturing, LLC in Powhatan, VA: At one time I required all of my employees to sign non-compete agreements but decided to end that practice because I felt it was hurting my ability to hire the most talented workers. I also

went a step further: For employees who signed a non-compete in the past and still work for me, I voided their agreements. Since making this change, my business has not suffered any financial harm. I firmly believe that as workers gain skills and experience throughout their careers they must be allowed to use those skills and experiences to further their livelihoods in ways that are in the best interest of the workers and their families.

e. Jean Underwood, owner of Design Mavens Architecture in Bloomington, IL: Non-compete agreements are a hindrance to people who want to start a small business. I didn't have a choice but to sign one for one of my previous employers as part of a promotion. I figured I wasn't going anywhere, so I'd just sign it. It turns out that agreement wasn't well written; however it was still enforceable in the state of Illinois. As a result, I had to wait one year before being able to reach out to any of my clients and contacts after I left my previous employer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 12, 2025 at Washington, DC.

_____

John C. Arensmeyer

# Exhibit B

Pursuant to 28 U.S.C. § 1746, I, John Roffino, hereby declare as follows:

1.    I am over 21 years of age and a resident of Georgetown, Texas. I have personal knowledge of the facts set forth herein and am competent to testify about them if called as a witness.

2.    I am offering this declaration in support of my Motion For Permissive Intervention Or, In The Alternative, Conditional Motion For Intervention As Of Right in Case No. 24-10951.

3.    I enlisted in the United States Army after graduating high school to serve my country and help pay for college. I joined a special operations unit because it provided better education benefits.

4.    I was in that unit on September 11, 2001. Operation Enduring Freedom was launched shortly afterwards, and I never went to college. Instead, I was deployed to Afghanistan, where I served as a psychological operations specialist. Over the course of my military career, I served in Afghanistan two different times and was deployed in Afghanistan for over two years.

5.    During my deployments, I was on the front lines with Special Operations forces working with the local population to combat enemy propaganda, including by helping to develop a local news station into a critical source of news in the area. I also engaged in active combat and earned a bronze star medal in recognition of my distinguished performance.

6.    While serving during my second tour in Afghanistan I missed the birth of my firstborn son. I have been a part of three military funerals for fellow soldiers lost overseas and one due to complications in medication from the VA healthcare system post-deployment. I was also classified and diagnosed by the VA as being a 100% disabled veteran due to injuries sustained during my two deployments.

7.    I am very proud of my service to my country, and when I returned to civilian life, I sought a profession that would allow me to continue to help people, especially veterans like myself.

8.    My first civilian job out of the military was in working in a pediatric intensive care unit which got me into the hospital setting working hands-on with doctors and surgeons.

9.    While I was working in the pediatric Neuro/Trauma intensive care unit, I met a medical equipment sales representative who was also a veteran. He told me that his job was a better fit for my skillset and encouraged me to get into the field of medical device sales

10.    Upon his urging, I got my first sales job at a company that sells medical devices that help patients regain mobility post-surgery. I was particularly interested in the job because the company did a lot of business with the Veterans' Administration.

11.     As a veteran with a 100% service-connected disability myself, I choose to receive my services through the Veterans' Administration. One of the things I was most excited about was being able to help and encourage fellow veterans that were going through an experience I understood and could help them with.

12.     My job entailed explaining medical technology to doctors and helping them to identify patients who were suffering from post-surgical motion loss and could benefit from use of our product. For example, if a patient showed up to their post-surgical follow-up visit and were stiffer than they should have been if they were healing normally, I would work with the doctor to get the patient set up with the medical device that the company sold so that they could perform stretching exercises at home.

13.     I quickly became one of the company's top sales representatives, largely because my experience as a disabled veteran allowed me to connect with the veterans who could benefit from the product. I was able to motivate them to get better during some of the most frustrating experiences of their lives, when they had just been through a major surgery and weren't progressing as expected. I felt like I was making a real difference, and that everything in my life until that point had led me up to being able to excel at my job.

14.     Although in many ways the job was perfect for me, I always felt like I could do a better job if I ran the business myself. I had ideas for a product that would perform better and wanted to provide the VA with a treatment that wasn't rented. Selling the device outright would allow the VA more accountability for their spending and would allow veterans to avoid feeling rushed in their treatment, which would likely lead to better outcomes.

15.     I also felt a lot of pressure to keep increasing sales, even though I had already cornered the entire market in the area where I worked and didn't think there was very much additional opportunity. As a result, I began to worry that my job was in jeopardy. I loved what I was doing, but I wanted to be able to do it on my own terms.

16.     If I started my own business that would provide mobility devices to veterans, I could charge a one-time payment, so that for example they do not face pressure to return the device just as it is starting to work. This would also give me the opportunity to focus on the VA market, which is my passion, helping the VA to lower costs and helping veterans to regain their lives.

17.     However, when I looked into leaving, I realized for the first time that, as part of the on-boarding process, I was required to sign a non-compete agreement, which I have attached hereto as **Exhibit A**.

18.     At the time I was hired, I had no idea that I had agreed to a non-compete contract, or even what a non-compete contract was. In fact, the initial non-compete agreement that I signed accidentally listed the name of an entirely different employee, which I didn't notice at the time.

19.     It didn't occur to me that the packet of on-boarding paperwork my employer sent me could take away a fundamental right like my right to work in my chosen profession. The non-compete prevents me from engaging directly or indirectly in "the business of researching, developing, providing, rendering, manufacturing, selling and distributing" orthopedic medical devices within two years of the date of termination of employment. The restricted activities under the non-compete include activities like "business development" and "strategic planning."

20.     The agreement covers any territory in which I had material responsibilities, which includes the greater Austin area.

21.     The agreement also has a tolling provision stating that if a court determines that I have violated the non-compete, then the two-year statute of limitations can either be extended or restarted.

22.     Separate from the non-compete, the agreement has a provision that prevents me from using any confidential information and another provision that protects the company's intellectual property.

23.     I consulted with at least two lawyers, both of whom I paid a consultation fee, about the validity of the non-compete agreement. Both told me that I could face risk if I tried to sell mobility devices to veterans in the greater Austin area, either with another employer or through my own business.

24.     Around the time I began to realize how the non-compete would affect my life and future, I learned that the FTC had proposed a rule that would ban non-competes. On January 31, 2023, I submitted a comment to that rulemaking where I stated my frustration with how my non-compete was affecting my life and my future. That comment is attached hereto as **Exhibit B**.

25.     I left my employment on February 17, 2023. Although there were other companies that I could easily have gotten a job with to sell mobility devices, because of the non-compete, I wasn't able to find another job doing the same kind of sales work. Instead, I took a job for a different company in a completely different industry, which required me to rebuild my relationships and expertise from scratch and take a pay cut of approximately $30,000 per year in guaranteed salary. At my current employer I earn about 2/3 of what I earned at my previous employer.

26.     Worse, the non-compete has kept me from what I believe is my calling of serving veterans and the VA by doing what I am best at. Not only am I prohibited from starting a business that competes with the business of my prior

employer for two years after leaving my employment, but because the non-compete also covers activities like strategic planning and business development, I am worried that my employer will try to enforce it against me even after the two years is up, for example by arguing that I began to develop my ideas for a new business during the restricted post-employment period, or by arguing that the two-year statute of limitations restarted at some time during that period.

27.    This feels particularly unfair because I felt like I was pushed out of my job for being too successful and dominating the market too quickly, which meant I couldn't provide the constant growth my company was looking for. This left me in the impossible situation where either I had to quit and to abandon the subject of my expertise and the patients I worked with, or the company could force me to do whatever they wanted.

28.    If I did at some point start my own sales business and the non-compete rule doesn't go into effect, it will make it far harder for me to break in, because many of the skilled and knowledgeable sales representatives that I could recruit are subject to non-competes that prohibit them from working with me. This is not the America that I fought for. The America that I fought for is a country that values freedom, where the good ideas rise to the top on their merit and where success is earned through healthy competition and not by blocking others from challenging the status quo. If the FTC's final rule does not go into effect, the

Docusign Envelope ID: 8087BE7E-5092-4D31-9E92-74AF30EEDB16

dreamers and innovators of America who can drive change that benefits our society will be blocked for the sake of rich corporations and businesses. The very foundation of our country is that Americans are free to make a better life for themselves and others. Our society is founded on driving innovation and efficiency and the principles of free will and progression. Our country desperately needs to ban non-compete agreements so that innovators and change-makers in the healthcare industry can be driven by the progression of patient care, not for the security of big corporations and businesses.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 12, 2025 at Georgetown, TX.

John Roffino

Exhibit A to

Declaration of John Roffino

## CONFIDENTIALITY, NON-COMPETITION
## AND INTELLECTUAL PROPERTY AGREEMENT

This CONFIDENTIALITY, NON-COMPETITION AND INTELLECTUAL PROPERTY AGREEMENT (this "Agreement") is dated _____ and is between ERMI, INC., a Georgia corporation (the "Company") and John McElvarr ("Employee").

WHEREAS, the Company has expended significant time, effort and resources to develop and protect its trade secrets and confidential information, its relationships with current and prospective customers, and its investment in recruiting and training its workforce; and

WHEREAS, the nature of Employee's position with the Company gives Employee access to the Company's trade secrets and confidential information, the opportunity to develop relationships with the Company's current and prospective customers, and/or the opportunity to obtain selective or specialized skills, knowledge or abilities that would give Employee the ability to unfairly compete with the Company.

NOW, THEREFORE, in consideration of Employee's employment or continued employment with the Company, Employee's access to trade secrets, confidential information and customer relationships, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

1.  <u>Definitions</u>. As used in this Agreement, the following terms have the following meanings:

"<u>Affiliate</u>" means, with respect to any specified Person other than a natural person, any Person that, directly or indirectly, has the power to direct the management and policies of such Person whether through the ownership of voting securities, by contract or otherwise.

"<u>Business</u>" means the business of researching, developing, providing, rendering, manufacturing, marketing, selling and distributing orthopedic medical devices designed to improve joint range of motion, brace any joint or joints to improve function or influence the joint to improve function or range of motion, and any medical device, system or method designed to provide an orthopedic diagnosis, improve or assist an existing orthopedic diagnostic device or technique and the development of any database surrounding the findings of the aforementioned orthopedic diagnostic system, and any medical device, system or method designed to move or position a patient or similar activities conducted, authorized, offered or provided by the Company Group within two (2) years prior to the date of termination of Employee's employment with the Company.

"<u>Company Group</u>" means the Company together with all of its direct and indirect subsidiaries.

"<u>Confidential Information</u>" means confidential information relating to the business of the Company Group that has value to the Company Group and is not generally known to its competitors. Confidential Information includes business strategies, methods of operation, pricing information, customer lists, information regarding past, current, and prospective customers, suppliers, distributors, and business partners, financial information and projections, sales and marketing strategies and information, research and development information, legal information, information regarding recruiting and hiring activities and similar confidential information, regardless of whether such information is specifically identified by the Company Group as confidential. Confidential Information includes trade secrets (as defined under Georgia law) as well as information that does not rise to the level of a trade secret, and includes any confidential information that has been entrusted to the Company Group by another Person under an obligation of confidentiality. However, Confidential Information does not include any information that has been voluntarily disclosed to the

public by the Company Group (except where such public disclosure has been made by Employee without authorization) or that has been independently developed and disclosed by others, or that otherwise enters the public domain through lawful means.

"Customer" means any Person (i) who is or was a customer, referral source, or vendor of the Company Group and (ii) with whom Employee had Material Contact during the two (2)-year period immediately preceding the date of termination of Employee's employment with the Company.

"Intellectual Property Rights" has the meaning set forth in Section 4(a).

"Material Contact" means contact between Employee and any Customer or Prospective Customer (i) with whom Employee dealt on behalf of the Company Group, (ii) whose dealings with the Company Group were coordinated or supervised by Employee, (iii) about whom Employee obtained Confidential Information in the ordinary course of business as a result of Employee's association with the Company Group, or (iv) who receives products or services authorized by the Company Group, the sale or possession of which results or resulted in possible compensation, commissions, or earnings for Employee within the two (2)-year period immediately preceding the date of termination of Employee's employment with the Company.

"Person" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, joint venture, joint stock company, governmental agency or instrumentality or other entity of any kind.

"Prohibited Activities" means executive, management, marketing, sales, business development, strategic planning, research and development, financial or consulting activities that are of the type conducted, provided, or offered by Employee for or on behalf of the Company Group during the two (2)-year period immediately preceding the date of termination of Employee's employment with the Company. Prohibited Activities also include any activities that are likely to lead to the disclosure of Confidential Information.

"Prospective Customer" means any Person (i) who is or was actively sought by the Company Group as a prospective customer, referral source, or vendor and (ii) with whom Employee had Material Contact during the two (2)-year period immediately preceding the date of termination of Employee's employment with the Company.

"Restricted Period" means the period of Employee's employment with the Company and the two (2)-year period following the date Employee's employment with the Company terminates for any reason.

"Territory" means the sales territory to which Employee was assigned during the two (2)-year period immediately preceding the date of termination of Employee's employment with the Company.

"Work Product" has the meaning set forth in Section 4(a).

2.    Non-Disclosure of Confidential Information.

(a)    Restrictions on Use. Except as necessary in connection with Employee's duties and responsibilities to the Company Group or as required by law or court order, Employee shall hold in confidence all Confidential Information and shall not, either directly or indirectly, use or disclose any Confidential Information to any Person without the prior written consent of the Company's Chief Executive Officer. Employee's obligations as set forth in this Section 2 are in addition to and not in lieu of any other

2

obligations Employee may have to protect Confidential Information (including obligations arising under the Company Group's policies, ethical rules, and applicable law), and such obligations will continue for so long as the information in question continues to constitute Confidential Information. Nothing in this Agreement is intended to or should be interpreted as diminishing any rights and remedies that the Company Group has under applicable law related to the protection of confidential information or trade secrets. Any unauthorized use or disclosure of Confidential Information during Employee's employment may lead to disciplinary action, up to and including termination.

(b)     Advance Notice of Required Disclosure.  In the event Employee is requested or required pursuant to any legal, governmental, or investigatory proceeding or process or otherwise to disclose any Confidential Information, Employee shall promptly notify the Company's Chief Executive Officer in writing (in no event later than five (5) business days prior to the disclosure unless disclosure is required in less than five (5) days, in which case Employee shall notify the Company as soon as possible), so that the Company may seek a protective order or other appropriate remedy or, if it chooses, waive compliance with the applicable provision of this Agreement. Employee shall cooperate with the Company Group to preserve the confidentiality of such Confidential Information consistent with applicable law or court order, and shall use Employee's best efforts to limit any such disclosure to the minimum disclosure necessary to comply with such law or court order.

(c)     Permitted Disclosures.  Notwithstanding any other provision of this Agreement, Employee is not prohibited from providing truthful testimony or accurate information in connection with any investigation being conducted into the business or operations of the Company Group by any government agency or other regulator that is responsible for enforcing a law on behalf of the government or otherwise providing information to the appropriate government regulatory agency or body regarding conduct or action undertaken or omitted to be taken by the Company Group that Employee reasonably believes is illegal or in material non-compliance with any financial disclosure or other regulatory requirement applicable to the Company Group. Employee is not required to obtain the approval of, or give notice to, the Company or any of its representatives to take any action permitted under this Section 2(c).

3.     Protection Against Unfair Competition.

(a)     Non-Competition.  During the Restricted Period, except on behalf of the Company Group, Employee shall not, directly or indirectly, perform Prohibited Activities anywhere in the Territory for, or on behalf of, any Person that engages in the Business.

(b)     Non-Solicitation of Customers and Prospective Customers.  During the Restricted Period, Employee shall not, directly or indirectly, (i) solicit or attempt to solicit any Customer or Prospective Customer for purposes of providing products or services that are competitive with those offered or provided by the Company Group during the two (2)-year period immediately preceding the date of termination of Employee's employment with the Company.

(c)     Non-Solicitation of Employees.  During the Restricted Period, Employee shall not solicit or attempt to solicit, directly or by assisting others, any Person who was employed with the Company Group on, or within six (6) months before, the date of such solicitation or attempted solicitation, for purposes of inducing such Person to leave the employment of the Company Group.

4.     Intellectual Property.

(a)     Ownership of Work Product.  Employee acknowledges and agrees that all writings, works of authorship, technology, inventions, discoveries, ideas and other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived or reduced to practice by Employee individually or jointly with others during the period of Employee's employment with

3

the Company and relating in any way to the business or contemplated business, research or development of the Company (regardless of when or where the Work Product is prepared or whose equipment or other resources is used in preparing the same) and all printed, physical and electronic copies, all improvements, rights and claims related to the foregoing, and other tangible embodiments thereof (collectively, "Work Product"), as well as any and all rights in and to copyrights, trade secrets, trademarks (and related goodwill), patents and other intellectual property rights therein arising in any jurisdiction throughout the world and all related rights of priority under international conventions with respect thereto, including all pending and future applications and registrations therefore, and continuations, divisions, continuations-in-part, reissues, extensions and renewals thereof (collectively, "Intellectual Property Rights"), shall be the sole and exclusive property of the Company.

(b)　　Work Made for Hire; Assignment.　Employee acknowledges that, by reason of being employed with the Company at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in 17 U.S.C. § 101 and such copyrights are therefore owned by the Company.　To the extent that the foregoing does not apply, Employee hereby irrevocably assigns to the Company, for no additional consideration, Employee's entire right, title and interest in and to all Work Product and Intellectual Property Rights therein, including the right to sue, counterclaim and recover for all past, present and future infringement, misappropriation or dilution thereof, and all rights corresponding thereto throughout the world.　Nothing contained in this Agreement is to be construed as reducing or limiting the Company's rights, title or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company would have had in the absence of this Agreement.

(c)　　Further Assurances; Power of Attorney.　During and after Employee's employment with the Company, Employee agrees to reasonably cooperate with the Company to (i) apply for, obtain, perfect and transfer to the Company all Work Product as well as all Intellectual Property Rights in the Work Product in any jurisdiction in the world, and (ii) maintain, protect and enforce the same, including, without limitation, executing and delivering to the Company any and all applications, oaths, declarations, affidavits, waivers, assignments and other documents and instruments as may be requested by the Company.　Employee hereby irrevocably grants the Company power of attorney to execute and deliver any such documents on Employee's behalf in Employee's name and to do all other lawfully permitted acts to transfer the Work Product to the Company and further the transfer, issuance, prosecution and maintenance of all Intellectual Property Rights therein, to the fullest extent permitted by law, if Employee does not promptly cooperate with the Company's request (without limiting the rights the Company may have in such circumstances by operation of law).　The power of attorney is coupled with an interest and shall not be affected by Employee's subsequent incapacity.

(d)　　No License.　Employee understands and agrees that this Agreement does not, and shall not be construed to, grant Employee any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software or other tools made available to Employee by the Company.

5.　　Return of Property.　All records, notes, lists and any other documents and materials relating to the Company and its operations are and shall be the sole property of the Company.　Upon termination of Employee's employment, or upon the Company's request at any time, Employee shall immediately (a) deliver to the Company all Company property in Employee's possession or control, including all keys, access cards, credit cards, mobile devices, computers, storage media, documents, and any other materials belonging to the Company (including those that constitute or contain any Confidential Information), together with all copies of the foregoing; (b) delete all Confidential Information stored on any networks, computers or other storage media not owned by the Company that are within Employee's possession or control; (c) produce for inspection any laptops, tablets or other mobile devices that Employee has used for work-related purposes and

4

permit the Company to delete all Company data from such devices; and (d) disclose to the Company all passwords and passcodes in Employee's knowledge and/or possession relating to the Company's operations.

6. _Non-Disparagement_. To the fullest extent permitted by law, Employee shall not to make any defamatory or disparaging remarks, comments or statements concerning the Company, its Affiliates, or their respective officers, directors, employees, products or services. Nothing in this Agreement prohibits Employee from providing truthful testimony or information pursuant to a subpoena, court order or other legal process.

7. _Use of IT Systems_. Employee acknowledges and agrees that all contents of the Company's information technology resources and communications systems (collectively, "IT Systems") are the property of the Company. Employee shall not transmit any Confidential Information stored in the Company's IT Systems to or via any unsecure source, including Employee's personal e-mail accounts or electronic storage devices. Employee has no expectation of privacy whatsoever in any e-mail, file, data, document, facsimile, telephone conversation, public social media post, conversation or message, or any other kind or form of information or communication transmitted to, received or printed from, or stored or recorded on the Company's IT Systems. Employee acknowledges and agrees that the Company has the right to monitor, intercept and review, without further notice, Employee's activities using the Company's IT Systems.

8. _Cooperation_. During Employee's employment with the Company and thereafter, Employee agrees to cooperate with all reasonable requests by the Company for assistance in connection with any internal or external investigations or legal proceedings involving the Company Group, including by providing truthful testimony in person in any such legal proceedings without having to be subpoenaed.

9. _Enforcement_. Employee acknowledges and agrees that a breach of any of _Sections 2 through 6_ of this Agreement would cause irreparable damage to the Company Group, the exact amount of which would be difficult to determine, and that the remedies at law for any such breach would be inadequate. Accordingly, Employee agrees that, in addition to any other remedy that may be available at law, in equity, or hereunder, the Company Group shall be entitled to specific performance and injunctive relief and other equitable relief, without posting bond or other security, to enforce or prevent any breach of any _Sections 2 through 6_ of this Agreement. The existence of any claim or cause of action that Employee may have against the Company Group shall not constitute a defense to the enforcement by the Company Group of the restrictive covenants contained in this Agreement. In any action for injunctive relief, the prevailing party will be entitled to collect reasonable attorneys' fees and other reasonable costs from the non-prevailing party.

10. _Tolling_. In the event the enforceability of any of the restrictive covenants in this Agreement is challenged in a claim or counterclaim in court during the time period set forth in this Agreement for such restrictive covenant, and Employee is not immediately enjoined from breaching such restrictive covenant, then if a court of competent jurisdiction later finds that the challenged restrictive covenant is enforceable, the time period set forth in the challenged restrictive covenant shall be deemed tolled upon the filing of the claim or counterclaim in court seeking or challenging the enforceability of such covenant until the dispute is finally resolved and all periods of appeal have expired; _provided_, _however_, that to the extent Employee complies with such restrictive covenant during such challenge, the time period set forth in the challenged restrictive covenant shall not be deemed tolled.

11. _No Claims; No Conflicts_. Employee agrees that Employee does not and will not assert any rights to any Confidential Information or Work Product (or any Intellectual Property Rights therein), as having been made or acquired by Employee before Employee's employment with the Company, or since the commencement of Employee's employment with the Company, and expressly agrees that any such rights or potential rights are subject to and governed by this Agreement. Employee represents and warrants that Employee's performance of all the terms of this Agreement, and the performance of Employee's duties as an

5

employee of the Company, do not and will not breach any agreement between Employee and any other Person, including any prior employer.

12. _Notification to Subsequent Employer_. Employee agrees to notify any subsequent employer of the existence and terms of this Agreement. In addition, Employee authorizes the Company to provide a copy of this Agreement to third parties, including but not limited to Employee's subsequent, anticipated, or possible future employers.

13. _Notices_. All notices and other communications among the parties shall be in writing and shall be deemed to have been duly given (a) when delivered in person, (b) when delivered after posting in the United States mail having been sent registered or certified mail return receipt requested, postage prepaid, (c) when delivered by a nationally recognized overnight delivery service, or (d) when delivered by facsimile or e-mail (in each case in this clause (d), solely if receipt is confirmed), addressed as follows:

To the Company:              ERMI, Inc.
                            411 Armour Place
                            Atlanta, Georgia 30324
                            Attn: Administrator for the Chief Executive Officer
                            Facsimile: (770) 674-6365
                            Email: t.base@getmotion.com

To Employee:              To Employee at Employee's most recent address as
                            reflected in the Company's personnel records

or to such other address or addresses as the parties may from time to time designate in writing in a notice delivered in accordance with this Section 13.

14. _Assignment_. Employee may not assign or delegate this Agreement or any of his or her rights or obligations hereunder without the prior written consent of the Company. Any purported assignment by Employee in violation of this provision shall be null and void from the time of such purported assignment. The Company may assign this Agreement or any or all of its rights and interests hereunder to one or more of its Affiliates or to any successor to all or substantially all of the business and/or assets of the Company. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

15. _Severability_. Should any provision of this Agreement be declared or determined by any court of competent jurisdiction to be unenforceable or invalid for any reason, the validity of the remaining parts, terms or provisions of this Agreement shall not be affected thereby and the invalid or unenforceable part, term or provision shall be deemed not to be a part of this Agreement.

16. _Entire Agreement_. This Agreement constitutes a single integrated contract expressing the entire agreement of the parties with respect to the subject matter of this Agreement, and supersedes and replaces any and all other agreements and understandings, both written and oral, between the parties with respect to the same subject matter.

17. _Waiver; Modification_. No provision of this Agreement may be modified or waived except in writing signed by Employee and a duly authorized representative of the Company, which must specifically reference this Agreement and the provision that the parties intend to waive or modify. Notwithstanding the foregoing, if it is determined by a court of competent jurisdiction that any restrictive covenant set forth in this Agreement is excessive in duration or scope or is otherwise unenforceable as drafted, it is the intent of the parties that such restriction be modified by the court to render it enforceable to the maximum extent permitted by law.

6

'Should you have any questions, feel free to contact me at (404) 389-0759. We look forward to having you as part of the team!

Sincerely,

Jamie Williams
Director - Human Resources

Enclosure: Confidentiality, Non-Competition and Intellectual Property Agreement

cc:      Natalie Moretz- District Sales Manager

**ACCEPTED AND AGREED:**

John Roffino

DATE: 1/30/2017

8

# Exhibit B to

# Declaration of John Roffino

‹ View Docket (/docket/FTC-2023-0007)

Share ▾

 **PUBLIC SUBMISSION**

# Comment from Roffino, John

Posted by the **Federal Trade Commission** on Mar 4, 2023

**Document Details (/document/FTC-2023-0007-7563)**

Docket (FTC-2023-0007) (/docket/FTC-2023-0007)  / Document

Comment

I served my country in Afghanistan for over 2 years of my life, devoting my life to the service of others. The sacrifices for my country and the experiences of that war shape the work effort and devotion I have for my craft, which is and always will be to help others. I work in the medical equipment industry where I serve veterans and injured Americans with their recovery from injuries and ailments. At the time of my hire I signed a non-compete because, well, I needed the job. Due to my devotion to helping others I have gained the trust of my providers and customers who also follow the same desires and goals in their career. I understand that my job is sufficient enough to make a good life for my family, but there are better options for my patients and providers. Because of my non-compete I have to fight and attempt to keep my providers from using a better alternative treatment option. The concept of forcing someone to fight for your inferior product at the possible expense of patient care, all because your employee is forced by law to "serve" you feels extremely un-American and unconstitutional.

Please, understand that the simple concept of capitalism and what America was founded upon is to encourage the development and advancement of technology and science by the heart and devotion of its citizens.

As it stands now, I am legally forced to work for my company out of fear of a mega million dollar company ruining my life and my families livelihood. Patients will continue to face the possibility that their outcomes could be diminished and ineffective. Pretty sure that's not what I fought for.

Please ban non compete agreements for the sake of American progress.

Give Feedback



**Document ID**

FTC-2023-0007-7563

**Tracking Number**

ldk-tbc0-c884

| Document Details | Submitter Info |
|---|---|

**Received Date**

Jan 31, 2023



About        Bulk Data Download        Agencies        Learn            Reports      FAQ

(/about)        (/bulkdownload)        (/agencies)    (/learn)    (/dotreports)    (/faq)

Privacy & Security Notice (/privacy-notice)    |    User Notice (/user-notice)    |

Accessibility Statement (/accessibility)    |    API Requests (https://open.gsa.gov/api/regulationsgov/)    |

FOIA (https://www.gsa.gov/reference/freedom-of-information-act-foia)

Give Feedback

Support (/support)

# Exhibit C

Pursuant to 28 U.S.C. § 1746, I, Daniella Emmer, hereby declare as follows:

1.    I am over 21 years old and reside in Philadelphia, PA. I have personal knowledge of the facts set forth herein and am competent to testify about them if called as a witness.

2.    I am offering this declaration in support of my Motion For Permissive Intervention Or, In The Alternative, Conditional Motion For Intervention As Of Right in Case No. 24-10951.

3.    I am a pre-licensed therapist practicing in Philadelphia. I have a Master's Degree in Community & Trauma Counseling and certification as a Certified Trauma Professional (CTP).

4.    I currently work for a group therapy practice. As a condition of my hiring, I was required to sign both a non-solicitation agreement and a non-compete agreement. I did not want to sign either agreement, but because my employer had already refused to negotiate other terms of my employment, I believed that trying to negotiate the non-compete would not only be unsuccessful but would risk my job offer. Because I could not afford to lose out on the job at the time I was hired, I had no choice but to accept the non-compete agreement.

5.    If I leave my current employer for any reason, the non-compete agreement would prohibit me from serving as a therapist for any patient I started treating while at my current employer. This prohibition applies even if I do not

directly contact or otherwise solicit the patient. Thus, even if a patient proactively seeks out my services at my new employer, the non-compete agreement would require me to turn down that patient. The non-compete agreement applies for two years after the termination of my employment, and it applies no matter why my employment is terminated. The non-compete agreement has no geographical restriction, so even if I moved to a different city or state and an old client located me there, I still could not provide clinical services to that patient.

6.    The non-compete agreement states that I would be required to pay thousands of dollars in liquidated damages to my current employer for each individual patient I serviced in violation of the non-compete agreement, within five days of my employer's demand.

7.    My employment contract also required me to agree that the non-compete agreement is reasonable and fully enforceable against me.

8.    The only exception to the non-compete agreement is if my continuing treatment of a patient is clinically necessary, but the contract gives my employer total discretion to decide whether treatment is clinically necessary. I do not believe my employer would agree that treatment is clinically necessary except in extreme circumstances that would not apply to the vast majority of my patients.

9.    Since I started working for my current employer, I have had job opportunities that I wanted to pursue, and would have pursued, but for the non-

compete agreement. If the non-compete agreement had not been enforceable, I would have already left my current employer and started working for a different employer where I would have made more money.

10.     I would like to leave my current employer, but I do not have the freedom to do so because of the non-compete agreement. If I did not have a non-compete agreement, or if it was not enforceable, I would be actively seeking a different job. Based on my knowledge of the job market and the jobs that would be available to me, I am confident that I would be able to find one that pays me more money than my current job. Instead, because I cannot afford to turn down clients who sought me out at a new employer, and because doing so would be clinically detrimental to my patients in many circumstances, I am unable to leave my current employer despite my desire to do so.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 10, 2025 at Philadelphia, PA.

_Daniella Emmer_
_____
Daniella Emmer